Jeffrey D. BILLIS, Appellant
(Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

Vicki MOON, Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

Wilfred J. VIGIL a/k/a Two Dogs,
Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

Scott P. McIVER, Appellant
(Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

Nellie MAGARAHAN, Appellant
(Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

STATE of Wyoming, Plaintiff,

v.

Victoria LOWRY, Defendant.

Nos. 88–311, 89–4, 88–312, 88–250,
88–304 and 88–310.

Supreme Court of Wyoming.

Oct. 5, 1990.

Rehearing Denied Nov. 9, 1990.

Public Defender Program: Mike Cornia, Appellate Counsel, Cheyenne, for appellants in Case Nos. 88–250, 88–304, 88–310, 88–311, 89–4 and for defendant in No. 88–312.

Joseph B. Meyer, Atty. Gen., John W. Renneisen, Deputy Atty. Gen., Karen A. Byrne, Paul S. Rehurek, Sr. Asst. Attys. Gen., Cheyenne, and Campbell County Prosecutor's Office: John D. Young, County and Pros. Atty., Russell A. Hansen, Chief Deputy, Civ. Div., and Doug Lesley, Deputy County Atty., Gillette, for appellee State of Wyo.

Before URBIGKIT, C.J., and THOMAS, CARDINE, MACY and GOLDEN, JJ.

GOLDEN, Justice.

In these consolidated cases we must answer several constitutional questions concerning W.S. 7–13–301 (June 1987 Repl.) (hereinafter "new 301"). "New 301" is a probation statute that applies to a criminal defendant who has never before been convicted of a felony and is presently charged with, has pleaded guilty to, or has been found guilty of an offense within a certain group of felonies and misdemeanors. Under the statute, if both the defendant and the state consent, the court may defer further prosecution proceedings and place the defendant on probation without entry of a judgment of guilt or conviction.

The three main issues presented by these cases concern whether the state's consent requirement of "new 301" violates the principle of separation of powers explicitly stated in Wyo. Const. art. 2, § 1; whether the bill that enacted "new 301" was so altered or amended on its passage as to change the bill's original purpose in violation of Wyo. Const. art. 3, § 20; and whether the bill that enacted "new 301" contained more than one subject in violation of Wyo. Const. art. 3, § 24. In several of these consolidated cases there are additional issues that we will address after resolving these three primary issues.

We hold that "new 301" is constitutional. With this holding, and with our resolution of the additional issues presented in some of the cases, we reverse *State v. Lowry* (No. 88–312) and affirm *Billis v. State* (No. 88–250), *Moon v. State* (No. 88–304), *Vigil v. State* (No. 88–310), *McIver v. State* (No. 88–311), and *Magarahan v. State*, (No. 89–4).

### FACTS AND ISSUES IN THE CONSOLIDATED CASES

#### *State v. Lowry (No. 88–312)*

*Facts:*

Victoria Lowry was arrested and charged with two misdemeanors, speeding, in violation of W.S. 31–5–301(b)(ii) (1977), and driving while under the influence, in violation of W.S. 31–5–233 (Cum.Supp. 1987). In the evening of April 14, 1988, after meeting her brother at a lounge and drinking several beers, Ms. Lowry was driving home when she was stopped by police for speeding. The police officer noticed that her speech was slurred, her eyes bloodshot, and her balance unsteady. Because he smelled a strong odor of alcoholic beverage on her breath, he conducted a field sobriety test. Ms. Lowry was then placed under arrest. She consented to a breathalyzer test at the police station; the test showed a .185 blood alcohol level.

Under a plea bargain with the prosecutor, Ms. Lowry pleaded guilty to the charge of driving while under the influence in exchange for the state's dismissal of the speeding charge. On being informed of the plea bargain, the county court judge asked whether the prosecutor would consent to Ms. Lowry's being placed on probation without entry of judgment of conviction under "new 301." The prosecutor would not consent. The county court judge deferred findings of a factual basis for the plea of guilty and ordered a presentence investigation report.

The presentence investigation report revealed that Ms. Lowry had never before been charged with any criminal offense, had overcome much adversity in her life, was well-educated, had maintained steady employment, normally drank alcoholic beverages only socially, and customarily did not drink to excess. The probation officer making the report recommended probation without entry of judgment of conviction under "new 301." Although stating that he had considered Ms. Lowry's good character and lack of any criminal record, the prosecutor refused to give the state's consent to probation under "new 301" because Ms. Lowry's blood alcohol level of .185 was too high.

After noting the favorable information contained in the presentence investigation report and the recommendation of leniency, the county court judge concluded that "the state's entry into sentencing prerogatives is an unconstitutional invasion of the judicial function by that executive branch * * *." The county court judge held that the state's consent requirement contained in "new 301" was unconstitutional. Obtaining Ms. Lowry's consent, as required under "new 301", the county court judge ordered that her plea of guilty be deferred, she be placed on supervised probation for one year, she be evaluated by Powder River Council and comply with its recommendations, she not use drugs or alcohol, and she reimburse the government for attorney's fees in the amount of $200. The county court judge informed Ms. Lowry that if she violated her probation, he would immediately accept her plea of guilty.

Following the county court's action, the state applied to this court for permission to

file a bill of exceptions [1] on the issue whether "new 301" constitutes an unconstitutional invasion of a judicial function. We granted the state's application, ordered that the state file the bill, and ordered there should also be a ruling whether "new 301" had been constitutionally enacted. Later, this court received appeals from criminal defendants in *Billis, Vigil, McIver, Moon and Magarahan* presenting identical issues; the six cases were consolidated on appeal.

*Issues:*

For clarity we have rephrased Ms. Lowry's issues as follows:

1. Whether W.S. 7–13–301 (June 1987 Repl.), requiring the state's consent to the court's deferring further proceedings and placing a defendant on probation without entry of a judgment of conviction, infringes on the judicial department's sentencing power in violation of the principle of separation of powers explicitly stated in Wyo. Const. art. 2, § 1.

2. Whether 1987 Wyo.Sess.Laws, ch. 157, § 3, enacting W.S. 7–13–301 (June 1987 Repl.), was enacted in violation of Wyo. Const. art. 3, § 20, which proscribes altering or amending a bill during its passage through the legislature so as to change the bill's original purpose.

3. Whether 1987 Wyo.Sess.Laws, ch. 157, § 3, enacting W.S. 7–13–301 (June 1987 Repl.), was enacted in violation of Wyo. Const. art. 3, § 24, which mandates the passage of a bill containing only one subject which must be clearly expressed in the bill's title.

4. Whether W.S. 7–6–106(d) (June 1987 Repl.), under which the county court ordered Ms. Lowry to reimburse the state for attorney's fees, is constitutional.

### Vigil v. State (No. 88–310)

*Facts:*

On January 22, 1988, in Cheyenne, Wyoming, Mr. Vigil sold one-fourth ounce of cocaine to a confidential police informant. He was charged with violating W.S. 35–7–1031(a)(i) and 35–7–1016(b)(iv) (1977). In a plea bargain Mr. Vigil agreed to plead guilty to the felony in exchange for the state's not opposing probation after sentencing provided the presentence investigation report revealed no prior felony convictions. The state would not consent to "new 301" probation.[2] The presentence investigation report revealed that Mr. Vigil admitted to prior drug sales that he described as not amounting to much. Mr. Vigil filed a motion for sentencing under "new 301," in which he requested probation without entry of judgment of conviction in spite of the state's refusal to consent and, alternatively, the district court's certification of the state's consent requirement issue to this court. The prosecutor told the

---

**1.** W.S. 7–12–102 through 7–12–104 (June 1987 Repl.):

The district attorney may take exceptions to any opinion or decision of the court made during the prosecution of a criminal case. Before being filed in the supreme court, the bill of exceptions shall be presented to the trial court which shall certify whether the contents of the bill are correct. If certified, the trial court shall sign the bill containing the exceptions and affix the seal of the court and the bill shall be made part of the record. The bill of exceptions shall be governed by rules as shall be promulgated by the Wyoming supreme court.

Following certification of a bill of exceptions by the trial court as provided by W.S. 7–12–102, the attorney general may apply to the supreme court for permission to file the bill for review and decision upon the points presented. If the supreme court allows the bill to be filed, the judge who presided at the trial in which the bill was taken shall appoint a competent attorney to argue the case against the state and shall fix a reasonable fee for his service to be paid out of the treasury of the county in which the bill was taken.

(a) If the bill of exceptions is allowed to be filed, the supreme court shall render a decision on each point presented.

(b) The decision of the supreme court shall determine the law to govern in any similar case which may be pending at the time the decision is rendered, or which may afterwards arise in the state, but shall not reverse nor in any manner affect the judgment of the court in the case in which the bill of exceptions was taken.

**2.** W.S. 35–7–1037 (June 1988 Repl.) also provides a procedure for probation and discharge of first-time drug offenders. That statute is not, however, involved in any of these cases on appeal.

district court that the state refused to consent to "new 301" treatment for Mr. Vigil because his was a drug case and he had sold drugs before. The district court found that the state's position was rational, denied Mr. Vigil's motion, and sentenced him for a term of not less than two nor more than five years, suspended in favor of five years probation. The court also ordered Mr. Vigil to reimburse the state for the fees and costs of his public defender. W.S. 7–6–106(d) (June 1987 Repl.).

*Issues:*

In addition to the four issues raised in *Lowry,* Mr. Vigil raises the following:

1. Whether the prosecutor's refusal to consent to first offender treatment for Mr. Vigil violated his rights to due process, and

2. Whether the prosecutor's refusal to consent to sentencing under § 7–13–301 was arbitrary and an abuse of discretion and therefore violated Article 1, Sections 2 and 7, of the Wyoming Constitution.

### State v. McIver (No. 88–311)

*Facts:*

On July 1, 1988, Mr. McIver and two companions discussed stealing money from soft-drink trucks and later spotted two such trucks. One of Mr. McIver's companions stole $45 from one of the trucks and $1,500 from the other. They were caught and arrested. The state charged Mr. McIver with one count of conspiracy to commit burglary in violation of W.S. 6–1–303 (June 1988 Repl.). At his arraignment on this felony charge, he pleaded guilty. Before sentencing, he filed a motion for sentencing under "new 301," in which he requested probation without entry of judgment of conviction or, alternatively, that the district court certify the state's consent requirement issue to this court. At sentencing, the prosecutor told the district court that the state refused to consent to "new 301" treatment for Mr. McIver because of the premeditated nature of the crime and indications Mr. McIver and his companions had also planned stealing from trucks in Nebraska. The district court found the

state's position was rational and denied Mr. McIver's motion. The district court sentenced Mr. McIver to a term of not less than eighteen months nor more than thirty-six months, suspended in favor of probation for three years. The district court also ordered Mr. McIver to reimburse the state for defense fees and costs. W.S. 7–6–106(d) (June 1987 Repl.).

*Issues:*

Mr. McIver raises the same issues raised by Ms. Lowry.

### Moon v. State (No. 88–304)

*Facts:*

On September 24, 1987, Ms. Moon sold one-eighth ounce of cocaine to an informant working with the Casper Police Department. The state charged her with one count of conspiracy to deliver cocaine in violation of W.S. 35–7–1016(b)(iv), 35–7–1031(a)(i), and 35–7–1042 (Cum.Supp.1987). At her arraignment she pleaded not guilty. Later, the state and Ms. Moon struck a plea bargain under which she agreed to plead guilty to the felony and the state agreed to recommend she be placed on probation after sentence was imposed and she receive neither a fine nor jail time. At sentencing, Ms. Moon requested treatment under "new 301"; the state refused to consent. Although Ms. Moon stated her belief that the state's consent requirement of "new 301" was unconstitutional because it interfered with the court's sentencing authority, she did not request the court's ruling on that issue. Instead, she simply asked the court to disregard the state's refusal to consent and place her on probation under "new 301." The district court made no ruling on the issue, concluding that it had no authority to grant probation under "new 301" without the state's consent. She was sentenced to serve a two-year term of probation.

*Issues:*

Ms. Moon raises issues concerning separation of powers, original purpose, one subject, and the prosecutor's arbitrariness in refusing to consent.

*State v. Magarahan (No. 89–4)*

*Facts:*

On March 31, 1988, Ms. Magarahan took, without permission, her roommate's federal income tax refund check for $290.58, endorsed her roommate's name on it, and cashed it. The state charged her with one count of forgery in violation of W.S. 6–3–602(a)(ii) and (b) (June 1988 Repl.). Under the terms of the plea bargain between the state and Ms. Magarahan, she agreed to plead guilty to the felony and the state agreed to recommend that she not be imprisoned or fined, but that she be placed on probation for eighteen months, pay restitution, and pay $50 to the crime victims' compensation account. W.S. 1–40–114 (June 1988 Repl.). The state did not consent to treatment under "new 301." At sentencing, Ms. Magarahan asked the district court to grant her probation under "new 301" in spite of the state's refusal to consent. She told the district court she believed the state's consent requirement is an unconstitutional infringement on the court's sentencing power; the district court did not rule on that issue and declined to use "new 301" without the state's consent. The district court sentenced her in accordance with the state's recommendation.

*Issues:*

Ms. Magarahan raises the same issues raised by Ms. Moon.

*State v. Billis (No. 88–250)*

*Facts:*

On December 1 and again on December 10, 1987, Mr. Billis, age 33, sold one-eighth ounce amounts of cocaine to an undercover law enforcement agent in Cheyenne, Wyoming. The state charged him with two counts of delivery of cocaine in violation of W.S. 35–7–1031(a)(ii) and 35–7–1016(b)(iv) (Cum.Supp.1987). Under a plea bargain with the state, Mr. Billis pleaded guilty to one count of delivery in exchange for dismissal of the other count. At sentencing, Mr. Billis asked the district court to place him on probation without entry of judgment of conviction under "new 301." The state refused to consent to this treatment because of Mr. Billis' age and the experienced manner in which he delivered the cocaine. Because of the plea bargain the state had dismissed one count of delivery. Although Mr. Billis stated his belief that the state's consent requirement of "new 301" was unconstitutional, the district court judge stated that without that consent he was not authorized to consider "new 301" treatment. The district court sentenced Mr. Billis to a term of not less than three nor more than five years, suspended in favor of three years' probation.

*Issues:*

Mr. Billis raises the same issues raised by Ms. Moon and Ms. Magarahan.

## PRELIMINARY MATTER

 In all of these consolidated cases except *Lowry*, the state maintains that since the defendants did not adequately raise their appellate issues at the district court level, they cannot raise those issues here for the first time. *Jahnke v. State*, 692 P.2d 911, 927–28 (Wyo.1984); *Hopkinson v. State*, 664 P.2d 43, 50 (Wyo.1983), *cert. denied*, 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246. Moreover, the state asserts these defendants have no standing to raise these issues because they cannot demonstrate any adverse impact on their rights resulting from the allegedly unconstitutional portion of "new 301" requiring the state's consent. *LaCombe v. City of Cheyenne*, 733 P.2d 601, 603 (Wyo.1987); *Gooden v. State*, 711 P.2d 405, 408–09 (Wyo. 1985).

The state concedes, however, that the county court judge's ruling in *Lowry*, and the state's bill of exceptions thereto, legitimately place the issue of "new 301's" constitutionality before this court. We agree. Because *Lowry* presents these constitutional issues concerning "new 301," we concluded that the defendants in the consolidated cases should gain the benefit of a decision in *Lowry* favorable to the criminal defendant in that case. Accordingly, we need not discuss the questions of inade-

quate presentation of issues below and standing raised by the state.[3]

## ANALYSIS

## I.

## PRESENT STATUTES

"New 301" provides as follows:

§ 7–13–301. Placing person found guilty, but not convicted, on probation.

(a) If a person who has not previously been convicted of any felony is charged with or is found guilty of or pleads guilty to any misdemeanor except any second or subsequent violation of W.S. 31–5–233, or any similar provision of law, or any felony except murder, sexual assault in the first or second degree or arson in the first or second degree, the court may, with the consent of the defendant and the state and without entering a judgment of guilt or conviction, defer further proceedings and place the person on probation for a term not to exceed five (5) years upon terms and conditions set by the court. The terms of probation shall include that he:

(i) Report to the court not less than twice in each year at times and places fixed in the order;

(ii) Conduct himself in a law-abiding manner;

(iii) Not leave the state without the consent of the court; and

(iv) Conform his conduct to any other terms of probation the court finds proper.

(b) If the court finds the person has fulfilled the terms of probation and that his rehabilitation has been attained to the satisfaction of the court, the court may at the end of five (5) years, or at any time after the expiration of one (1) year from the date of the original probation, discharge the person and dismiss the proceedings against him.

(c) If the defendant violates a term or condition of probation at any time before final discharge, the court may:

(i) Enter an adjudication of guilt and conviction and proceed to impose sentence upon the defendant if he previously pled guilty to or was found guilty of the original charge for which probation was granted under this section; or

(ii) Order that the trial of the original charge proceed if the defendant has not previously pled or been found guilty.

(d) Discharge and dismissal under this section shall be without adjudication of guilt and is not a conviction for any purpose.

(e) There shall be only one (1) discharge and dismissal under this section or under any similar section of the probationary statutes of any other jurisdiction.

We must also take note of W.S. 7–13–302 (June 1987 Repl.), which provides:

§ 7–13–302. Placing person convicted on probation; suspension of imposition or execution of sentence; imposition of fine.

(a) After conviction or plea of guilty for any offense, except crimes punishable by death or life imprisonment, and following entry of the judgment of conviction, the court may:

(i) Suspend the imposition or execution of sentence and place the defendant on probation; or

(ii) Impose a fine applicable to the offense and place the defendant on probation.

## II.

## PREDECESSORS OF "NEW 301"

Before we address the constitutional issues relating to "new 301," we find it helpful to identify and describe the origins of that statute. Before "new 301" was enact-

---

**3.** We note in passing that in *White v. Fisher,* 689 P.2d 102, 105 (Wyo.1984), in which the parties had not raised the constitutionality of W.S. 1–1–114 (1977), relating to the legislatively imposed requirement that the prayer for damages in a personal injury or wrongful death action shall not state any dollar amount or demand a sum as judgment, this court was compelled to consider the statute's constitutionality because of its apparent infringement upon the doctrine of separation of powers.

ed by the Forty–Ninth Legislature in 1987 as part of a substantial revision of Title 7 of the Wyoming Statutes (1987 Wyo.Sess. Laws ch. 157, § 3), two statutory provisions occupied the field. Originally enacted in 1909, W.S. 7-13-203 (1977) (1909 Wyo. Sess.Laws ch. 87, § 1) (hereinafter "old 203") provided probation to first-time felons who had not committed murder, sexual assault, or arson.[4] The legislature provided for probation by having the trial court delay passing sentence and place the defendant on "parole." In *Sorenson v. State*, 604 P.2d 1031, 1038 (Wyo.1979), this court noted that "parole" was a misnomer and the correct status was "probation."

In 1939, the legislature enacted W.S. 7-13-301 (1939 *Wyo.Sess.Laws*, ch. 91, § 1) (hereinafter "old 301"). *King v. State*, 720 P.2d 465, 468 (Wyo.1986). "Old 301" provided another scheme of probation.[5] The statute applied to any criminal defendant, not just first-time felons as "old 203" did, who had committed any crime, whether misdemeanor or felony, except a crime punishable by life imprisonment or death. In *Peterson v. State*, 586 P.2d 144, 156 (Wyo. 1978), *overruled on other grounds* in *Crozier v. State*, 723 P.2d 42, 56 (Wyo.1986), this court held that the phrase "crimes punishable by life imprisonment or death" did not embrace offenses which had a sentence of less than life imprisonment as a minimum and a maximum of either life imprisonment or death.

Under "old 301" the legislature established four methods by which the trial court could implement the probation established by the legislature. First, with the defendant's consent, the legislature authorized the court to suspend trial and place the defendant on probation. We believe the defendant's consent feature was designed to avoid the later assertion of a

4. § 7-13-203. Parole before sentence; generally; terms and conditions; discharge; revocation of parole and imposition of sentence.

If any person is found guilty of or pleads guilty to any felony except murder, sexual assault in the first or second degree or arson of a dwelling house or other human habitation in the actual occupancy of a human being, the court shall ascertain whether the offense of which the accused is guilty is his first offense, the extent of moral turpitude involved in the act committed, and other facts and circumstances relating to the accused as he may desire to know. If the court is satisfied that he was a person of good reputation before the commission of the offense charged and had never before been convicted of any felony, and that if permitted to go at large would not again violate the law, the court may in its discretion, by an order entered of record, delay passing *sentence and then pa*role the person and permit him to go at large upon his own recognizance, conditioned that he will personally appear and report to the court twice in each year at times and places fixed in the order and that he will demean himself while at large in a law-abiding manner and live a worthy, respectable life, and that he will not leave the state without the consent of the court. The court, if satisfied at the time of appearance, that the person has demeaned himself in a law-abiding manner and lived a worthy, respectable life, may by an order of record, continue parole for the period of five (5) years, at the expiration of which the court shall enter an order finally discharging *the person, and no further pro*ceedings shall be had upon such verdict or plea. At any time after the expiration of one (1) year from the date of the original parole the court shall have the power in its discretion to terminate parole and finally discharge the person and annul the verdict or plea of guilty. At any time before the final discharge of the person that the court believes that the paroled person has attempted to leave the state or failed to comply with the terms of his parole the court shall cause a warrant to issue for the apprehension and arrest of the person and require him to be brought before the court. The court shall inquire into his conduct since his parole, and if satisfied from the inquiry that the person has violated the terms *of his parole and recognizance, the court* may impose sentence upon the verdict or plea against him in the manner and to the same extent as though the passing of sentence had not been delayed and the person had not been paroled or permitted to go at large.

5. § 7-13-301. Suspension of imposition or execution of sentence; placing defendant on probation; fine and probation; suspension of trial and placing defendant on probation.

After conviction or plea of guilty for any offense, except crimes punishable by death or life imprisonment, the court may suspend the imposition of sentence, or may suspend the execution of all or a part of a sentence and may also place the defendant on probation or may impose a fine applicable to the offense and also place the defendant on probation. With the consent of a defendant charged with a crime, except a crime punishable by death or life imprisonment, the court may suspend trial and place such defendant on probation.

speedy trial violation by a defendant whose probation was terminated for misconduct and who then faced resumption of the criminal proceedings against him. The three other methods for probation followed a plea of guilty or being found guilty following a trial. Thus, the legislature authorized the court to suspend the imposition of sentence and place the defendant on probation. In *King*, 720 P.2d at 468, 469, this court likened "suspension of imposition of sentence" to "delay passing sentence," as found in "old 203." In yet another method under "old 301" the court was authorized to suspend the execution of all or a part of a sentence and place the defendant on probation. In *Sorenson*, 604 P.2d at 1037, this court held that the legislature's 1971 act creating the board of parole repealed by implication the court's authority to require a defendant to serve part of a sentence, suspend execution, and place the defendant on probation as to the balance. W.S. 7–13–402 (1977) (1971 Wyo.Sess.Laws, ch. 92, § 10). *See also King*, 720 P.2d at 467; *Williams v. State*, 692 P.2d 233, 235–36 (Wyo.1984). A final method under "old 301" authorized the court to impose a fine applicable to the offense and place the defendant on probation.

In *Sorenson*, 604 P.2d at 1038 n. 6, this court suggested that "old 203" probably had been superseded by "old 301," but the suggestion was retracted in *King*, 720 P.2d at 467, 469. In *Peterson*, 586 P.2d at 156, this court considered the differences between "old 203" and "old 301." Later, in *King*, 720 P.2d at 468, Justice Cardine, writing for the court, drew on *Peterson* and made further comparisons of the two statutes. He concluded that the legislature intended "old 203" to be an alternative sentencing provision for a limited number of cases. He found that "old 203" allowed the first-time felon a considerable degree of liberty, his or her actions and freedom being subject to rather minimal limitations with the possibility of no sentence at all. *Id.* at 468. *Peterson*, 586 P.2d at 156. In "old 203" the legislature intended to preclude first-time felons who had committed the serious crimes of murder, sexual assault, or arson from the benefit of the possibility of no sentence at all. *Id.* In contrast, "old 301" was "much more restrictive [than "old 203"] since it [did] not itself specify the conditions of any probationary freedom." *Id.* In "old 301" the legislature intended "that those criminal defendants excluded from the benefits of ["old 203"] could be in some cases beneficially rehabilitated under the provisions of ["old 301"] with one exception—those guilty of 'crimes and offenses punishable by death or life imprisonment.' " *Id.*

On a final point of comparison, Justice Cardine noted that under "old 203" when the defendant successfully completed probation the legislature authorized the court to annul the verdict or plea of guilty. *Id.* In contrast, he observed, under "old 301" when the defendant successfully completed probation the legislature authorized the court, under then W.S. 7–13–304 ("old 304"), to discharge the defendant, but no mention was made of annulling the verdict or plea of guilty. *Id.*

## III.

### "NEW 301" AND "NEW 302"

By keeping the chief features of "old 203" and "old 301" in mind and by comparing them with "new 301" and "new 302" as enacted in 1987 by the Forty–Ninth Legislature, we can identify how "old 203" was revised to become "new 301" and how "old 301" was revised to become "new 302."

*A. Revision of "Old 203" into "New 301"*

"Old 203" emerged as "new 301," as follows:

1. From "old 203" the legislature retained the requirement that the defendant be a person who had never before been convicted of a felony and used that feature in the first line of the first sentence of "new 301" to describe to whom "new 301" applied. Thus, the first line of "new 301" reads in relevant part, "[i]f a person who has not previously been convicted of any felony * * *."

2. Next, from "old 203" the legislature retained the requirement that a first offender be found guilty or have pleaded

guilty, but then added to that the feature from "old 301" relating to a defendant who had been only charged with a crime. Thus, the next part of "new 301's" opening line now read, "[i]f a person who has not previously been convicted of any felony *is charged with or is found guilty of or pleads guilty to.*" (Emphasis added.)

3. Next, the legislature retained the felony category of crimes, with slight modification, for which the defendant may receive probation. Thus, that portion of "old 203" that read "any felony except murder, sexual assault in the first or second degree or arson of a dwelling house or other human habitation in the actual occupancy of a human being" emerged in "new 301" as "any felony except murder, sexual assault in the first or second degree or arson in the first or second degree." As can be seen, the slight modification related to the arson offense.

At this point, the legislature took from "old 301" the feature relating to misdemeanors, with an exception not important to our purposes here, adding misdemeanors to the previously retained felony category in "new 301."

4. Next, the legislature deleted from "old 203" the following phrases that appeared in the first two sentences of "old 203":

a. The court shall ascertain whether the offense of which the accused is guilty is his first offense, the extent of moral turpitude involved in the act committed, and other facts and circumstances relating to the accused as he may desire to know.

b. If the court is satisfied that he was a person of good reputation before the commission of the offense charged and had never before been convicted of any felony, and that if permitted to go at large would not again violate the law.

5. Next, the legislature made the change in "old 203" that is at the heart of our controversy. That portion of "old 203" which read, "the court may in its discretion, by an order entered of record, delay passing sentence and then parole the person and permit him to go at large

upon his own recognizance * * *," was changed to read, "the court may, with the consent of the defendant and the state and without entering a judgment of guilt or conviction, defer further proceedings and place the person on probation * * *." In making this change the legislature borrowed from "old 301" the feature contained in its last sentence, "With the consent of a defendant charged with a crime * * * the court may suspend trial and place such defendant on probation." That borrowed feature explains where the requirement of the defendant's consent came from. It does not explain where the requirement of the state's consent came from. For that explanation, we must look elsewhere. The details of the source of the explanation are set out later in this opinion. Summarized here, the explanation is the state's consent requirement probably derives from the prosecutor's common law *nolle prosequi* power which in Wyoming was codified in old W.S. 7–198 (1957) and later recognized in W.R.Cr.P. 45(a).

As can be seen, the portion of "old 203" that read "delay passing sentence and then parole the person" was changed in "new 301" to read "without entering a judgment of guilt or conviction, defer further proceedings and place the person on probation * * *." The legislature's use of the term "judgment of guilt or conviction" shows its proper recognition of the bright line that divides the prosecution's power to prosecute from the court's power to adjudicate and to impose sentence. As W.R.Cr.P. 33(b) informs, "A judgment of conviction shall set forth the plea, the verdict or findings, and the adjudication and sentence. * * * The judgment shall be signed by the judge and entered by the clerk." In *Vigil v. State*, 563 P.2d 1344, 1349 (Wyo.1977), this court made clear that

there is only one final judgment. The final judgment in a criminal case means sentence. The sentence is the judgment. *Berman v. United States*, 1937, 302 U.S. 211, 212, 58 S.Ct. 164, 165, 82 L.Ed. 204 (1937). This is con-

sistent with Rule 33(b), W.R.Cr.P. * * *. There is no judgment against the defendant until sentence is pronounced.

6. We need not dwell on other changes in "old 203" which emerged as "new 301" for purposes of this opinion. "Old 203's" feature of a maximum five-year probation period was retained. Also retained was "old 203's" requirement that the probationer report to the court twice yearly. "Old 203's" feature that the court shall enter an order discharging the defendant and annulling the verdict or plea of guilty was retained with slight modification in "new 301" which, instead of using "annulling," made it clear that such discharge and dismissal shall be without adjudication of guilt and is not a conviction for any purpose. By clarifying this last feature, the legislature again showed its recognition that this deferral-probation scheme was taking place in the prosecutorial phase, not the adjudicatory-sentence phase, of a criminal prosecution. Further, the legislature was recognizing that portion of W.R. Cr.P. 33(b) which provides, "If the defendant * * * for any other reason is entitled to be discharged, judgment shall be entered accordingly. The judgment shall be signed by the judge and entered by the clerk."

## B. Revision of "Old 301" into "New 302"

"Old 301" emerged as "new 302," as follows:

1. The legislature inserted the phrase "and following entry of the judgment of conviction" between the phrase "except crimes punishable by death or life imprisonment" and the phrase "the court may."

2. In two ways the legislature changed the phrase "the court may suspend the imposition of sentence, or may suspend the execution of all or a part of a sentence and may also place the defendant on probation or may impose a fine applicable to the offense and also place the defendant on probation." First, it deleted that portion relating to suspending the execution of "part of a sentence."

This was done in recognition of this court's decisions in *Sorenson, King,* and *Williams,* stating that the power to suspend execution of a part of a sentence and place the defendant on probation was given by the legislature to the board of parole in the 1971 act establishing that board. The legislature then simply fit the phrase back together with a few grammatical changes. Thus, the phrase that read "the court may suspend the imposition of sentence, or may suspend the execution of all or a part of a sentence and may also place the defendant on probation" became "the court may suspend the imposition or execution of sentence and place the defendant on probation." The legislature then retained the "may impose a fine applicable to the offense and place the defendant on probation" language.

3. Finally, the legislature deleted the last sentence of "old 301" that read "with the consent of a defendant charged with a crime, except a crime punishable by death or life imprisonment, the court may suspend trial and place such defendant on probation."

## IV.

## SEPARATION OF POWERS ANALYSIS

With respect to the separation of powers issue we will decide whether the "new 301" requirement, that the state consent to the court's deferral of further proceedings and placement of defendants on probation without entry of a judgment of conviction, infringes on the judicial department's sentencing power in violation of the principle of separation of powers explicitly stated in Wyo. Const. art. 2, § 1.

### A. Standard of review

In *White v. Fisher,* 689 P.2d 102, 105 (Wyo.1984), we reviewed the separation of powers issue using these principles:

We recognize the principle articulated in *Washakie County School District Number One v. Herschler,* Wyo., 606 P.2d 310 (1980), *cert. denied* 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28 (1980):

"Courts have a duty to uphold the constitutionality of statutes which the legislature has enacted if that is at all possible, and any doubt must be resolved in favor of constitutionality. *Witzenburger v. State*, Wyo.1978, 575 P.2d 1100, 1112; *Lund v. Schrader*, Wyo.1971, 492 P.2d 202, 206. Though the supreme court has the duty to give great deference to legislative pronouncements and to uphold constitutionality when possible, it is the court's equally imperative duty to declare a legislative enactment invalid if it transgresses the state constitution. *Witzenburger*, supra, 575 P.2d at 1114. In our consideration of this case, we have consistently kept these basic principles in mind to avoid a declaration of unconstitutionality—but doubt is not present."

We also are cognizant of our duty in any case in which the constitutionality of a statute is in issue:

"It is this court's obligation to make sense out of a statute and give full force and effect to the legislative product. *Yeik v. Department of Revenue and Taxation*, Wyo., 595 P.2d 965 (1979). In construing statutes the intention of the law-making body must be ascertained from the language of the statute as nearly as possible. *Wyoming State Treasurer v. City of Casper*, Wyo.1976, 551 P.2d 687 (1976). We must not give a statute a meaning that will nullify its operation if it is susceptible of another interpretation." *McGuire v. McGuire*, Wyo., 608 P.2d 1278, 1283 (1980).

*See also Hopkinson*, 664 P.2d at 54, which involved, *inter alia*, a separation of powers issue. These principles will guide our way here. Additionally,

[a]ll statutes are presumed to be enacted by the legislature with full knowledge of the existing state of law with reference thereto and statutes are therefore to be construed in harmony with the existing law, and as a part of an overall and uniform system of jurisprudence, and their meaning and effect is to be determined in connection, not only with the common law and the constitution, but also with reference to the decisions of the courts. *Civic Association of Wyo-*

*ming v. Railway Motor Fuels*, 1941, 57 Wyo. 213, 238, 116 P.2d 236, 245.

*Matter of Adoption of Voss*, 550 P.2d 481, 486 (Wyo.1976).

## B. Discussion

### 1. Air–Tight Compartments vs. Integrated Government

Under the Wyoming Constitution, the legislative power is vested in a senate and house of representatives. Wyo. Const. art. 3, § 1. The executive power is vested in a governor. Wyo. Const. art. 4, § 1. The judicial power is vested in a supreme court, district courts and such subordinate courts as the legislature may establish. Wyo. Const. art. 5, § 1. The Wyoming Constitution contains a definitive separation of powers provision:

**Powers of government divided into three departments.—**

The powers of government of this state are divided into three distinct departments: The legislative, executive and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any powers properly belonging to either of the others, except as in this constitution expressly directed or permitted.

Wyo. Const. art. 2, § 1.

The state's framers probably borrowed this provision from the constitutions of our neighboring states of Idaho and Montana. R. Prien, *The Background of the Wyoming Constitution* 56 (August 1956) (unpublished thesis); *see also* R. Keiter, *An Essay on Wyoming Constitutional Interpretation*, XXI Land & Water L.Rev. 527, 534 (1986). During the floor adoption of that provision at the 1889 constitutional convention, the framers discussed precious little about that provision. *Journals and Debates of the Constitutional Convention of the State of Wyoming*, 44, 210, 247, 315–16 (1893) (where Mr. F.H. Harvey said it was the form found in most of the western states). It is likely more was said in committee, but we will never know since

committee reports are not extant.[6] In determining the meaning of the separation of powers provision in the face of such meager evidence, "we must consider the probable intention of the framers of the constitution * * *. [T]he language is to be understood in the sense in which it was used at the time when it was adopted." *Witzenberger v. State ex rel. Wyoming Community Development Authority,* 575 P.2d 1100, 1111–12 (Wyo.1978).

In what sense, then, did our state's framers use the separation of powers language in 1889? Claiming that one department of government may not encroach upon functions belonging to another, these criminal defendants contend it is essential that we preserve each of the powers in separate, air-tight compartments. They refer us, however, to neither legal authority nor historical evidence that our state's framers had in mind principles of separation of powers any different from those recognized as implicit under the Federal Constitution.[7] Surveying our state constitution, we identify convincing evidence that our state's framers intended an integration of dispersed powers into a balanced, workable government.

Our state constitution, like the Federal Constitution, places the respective powers of the three departments of government into three articles. Wyo. Const. art. 3, § 1, concerning the legislative power, is similar to the U.S. Const. art. I, § 1. Wyo. Const. art. 4, § 1, concerning the executive power, is similar to the U.S. Const. art. II, § 1. Wyo. Const. art. 5, § 1, concerning the judicial power, is similar to U.S. Const. art. III, § 1. Under both the Federal Constitution and our state constitution, although the legislative bodies propose and enact laws, the executive bodies exercise veto power, which by its nature injects the executive department into the business of the legislative department.[8] Under both constitutions the judicial department has and exercises the power to adjudicate and declare legislative enactments unconstitutional, which by its nature injects the judicial department into the business of the legislative department. Under both constitutions, although the judicial department adjudicates and imposes legislatively determined sentences upon adjudicated criminal defendants, the executive department has and exercises a pardon power, which by its nature injects the executive department into the business of both the legislative and judicial departments.[9] Moreover, in Wyo-

6. Prien, *supra,* appendix A, at 38.

7. The doctrine of separation of powers embodied in the Federal Constitution is not mandatory on the states. *Dreyer v. People of the State of Illinois,* 187 U.S. 71, 84, 23 S.Ct. 28, 32, 47 L.Ed. 79, 85 (1902).

8. Wyo. Const. art. 4, § 8.
 **Approval or veto of legislation by governor; passage over veto.**—Every bill which has passed the legislature shall, before it becomes a law, be presented to the governor. If he approves, he shall sign it; but if not, he shall return it with his objections to the house in which it originated, which shall enter the objections at large upon the journal and proceed to reconsider it. If, after such reconsideration, two-thirds of the members elected agree to pass the bill, it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered, and if it be approved by two-thirds of the members elected, it shall become a law; but in all such cases the vote of both houses shall be determined by the yeas and nays, and the names of the members voting for and against the bill shall be entered upon the journal of each house respectively. If any bill is not returned by the

governor within three days (Sundays excepted) after its presentation to him, the same shall be law, unless the legislature by its adjournment, prevent its return, in which case it shall be a law, unless he shall file the same with his objections in the office of the secretary of state within fifteen days after such adjournment.
 *See* U.S. Const. art. I, § 7.

9. Wyo. Const. art. 4, § 5:
 **Pardoning power of governor.**—The governor shall have power to remit fines and forfeitures, to grant reprieves, commutations and pardons after conviction, for all offenses except treason and cases of impeachment; but the legislature may by law regulate the manner in which the remission of fines, pardons, commutations and reprieves may be applied for. Upon conviction for treason he shall have power to suspend the execution of sentence until the case is reported to the legislature at its next regular session, when the legislature shall either pardon, or commute the sentence, direct the execution of the sentence or grant further reprieve. He shall communicate to the legislature at each regular session each case of remission of fine, reprieve, com-

ming, the courts, as courts of general jurisdiction, "have traditionally elaborated the state's common law and participated in a partnership of sorts with the state legislature in shaping the state's law." Keiter, *supra,* p. 535. If the state legislature disagrees with the court's common law decisions, it can legislatively reverse them. *Id.*

From the foregoing discussion, we see that Wyoming's constitutional scheme of state government is, like the federal scheme of national government, replete with checks and balances. Considering the organizational structure, the placement of powers and the system of checks and balances, we are convinced that the state's framers had in mind a pragmatic, flexible view of differentiated governmental power. They intended that "practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity." *Youngstown Sheet & Tube Company v. Sawyer,* 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153, 1199, 26 A.L.R.2d 1378 (1952) (Jackson, J., concurring opinion). Separation of powers, then, merges into balanced government.[10] We adopt this view and reject the "air-tight compartment" view of these criminal defendants.

### 2. Powers of Each Department

With this view of workable, balanced government, we now review this court's past decisions that identify the division of the government's powers in the criminal law area among the three departments. With these past decisions this court has painted the landscape of those powers. On review, we keep in mind the contentions of these criminal defendants. They contend the judicial department has the power to decide whether to defer a criminal prosecu-

tion and place a defendant on probation during the time period those prosecution proceedings are being deferred. Next, they claim that the disposition of deferral and probation without the entry of a final judgment of conviction or guilt is a sentence, and also that this power to decide to defer emanates from the judicial power to impose a sentence. *MJP v. State,* 706 P.2d 1108, 1110 (Wyo.1985). They maintain that, as a result, the state's consent requirement placed by the legislature in "new 301" is a constitutionally impermissible encroachment on the judicial power by the executive department. We disagree with these contentions.

■ In its exercise of the legislative power, the legislative department has the exclusive power to determine and declare what acts shall constitute crimes and to prescribe punishments for those crimes. *Baum v. State,* 745 P.2d 877, 882 (Wyo. 1987); *Cook v. State,* 710 P.2d 824, 826 (Wyo.1985); *Williams,* 692 P.2d at 235; *Schuler v. State,* 668 P.2d 1333, 1342 (Wyo. 1983); *Evans v. State,* 655 P.2d 1214, 1223 (Wyo.1982).

■ In its exercise of the judicial power, the judicial department has the exclusive power to adjudicate, to pronounce a judgment and carry it into effect. W.R.Cr.P. 33; S.Doc. No. 16, 99th Cong., 1st Sess. 631 (1987) (*Constitution of the United States–Analysis and Interpretation* ). By entering a judgment whether of acquittal or of conviction or of discharge, the judicial department is performing a significant act of government. W.R.Cr.P. 33(b); *Vigil,* 563 P.2d at 1344. On the other hand, the judicial department has no power to initiate a criminal prosecution. That department's exercise of the prosecution power would be a constitutionally impermissible encroach-

---

mutation or pardon granted by him, stating the name of the convict, the crime for which he was convicted, the sentence and its date and the date of the remission, commutation, pardon or reprieve with his reasons for granting the same.

*See* U.S. Const. art. II, § 2.

**10.** The United States Supreme Court has consistently reaffirmed founder James Madison's flexi-

ble approach to separation of powers, saying, "Madison recognized that our constitutional system imposes upon the Branches a degree of overlapping responsibility, a duty of interdependence as well as independence * * *." *Mistretta v. United States,* 488 U.S. 361, 109 S.Ct. 647, 659, 102 L.Ed.2d 714 (1989); *see also Morrison v. Olson,* 487 U.S. 654, 108 S.Ct. 2597, 2620, 101 L.Ed.2d 569 (1988).

ment on the executive department's prosecution power. *Petition of Padget*, 678 P.2d 870, 873 (Wyo.1984).

The judicial department has no inherent power to refuse to try a criminal charge upon considerations extraneous to the legality of the charge, such as a belief that the particular act made criminal by law ought not to be treated as criminal. *Ex Parte United States*, 242 U.S. 27, 42, 37 S.Ct. 72, 74, 61 L.Ed. 129, 140–41 (1916), cited in *Evans v. State*, 655 P.2d 1214, 1224 (Wyo.1982).

■ Where the court finds no legal error on which to reverse a final judgment of conviction, the court has no inherent power to expunge that judgment for the purposes of restoring the defendant's civil rights or of alleviating the defendant's fear of being classified as a habitual criminal in the event he commits further offenses. Because expungement of a final judgment of conviction has the effect of a pardon and the pardoning power belongs exclusively to the executive department, the judicial department's exercise of an expungement power would be a constitutionally impermissible encroachment on the executive department's pardoning power. *Stanton v. State*, 686 P.2d 587, 589 (Wyo.1984). Similarly, the judicial department has no power to grant an annulment of a final judgment of conviction. *Ward v. State*, 735 P.2d 707, 708 (Wyo.1987).

The judicial department has no inherent power to refuse to impose a sentence fixed by statute or to refuse to execute such a sentence when imposed. *Ex Parte United States*, 242 U.S. at 41–42, 37 S.Ct. at 74, 61 L.Ed. at 140, cited with approval in *Evans*, 655 P.2d at 1224. The judicial department has no inherent power to suspend a sentence. That power belongs exclusively to the legislative department. *Evans*, 655 P.2d at 1224. In *Evans*, this court relied favorably on *State v. Mabry*, 96 N.M. 317, 320, 630 P.2d 269, 272 (1981), where the New Mexico Supreme Court said:

" * * * The vast majority of jurisdictions which have considered the question whether the courts have the inherent power to suspend sentences have answered in the negative. * * * A leading case is *Ex Parte United States*, 242 U.S. 27, 37 S.Ct. 72, 61 L.Ed. 129 (1916), in which the Supreme Court held that federal courts do not have the power, absent authorization by Congress, to indefinitely suspend a sentence on good behavior. The Court examined common law authorities and found no support for the proposition that courts at common law had the inherent authority to suspend sentences indefinitely."

*Evans*, 655 P.2d at 1224.

■ The judicial department has no power, after imposing sentence, to reduce the sentence imposed to one the court was not authorized by the legislature to impose at the original sentencing. The judicial department has no power to either impose a sentence below the statutory minimum at the time of the original sentencing or impose a sentence within the statutory minimum and maximum and then suspend execution of a portion of that sentence. *Williams*, 692 P.2d at 236–37.

The judicial department has no power to impose a sentence different from the sentence mandated by the legislative department. We have held that the legislature in "old 301" properly exercised its power to prohibit the court from considering probation for habitual offenders with life sentences. *Schuler*, 668 P.2d at 1342.

The judicial department has no inherent power to grant probation. The legislative department has exclusive authority over sentencing. *Hicklin v. State*, 535 P.2d 743, 752 (Wyo.1975). And, the judicial department has no power to grant parole after incarceration. The legislative department, in the exercise of its authority over sentencing, has placed that parole power with the board of parole, an arm of the executive department. *Sorenson*, 604 P.2d at 1036–37.

Obviously, our Wyoming decisions agree with that said in *Geraghty v. United States Parole Commission*, 719 F.2d 1199, 1211 (3d Cir.1983), *cert. denied*, 465 U.S. 1103, 104 S.Ct. 1602, 80 L.Ed.2d 133 (1984), "Unlike interpreting the constitution or ad-

judicating disputes, sentencing is not inherently or exclusively a judicial function."

■ The executive department, in the exercise of its executive power to faithfully execute the laws, has the exclusive power to make the charging decision and prosecute the person who has allegedly committed the act determined by the legislative department to be a crime. *Padget*, 678 P.2d at 872–73. In *Padget* this court declared unconstitutional a legislative act that purported to authorize the court to exercise the prosecution power belonging exclusively to the executive department. Although this court stated that, once the prosecution made the decision to prosecute, the process which leads to acquittal or sentencing is fundamentally judicial in nature, we recognized that within the judicial process of criminal prosecution the prosecutor's power to dismiss charges, to reduce charges, to defer charges, in sum to control the prosecution, was exclusive and not shared by the judicial department. We quoted from several different sources:

"The prosecutor has broad discretion to decide whether or not prosecution of an alleged crime will serve the public interest. [Citations.] He may, and should, consider a wide range of factors that bear on the merits of prosecution—the nature of the offense, the nature and severity of the sanctions that will be imposed upon conviction, the personal circumstances of the accused, the expense of prosecution and congestion in the courts. * * *" *Hoines v. Barney's Club, Inc.*, [28 Cal.3d 603, 170 Cal.Rptr. 42, 620 P.2d 628, 635 (1980)] (Tobriner, J., dissenting). "A prosecutor's discretion in charging, deferring or requesting dismissal is limited by pragmatic factors, but not by judicial intervention. *See* Miller and Tiffany, Prosecutor Dominance of the Warrant Decision: A Study of Current Practices, 1964 Wash.U.Law Quarterly 1." *People v. District Court in and for County of Larimer*, [186 Colo. 335, 527 P.2d 50, 52 (1974)].

*Id.* at 873.

■ In *Jahnke*, we upheld against a separation of powers challenge the constitu-

tionality of W.S. 14–6–203(c) (1977), which placed the decision as to the appropriate court in which to prosecute a juvenile within the discretion of the prosecutor as an officer of the executive department. After noting that there is no constitutional right to be tried as a juvenile, this court stated:

Any decision to initiate criminal proceedings is vested in the prosecuting attorney, and the decision is discretionary. *Confiscation Cases*, 74 U.S. (7 Wall.) 454, 19 L.Ed. 196 (1869); *State v. Faltynowicz*, Wyo., 660 P.2d 368 (1983) (Thomas, J., concurring). Since one does not have an inherent right to be prosecuted as a juvenile but that is a privilege granted by the legislature, the legislature can restrict or qualify the privilege as it sees fit, so long as there is not involved any arbitrary or discriminatory classification. *Woodward v. Wainwright*, [556 F.2d 781, 785 5th Cir. (1977)]. *See, e.g., Lamb v. Brown*, 456 F.2d 18 (10th Cir. 1972).

*Jahnke*, 692 P.2d at 929.

We also added that

[t]he legislature of the State of Wyoming has chosen to vest in the prosecuting attorney the discretion with regard to what charges to file and in what court they should be filed. There may be circumstances which would justify judicial review of the prosecutorial discretion, but in the absence of such suspect factors as race, religion or other arbitrary classification, the exercise of discretion by the prosecutor in deciding whether to charge as a juvenile or adult involves no violation of due process or equal protection of the law.

*Id.* (citations omitted).

These principles relating to the prosecutor's power to control the prosecution of a criminal charge were earlier expressed by the United States Supreme Court in this way:

In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring * * * generally rests entirely in his

discretion. Within the limits set by the legislature's constitutionally valid definition of chargeable offenses, "the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation" so long as "the selection was [not] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification." *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 [1962]. *Bordenkircher v. Hayes*, 434 U.S. 357, 364, 98 S.Ct. 663, 668–69, 54 L.Ed.2d 604, 610–11 (1978).

In *Gooden*, 711 P.2d at 409–10, this court recognized another aspect of the prosecutor's power when it held that a criminal defendant has no constitutional right to any plea bargain with the prosecutor, nor to the reduction or dismissal of charges. The process of plea bargaining or whether it will be engaged in is left to the prosecutor's discretion. *Weatherford v. Bursey*, 429 U.S. 545, 560–61, 97 S.Ct. 837, 846, 51 L.Ed.2d 30, 42–43 (1977). *Accord, Corbitt v. New Jersey*, 439 U.S. 212, 223, 99 S.Ct. 492, 499, 58 L.Ed.2d 466, 476–77 (1978). The executive department, through the prosecutor as its officer, has the absolute right to prosecute. *United States v. Thompson*, 251 U.S. 407, 412, 415, 40 S.Ct. 289, 291, 292, 64 L.Ed. 333, 342–43 (1919). As expressed in *Weatherford*, 429 U.S. at 561, 97 S.Ct. at 846, 51 L.Ed.2d at 43: "It is a novel argument that constitutional rights are infringed by trying the defendant rather than accepting his plea of guilty."

In our review of the prosecutor's power to control the prosecution of a criminal case, we must also consider the prosecutor's common law power. We have consistently said that we will read our statutes in harmony with the common law. *Wetering v. Eisele*, 682 P.2d 1055, 1061 (Wyo.1984). In this light, we focus attention on the prosecutor's common law power of *nolle prosequi*. At common law the power to initiate and control criminal proceedings is within the exclusive domain of the prosecutor. *United States v. Brokaw*, 60 F.Supp. 100, 101–03 (S.D.Ill.1945); *Thompson*, 251 U.S. at 413–14, 40 S.Ct. at 292, 64 L.Ed. at 342; *Confiscation Cases*, 74 U.S. (7 Wall.) 454, 457, 19 L.Ed. 196 (1869); *U.S. v. Schumann*, 2 Abb.U.S. 523, 7 Sawy. 439, 27 F.Cas. 984, 985 (C.C.D.Cal.1866) (No. 16,-235); *Padget*, 678 P.2d at 872–73; *State v. Faltynowicz*, 660 P.2d 368, 377 (Wyo.1983) (Thomas, J., specially concurring, with whom Raper and Rose, JJ., joined); Comment, *The Nolle Prosequi Under Rule 48(a) of the Federal Rules of Criminal Procedure*, Det.C.L.Rev. 491 (1978). Indeed, as stated in 8B J. Moore, *Moore's Federal Practice* ¶ 48.02[1], 48–5 (2d ed. 1989): "At common law, a prosecutor had unfettered authority to initiate, control and discontinue a proceeding at any stage prior to appeal." [11]

An important feature of the prosecutor's unfettered power was his power to enter a *nolle prosequi* to discontinue a criminal proceeding he had earlier initiated. "*Nolle prosequi* means: 'I am unwilling to prosecute.'" *Brokaw*, 60 F.Supp. at 101. As described in *Brokaw*:

> The rule at the common law seems to have been, *and in the present-day common law courts to remain*, that *prior to trial* the *prosecutor has the absolute uncontrolled power to enter a nolle prosequi;* that after the empaneling of the jury until the return of a verdict the power is subject to the control of the court since it may not be used at that time to the prejudice of the defendant; and that *following the return of the verdict the uncontrolled power of the prosecutor to enter a nolle revives and continues until such time as judgment is entered and sentence imposed.* (emphasis added).

*Id.* at 102. (citations omitted). *See also* 8B J. Moore, *supra*, 48.02[1] at 48–5; 6 L. Orfield and M. Rhodes, *Orfield's Criminal*

---

11. 8B J. Moore, *Moore's Federal Practice* ¶ 48.02[1] (2d ed. 1989) n. 1:
 See *United States v. Ammidown*, 497 F.2d 615 (D.C.Cir.1974); *United States v. Greater Blouse, Skirt and Neckwear Contractors Ass'n.,* 228 F.Supp. 483 (S.D.N.Y.1964); *United States v. Brokaw*, 60 F.Supp. 100 (S.D.Ill.1945); *United States v. Woody*, 2 F.2d 262 (D.C.Mont. 1924); *Confiscation Cases*, 74 U.S. (7 Wall.) 454, 457, 19 L.Ed. 196 (1868).

*Procedure Under the Federal Rules* § 48.2–48.7, pp. 243–49 (2d ed.) (Lawyer's Co-op 1987); Comment, *Criminal Law—Nolle Prosequi—Trial Court has Power to Dismiss for Want of Prosecution,* 41 N.Y. U.L.Rev. 996–1001 (1966) (placing the initial appearance of *nolle prosequi* in Stretton & Taylor's Case, 1 Leon. 119, 74 Eng.Rep. 111 (K.B.1588)).

Commenting on the prosecutor's *nolle prosequi* power, the court in *United States v. Woody,* 2 F.2d 262, 262–63 (D.C.Mont. 1924), observed:

The power to determine whether a case shall be prosecuted to a conclusion must, of course, be lodged somewhere, and by common law the district attorney is made its repository. By no statute has Congress deprived him of it, in ordinary criminal cases. It is assumed he will exercise his power under a heavy sense of duty to enforce the law, to prosecute offenders, and to protect society, and with wisdom and justice.

The court cannot control him, unless, as in some states, it is given the power by statute. He is not even required to give a reason for dismissal.

In *United States v. Cox,* 342 F.2d 167, 171 (5th Cir.1965), *cert. denied sub nom. Cox v. Hauberg,* 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700, the court noted, "It follows, as an incident of the constitutional separation of powers, that the courts are not to interfere with the free exercise of the discretionary powers of the attorneys of the United States in their control over criminal prosecutions." In a concurring opinion, it was said:

"Responsibility for determining whether a prosecution is to be commenced or maintained must be clearly fixed. The power not to initiate * * * has to reside somewhere. And the more clearly pinpointed it is, the more the public interest is served through the focus of relentless publicity upon that decision. It may not, with safety, be left to a body whose great virtue is the combination of anonymity, transitory authority, and political unresponsibility."

*Id.* at 182. (Brown, J., concurring specially).

In another concurring opinion, Judge Wisdom reviewed the separation of powers doctrine, the exclusive power of the executive department to prosecute, the incompatibility of the functions of prosecutor and judge, and the prosecutor's power to enter a *nolle prosequi.* In light of his review, he observed that, within the context of law enforcement, a government's policy is involved. The executive department of that government is charged with carrying out the government's policy on law enforcement and is usually informed on more levels than the other two departments of government. *Id.* at 193. "In such a situation, a decision not to prosecute is analogous to the exercise of executive privilege. The executive's absolute and exclusive discretion to prosecute may be rationalized as an illustration of the doctrine of separation of powers." *Id.*

Wyoming is a common law state, except in those areas where the common law has been changed by statute or court rule. W.S. 8–1–101 (Aug.1978 Repl.); *Schlattman v. Stone,* 511 P.2d 959, 961 (Wyo. 1973); *Krug v. Reissig,* 488 P.2d 150, 152, 52 A.L.R.3d 748 (Wyo.1971); *Goldsmith v. Cheney,* 468 P.2d 813, 816 (Wyo.1970); *Johnston v. Laird,* 48 Wyo. 532, 538, 52 P.2d 1219, 1220 (1935); *State v. Foster,* 5 Wyo. 199, 208, 38 P. 926, 927–28 (1895). Wyoming's statutory adoption of the common law of England originated from C.L. 1876, ch. 25 § 1. Our research has not uncovered any early Wyoming decision involving the prosecutor's power to enter a *nolle prosequi* at common law. We have found, however, that by virtue of Laws 1890, ch. 73 § 133, the Wyoming legislature enacted W.S. 7–198 (1957) which, until superseded by W.R.Cr.P. 45(a),[12] provided:

---

**12.** W.R.Cr.P. 56:

From and after the effective date of these rules, the sections of the Wyoming Statutes, 1957, as amended, hereinafter enumerated, shall be superseded, and such statutes and all other laws in conflict with these rules shall be of no further force or effect:
1–59 through 1–63
The first sentence of 7–4
7–7

No indictment or information shall be nol-prossed, except by order of the court on the motion of the prosecuting attorney, and such motion must be in writing, and the reasons therefor must be stated in such motion and read in open court, before such order is made.

Other states have modified "the common law [of *nolle prosequi*] to give courts a responsible role in the dismissal of a pending criminal proceeding * * *." [13] *United States v. Cowan*, 524 F.2d 504, 509–10 (5th Cir.1975). "[T]he Advisory Committee on the Federal Rules of Criminal Procedure recommended the common law approach be adopted requiring additionally only that prosecutors file motions with the court including reasons for the *nolle prosequi*." J. Moore, *supra*, ¶ 48.02[1], at 48–3. The committee submitted the recommended rule to the United States Supreme Court. Reviewing the proposed rule, the Court "questioned the legal basis and wisdom of such a rule." Comment, 1978 Det.C.L.Rev. *supra*, at 494–95. Resubmitting the proposed rule, the committee added "only the requirement of obtaining the defendant's consent to the motion if filed during the trial." *Id.* at 495. The Court deleted the proposed rule's requirement of a prosecutor's statement of reasons and added a requirement "by leave of court." *Id.* As formally adopted by the Court, F.R.Cr.P. 48(a) states:

Rule 48. Dismissal

(a) By Attorney for Government. The Attorney General or the United States attorney may by leave of court file a dismissal of an indictment, information or complaint and the prosecution shall thereupon terminate. Such a dismissal may not be filed during the trial without the consent of the defendant.

Nearly twenty-three years after the United States Supreme Court adopted the Federal Rules of Criminal Procedure, the Wyoming Supreme Court's adoption of the Wyoming Rules of Criminal Procedure became effective February 11, 1969.[14] *Boggs v. State*, 484 P.2d 711, 714 n. 2 (Wyo.1971). W.R. Cr.P. 45(a) states:

7–8
7–86
7–118 through 7–125
7–127 through 7–134
7–136 through 7–146
7–148 through 7–154
7–157 through 7–160
7–162 through 7–164
7–166 through 7–171
7–173 through 7–178
7–181 through 7–200
7–202
7–204 through 7–217
7–219
7–222
7–229
7–230
7–232
7–234
7–235
7–240
7–245 through 7–249
7–253 through 7–260
7–266
7–268 through 7–274
7–276
7–283
7–284
7–286
7–287
7–292 through 7–295
7–299 through 7–301
7–330 through 7–332

7–344
7–451
(Amended January 20, 1969, effective February 11, 1969; amended July 12, 1971, effective November 18, 1971.)

**13.** As stated in 2 W. LaFave and J. Israel, *Criminal Procedure* § 13.3, p. 569 (1985),

[c]oncern over this unbridled discretion in the prosecution [to enter a *nolle prosequi*] resulted in legislation or rules of court in many jurisdictions intended to restrain the *nol pros* power of the prosecutor. These provisions, at a minimum, forced the prosecutor to explain his reasons for doing so in writing, thus assuring greater visibility of the manner in which the prosecutor acted; at a maximum they required that he receive judicial approval to make his decision effective.

*See United States v. Cowan*, 524 F.2d 504, 509, n. 11, 12 (5th Cir.1975), *cert. denied sub nom., Woodruff v. United States*, 425 U.S. 971, 96 S.Ct. 2168, 48 L.Ed.2d 795 (1976).

**14.** *See also Hopkinson v. State*, 664 P.2d 43, 51–52 (Wyo.1983), *cert. denied*, 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246, for this court's brief examination of the history of this court's rule making. *See* Armstrong, *The Wyoming Rules of Criminal Procedure, A View by the Judiciary*, V Land & Water L.Rev. 581–86 (1970)—part of a symposium on the Wyoming Rules of Criminal Procedure.

Rule 45. Dismissal

(a) By the prosecuting attorney.—The prosecuting attorney may, by leave of court, file a dismissal of an indictment, information or complaint, and the prosecution shall thereupon terminate. Such a dismissal may not be filed during the trial without the consent of the defendant.

After the effective date of this rule, W.S. 7–198 (1957), the *nolle prosequi* statute, was superseded and of no further force or effect. W.R.Cr.P. 56. Since W.R.Cr.P. 45(a) is the same as F.R.Cr.P. 48(a), we give great weight to federal precedent under F.R.Cr.P. 48(a) when considering matters arising under W.R.Cr.P. 45(a). *Dobbins v. State*, 483 P.2d 255, 258 (Wyo. 1971).[15]

According to Moore, the "by leave of court" requirement has been variously interpreted in the federal courts. Some federal courts believe they have broad discretion "to protect public interests in fair administration of criminal justice." J. Moore, *supra*, ¶ 48.02[1], p. 48–4. Others adhere to the standard that the prosecution's motion to dismiss should be denied only if "clearly contrary to manifest public interest." *Id.*, ¶ 48.02[2], at 48–7. Despite this disagreement on the scope of the court's discretion, it is clear that the "by leave of court" requirement has modified the absolute power of the executive department so that the defendant is not harassed. by charging, dismissing and recharging without placing the defendant in jeopardy. *Id.* ¶ 48.02[1], at 48–5; ¶ 48.02[2], at 48–8. "The executive branch, however, essentially remains the judge of the decision to initiate a prosecution and to terminate it." *Id.* ¶ 48.02[1], at 48–5. And, "[t]here is a presumption that the prosecutor's motion is made in good faith and in the proper discharge of his duties." *Id.* ¶ 48.02[2], at 48–7.

We see a direct relationship between the prosecutor's dismissal power under W.R. Cr.P. 45(a) and the prosecutor's power under "new 301" to consent to deferral of further prosecution without entry of judgment of conviction. In light of our foregoing analysis of the respective powers of the three departments of government in the criminal law area and of our tracing the evolution of the prosecutor's *nolle prosequi* power, we conclude that "new 301" is the product of the legislative department's correct recognition of the executive department's power to initiate, control, and terminate criminal prosecutions before the judicial department exercises its power to enter a final judgment. Recalling the meaning of "judgment of conviction" under W.R. Cr.P. 33(b), we find that it correlates well with that phrase found in "new 301": "The court may, with the consent of the defendant and the state and *without entering a judgment of guilt or conviction,* defer further proceedings * * *." (emphasis added). This statute demonstrates the legislative department's proper understanding that until the judicial department enters *a judgment of guilt or conviction* (final judgment) the prosecutor possesses the executive department's power to control and terminate the prosecution at any time before final judgment. Thus, we find W.S. 7–13–301 compatible with W.R.Cr.P. 33(b) and 45(a) and solidly based on a proper understanding of and appreciation for the common law power of the prosecutor to control the criminal case even through verdict until the court enters a final judgment.

In the face of extensive case law identifying and describing the legislative department's exclusive authority over sentencing, the contention of these criminal defendants that the judicial department has similar authority cannot stand. It is true that the judicial department has the power to impose sentence. W.R.Cr.P. 33(b); *MJP*, 706 P.2d at 1110. These criminal defen-

---

**15.** *See e.g., Fuller v. State*, 568 P.2d 900, 902 (Wyo.1977) (W.R.Cr.P. 16(b)(2) identical to F.R. Cr.P. 12(b)(2)); *Richmond v. State*, 554 P.2d 1217, 1222 (Wyo.1976); (W.R.Cr.P. 7 essentially the same as old F.R.Cr.P. 5(b) and (c)); *Gonzales v. State*, 551 P.2d 929, 931 (Wyo.1976) (portions of W.R.Cr.P. 9 essentially the same as F.R.Cr.P. 7)); *Evanson v. State*, 546 P.2d 412, 415 (Wyo.1976) (W.R.Cr.P. 32(c) identical to F.R.Cr.P. 31(c)); and *Simms v. State*, 492 P.2d 516, 523 (Wyo.1972), *cert. denied*, 409 U.S. 886, 93 S.Ct. 104, 34 L.Ed.2d 142 (W.R.Cr.P. 18(b) practically identical to F.R.Cr.P. 16(b)).

dants are wrong, however, in concluding that probation without entry of a judgment under "new 301" is the functional equivalent of a sentence. They fail to recognize what a sentence actually is.

> As we pointed out earlier in this opinion: There is only one final judgment. The final judgment in a criminal case means sentence. The sentence is the judgment. *Berman v. United States*, 1937, 302 U.S. 211, 212, 58 S.Ct. 164, 165, 82 L.Ed. 204. This is consistent with Rule 33(b), W.R. Cr.P., providing that, "A judgment of conviction shall set forth the plea, the verdict or findings, and the adjudication and sentence. * * *" There is no judgment against the defendant until sentence is pronounced.

*Vigil*, 563 P.2d at 1349. In *Berman v. United States*, 302 U.S. 211, 58 S.Ct. 164, 82 L.Ed. 204 (1937), the Court explained that the sentence is the final determination of the merits of the criminal charge.

> To create finality it was necessary that petitioner's conviction should be followed by sentence * * *. In criminal cases, as well as civil, the judgment is final for the purpose of appeal "when it terminates the litigation * * * on the merits" and "leaves nothing to be done but to enforce by execution what has been determined."

*Id.*, 302 U.S. at 212, 58 S.Ct. at 166, 82 L.Ed. at 205 (citations omitted).

The deferral of further prosecution proceedings and placement of a criminal defendant on probation *without entering a judgment of guilty or conviction* under "new 301" is by definition not a sentence. Deferral and probation without the entry of a judgment of guilty or conviction is not a final determination of the merits of the criminal charge. If the criminal defendant successfully completes probation, then the court discharges the defendant and dismisses the proceedings. In that event, there is finality. Discharge and dismissal occur without the court's adjudication of guilt and imposition of sentence. W.S. 7–13–301(d) (June 1987 Repl.).

On the other hand, if the criminal defendant violates probation, the court may proceed with the trial of the criminal charge if the criminal defendant has been charged but has not pleaded guilty or been tried and found guilty. W.S. 7–13–301(c)(ii). Or, if the criminal defendant violates probation, the court may, if the criminal defendant has previously pleaded guilty or been tried and found guilty, enter a judgment of guilt or conviction and proceed to impose sentence. W.S. 7–13–301(c)(i). Thus, for those criminal defendants who violate probation there will ultimately be a final judgment of either acquittal or of guilt and conviction *followed* by sentence.

There is another reason why probation without entry of a judgment is not a sentence. A criminal defendant upon whom a court has imposed a sentence cannot reject that sentence. The court has the power to force that sentence on the criminal defendant. Under W.S. 7–13–301, since the criminal defendant's consent is required, the criminal defendant is free to reject the tender of probation without entry of judgment. If this disposition were truly a sentence, then the criminal defendant could not reject it.

Viewed in this context, probation without entry of a judgment is analogous to a pardon. As Chief Justice John Marshall observed in *United States v. Wilson*, 7 Pet. (32 U.S.) 150, 160–61, 8 L.Ed. 640 (1833), a pardon is like a deed, to the validity of which delivery is essential, and delivery is not complete without acceptance. A pardon may be rejected by the person to whom it is tendered. If that person rejects it, a court has no power to force it on that person. In Marshall's view, a pardon is an act of grace, proceeding from the executive department's power to execute laws which exempts the person on whom it is bestowed from the punishment the law inflicts for a crime that person has committed. The prosecutor's consent to probation without entry of a judgment, like a pardon, exempts the person on whom it is bestowed from further criminal proceedings, specifically including a judgment of guilt or conviction. In the light of this favorable comparison, the prosecutor's consent to that type of disposition is also seen as an act of

grace, proceeding from the executive power.

We are not surprised that the pardon power and the prosecutor's consent power reside within the same department of government. Seeing the prosecutor's consent in this light, the symmetry of treatment is compelling. On the pre-entry of judgment side of the adjudicated guilt line, the executive department possesses the power to divert, or not, a criminal defendant into probation and away from further criminal prosecution in furtherance of the social policy enacted by the legislative department. On the post-entry of judgment side of the line, the executive department also possesses the power to divert, or not, a criminal defendant into pardon and away from further punishment.

Although "new 301" uses the word "probation," the legislature has used it only generally to describe the defendant's status before a final judgment of conviction or discharge has been entered. The legislature has not used it to mean a defendant's status after the court has entered a judgment of conviction. *See Hicklin,* 535 P.2d at 753. Probation before entry of judgment is not a punitive sanction. It is an opportunity for rehabilitation before sentencing. The probationer is not an adjudicated convict. If probation is successfully completed, the probationer may be discharged without adjudication of guilt.

These criminal defendants mistakenly seize upon the single phrase in *Padget* that says when the decision to prosecute has been made, the process which leads to acquittal or sentencing is fundamentally judicial in nature. *Padget,* 678 P.2d at 872 (applied in *People v. Tenorio,* 3 Cal.3d 89, 94, 89 Cal.Rptr. 249, 252, 473 P.2d 993, 996 (Cal.1970)). From that single phrase they claim that whatever happens to the criminal charge after that point is an exercise of judicial power, not executive power.

We agree that the prosecution of a criminal charge is part of the judicial process. In the prosecution phase of that judicial process, the judicial department exercises its powers and the executive department exercises its powers. The judicial department exercises its powers to control its docket, to administer court business, to adjudicate legal issues concerning the criminal procedures that necessarily attend the criminal proceeding, and to adjudicate substantive legal issues raised by the litigants. What these criminal defendants have failed to understand, however, is that during this judicial process the executive department is also at work exercising its powers. The prosecutor, as an officer of that department, is making decisions and controlling the criminal prosecution. In the exercise of these powers, the prosecutor may decide to add charges, to drop charges, or to reduce charges. The prosecutor may decide to dismiss some, but not all, charges. The prosecutor may decide to enter into plea negotiations. The prosecutor may decide to dismiss all charges and terminate the prosecution under W.R.Cr.P. 45(a), the *nolle prosequi* rule.

With respect to these decisions, and others like them, the prosecution is exercising its executive powers within the judicial process that leads to dismissal, discharge, acquittal, or conviction and sentencing. In their understandable zeal to seize upon the isolated phrase to support their position, these criminal defendants have overlooked this court's main teaching in *Padget:* during the prosecution phase of the criminal proceeding that is part of the judicial process, the prosecutor shall exercise executive powers unfettered by judicial intervention. To emphasize this point we quoted favorably from *People v. District Court in and for County of Larimer,* 186 Colo. 335, 527 P.2d 50, 52 (1974): "A prosecutor's discretion in charging, deferring or requesting dismissal is limited by pragmatic factors, but not by judicial intervention." *Padget,* 678 P.2d at 873.

These criminal defendants also mistakenly rely on *People v. Tenorio,* which this court found helpful in our separation of powers analysis in *Padget.* In *Tenorio* the defendant was convicted of possession of marijuana. He admitted an eight-year old prior conviction of marijuana possession. The marijuana possession statute provided no minimum term and a maximum term of

ten years for a first-time offender. For a defendant with one prior conviction, like Tenorio, the statute provided a minimum term of two years and a maximum term of twenty years. A related statute provided that unless the prosecutor so moved the court could not dismiss from the accusatory pleading an allegation of fact which, if admitted, would change the penalty from what it would be if such fact were not admitted. In other words, if the prosecutor refused to move to dismiss Tenorio's admission of the prior marijuana possession conviction, the court could not on its own dismiss that admission from the accusatory pleading, but must sentence Tenorio to at least a mandatory minimum term of two years. In violation of that statute, the trial court dismissed, without the prosecutor's approval, Tenorio's admission of his prior conviction from the complaint and granted Tenorio probation.

The state appealed the order granting probation. In affirming the order, the California Supreme Court concluded that the prosecutor's approval statute impermissibly infringed on the judicial power and violated California's separation of powers principle. By its decision, the California court reversed *People v. Sidener*, 58 Cal.2d 645, 25 Cal.Rptr. 697, 375 P.2d 641 (1962). The court reviewed the *Sidener* opinion, including Justice Schauer's lengthy dissent concurred in by two other justices that answered the majority's historical argument by noting that *nolle prosequi* never existed in California. Justice Schauer had argued that the common law power of *nolle prosequi* was not part of that Mexican law retained by California's 1849 constitution and that the nonexistence of *nolle prosequi* was codified by statute. *Tenorio*, 473 P.2d at 995. The *Tenorio* court concluded, however, that any arguments based upon California's legal history before 1850 were undeterminative. The court found that from and after 1850 neither decision nor legislation denied that the judiciary has the power to dismiss. *Id.* at 996. The court said:

> The judicial power is compromised when a judge, who believes that a charge should be dismissed in the interests of justice, wishes to exercise the power to dismiss but finds that before he may do so he must bargain with the prosecutor. The judicial power must be independent, and a judge should never be required to pay for its exercise.

*Id.* at 996. The court made it clear that when an individual judge exercises sentencing discretion he exercises a judicial power, the exercise of which cannot be foreclosed by power given to the prosecutor by the legislature.

We cannot follow *Tenorio* for several reasons. The subject statute in effect there operated as a mandatory sentence statute. Although the California Supreme Court apparently feels that such a statute cannot operate to deprive the court of sentencing discretion, this court does not agree. In *Evans*, 655 P.2d at 1224, this court upheld against a separation of powers challenge the constitutionality of "old 301" which mandated a life sentence for a habitual criminal. We held that "old 301," which precluded the court from suspending a habitual criminal's mandatory life sentence, was a proper exercise of the inherent legislative power to prohibit suspension of sentence in any given case. We further held that the legislative department, not the judicial department, had the inherent power to suspend a sentence, and that the legislature is free to retain or delegate sentencing discretion when defining and setting punishment. It may properly delegate that discretion in whole or in part in the exercise of its exclusive authority over sentencing. *Id.* We recognized *Ex Parte United States*, 242 U.S. at 42, 37 S.Ct. at 74, 61 L.Ed. at 140–41, which holds that the judicial department does not have the inherent power to refuse to impose a sentence fixed by statute or to refuse to execute such a sentence when imposed. There, the court implicitly denied the judicial department has the power to refuse to try a criminal charge because it believed the act made criminal should not be treated as criminal. *Id.*, 242 U.S. at 42, 37 S.Ct. at 74, 61 L.Ed. at 140–41.

*Tenorio's* holding that the judicial department has the inherent power to dismiss

a criminal charge in the interests of justice is directly contradicted by the United States Supreme Court's statement in *Ex Parte United States* (cited favorably in this court's *Evans*) that the judicial department has no inherent power to refuse to try a criminal charge upon considerations extraneous to the legality of the charge; by the United States Supreme Court's holding that the executive department has the absolute right to prosecute (*Bordenkircher, Weatherford,* and *Corbitt*); by this court's holding that the prosecutor does not have to enter into plea negotiations with a defendant and has the right to prosecute rather than accept a plea bargain (*Gooden*); and by this court's holdings that the judicial department has no inherent power to suspend a sentence (*Evans*); to expunge a final judgment of conviction which was without legal error and only for the purposes of restoring a defendant's civil rights or of alleviating his fear of being classified as a habitual criminal (*Stanton*); to grant an annulment of a final judgment of conviction (*Ward*); to reduce the sentence imposed to one which the legislature has not authorized the court to impose at original sentencing (*Williams*); to refuse to impose a sentence (*Evans*); to grant probation (*Hicklin*); or to grant parole after incarceration (*Sorenson*).

*Tenorio* is also out of step with *United States v. Huerta,* 878 F.2d 89 (2d Cir. 1989),[16] in which a federal statute requiring the prosecutor's motion before the sentencing court may impose sentence below the statutory minimum on the basis of the defendant's cooperation with the prosecution survived separation of powers and due process challenges. Under 18 U.S.C. § 3553(e), upon the prosecutor's motion, the court has the authority to impose a sentence below a level established by statute as minimum sentence so as to reflect a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense. Claiming that sentencing is a judicial prerogative, Huerta contended that a scheme which delegates to the executive branch's prosecutorial arm the authority to control when a judge may consider cooperation with the government as a mitigating factor interferes with or usurps a constitutionally assigned judicial function.

In upholding the statute, the court first noted that the statute does not permit the prosecution to engage in "adjudication." That power remains with the court. Next, the court observed that the prosecutor's authority under the statute to affect sentences is more limited than other prosecutorial means by which it affects sentences, such as the exclusive authority to decide whether to prosecute and to choose among alternative charges. Next, the court believed that the prosecution is uniquely fit to resolve the question whether a defendant's cooperation has risen to the level of "substantial assistance."

Recognizing that sentencing is not inherently a judicial function, the court concluded that the statute does not usurp a judicial function and, further, Congress has the power to eliminate all discretion in sentencing judges. Finally, the court found no precedent establishing a due process right of judicial review of the prosecution's decision to forego a motion under the statute.

Although *Tenorio* found that California's legal history before 1850 concerning the common law power of *nolle prosequi* was undeterminative, we do not have such uncertainty in Wyoming. Wyoming, as a common law state, with no historical legal ties to Mexican law, has recognized and continues to recognize the power of *nolle prosequi* in the prosecutor as an officer of the executive department.

**16.** *Accord United States v. Kuntz,* 908 F.2d 655 (10th Cir.1990); *United States v. Ayarza,* 874 F.2d 647 (9th Cir.1989), *cert. denied,* — U.S. ——, 110 S.Ct. 847, 107 L.Ed.2d 841 (1990); *United States v. Musser,* 856 F.2d 1484 (11th Cir.1988), *cert. denied,* 489 U.S. 1022, 109 S.Ct. 1145, 103 L.Ed.2d 205 (1989); *United States v. Severich,* 676 F.Supp. 1209 (S.D.Fla.1988), *aff'd* 872 F.2d 434 (11th Cir.1989). *See also United States v. Holmes,* 838 F.2d 1175 (11th Cir.1988), *cert. denied,* 486 U.S. 1058, 108 S.Ct. 2829, 100 L.Ed.2d 930; *but see United States v. Roberts,* 726 F.Supp. 1359 (D.D.C.1989); and *United States v. Curran,* 724 F.Supp. 1239 (C.D.Ill. (1989)).

Finally, these criminal defendants argue that deferral and probation under "new 301" must be "sentencing" because it is located in article 7, chapter 13, entitled *Sentence and Punishment.* That argument fails. As located, the statute is in close proximity to related statutes dealing with the treatment of criminal offenders. As these statutes comprise a coherent legislative scheme relating to criminal offenders, both before and after entry of judgment, it only makes sense that they occupy the location they do.

In light of the case law identifying and describing these governmental powers, and since probation without entry of a judgment is not a sentence, we are compelled to conclude that the *power to decide* whether a criminal defendant who has never before been convicted of a felony shall be treated under "new 301" belongs to the executive department as an integral part of its blended prosecution power. The "defer-probation" decision under "new 301" is not a decision to impose sentence; rather, it is a decision intimately related to the decisions to file charges, to reduce charges, to plea bargain, and to dismiss charges. All these decisions are committed to the sound discretion of the prosecutor as an officer of the executive department. We hold, therefore, that the executive department, not the judicial department, has the power to decide whether to defer prosecution under "new 301.[17] The exercise of that prosecutorial discretion is not subject to judicial review as long as any unjustifiable or suspect factors such as race, religion, or other arbitrary or discriminatory classification are not involved. *Gooden,* 711 P.2d at 408–09; *Jahnke,* 692 P.2d at 929.

"New 301" and "new 302" are the product of the legislature's revisions of "old 203" and "old 301." In "new 301" and "new 302" the legislature simply adjusted its sentencing and probation discretion. "New 301" provides for probation *before*

entry of final judgment; "new 302" provides for probation *after* entry of final judgment. Obviously, the legislature has used the act of final judgment as its point of reference or demarcation. As W.R.Cr.P. 33(b) informs us, final judgment means adjudication and sentence. *See Vigil.*

The judiciary exercises the power of adjudication and imposition of sentence when it enters final judgment of conviction, but not before. The prosecution exercises its prosecution power before entry of final judgment, but not after. Probation before entry of final judgment occurs within the prosecution phase of the criminal judicial process. Since the prosecutor exercises the prosecution power during that phase, including the power to file charges, to reduce charges, and to dismiss charges, it is correct that the prosecutor also have the power to consent to deferral of prosecution proceedings before entry of final judgment.

On the other hand, probation after entry of final judgment occurs within the adjudication phase of the criminal judicial process. Since the judiciary exercises the adjudication power during that phase, including the power to impose sentence, we are not surprised that the legislature did not attempt to require the state's consent to probation *after* entry of final judgment. It is correct that the judiciary have the power to impose probation *after* entry of final judgment.

What the legislature has done in "new 301" and "new 302" is not contrary to what it had done in "old 203" and "old 301," which this court approved of as within the legislature's legitimate exercise of its sentencing and probation authority. As we recognized in *Evans,* the legislature can retain or delegate its sentencing and probation discretion as it sees fit. It saw fit to do it in the manner it did in "new 301." It is not within the power of the judicial department to question the wisdom of that exercise of the legislative department.[18]

---

**17.** W. LaFave and J. Israel, *Criminal Procedure* § 13.6, p. 585 (1985): "A decision by the prosecutor not to divert a particular defendant and instead to proceed with prosecution on the pre-

existing charge is, in essence, a decision to prosecute * * *."

**18.** *Woodward v. Haney,* 564 P.2d 844, 846 (Wyo. 1977). For the United States Supreme Court,

We pass only on the legality and constitutionality of that exercise. Here, we hold that the exercise was legal and constitutional.

These criminal defendants object to the prosecution's possession of the power to decide from case to case whether a particular criminal defendant shall suffer or not from the penalties and disabilities associated with and consequent upon entry of a judgment of conviction or guilt. Despite the prosecutor's long-recognized possession of the power to charge, to reduce charges, to dismiss some or all of the charges, to plea bargain, and to dismiss the prosecution under W.R.Cr.P. 45(a), and despite the executive department's long-recognized possession of the power to pardon, these criminal defendants wish that the power to consent to a criminal defendant's probation without entry of a judgment resided in the judicial department rather than in the executive department. Under the state constitution, that cannot be. Once the prosecutor has decided to file the criminal charge, a criminal defendant has no constitutional right to a preferred disposition of that charge. He has no right to a reduced charge, to a dismissal of some charges, or to a plea bargain. *Gooden.*

Possessing the *nolle prosequi* power, the prosecutor has played the role of being able to terminate a prosecution at any time before final judgment of guilt or conviction. Possessing the pardon power, the executive department has also played the role of being able to grant a pardon before or after final judgment.[19] If granted before final judgment, the pardon prevented the attachment of conviction penalties, disabilities, and stigmas. If granted after final judgment, pardon removed conviction penalties, disabilities, and stigmas. Viewing in this light the prosecutor's possession of the power to consent, or not, to probation without entry of a judgment, we find

no constitutionally impermissible reason why the consent power cannot reside where the legislative department has placed it. The power must reside somewhere and its residence with the executive department is constitutionally consistent with other similar powers at home there.

In holding that "new 301" is constitutional, we find that the legislature enacted it with full knowledge of the existing state of the law with reference thereto. We have construed the statute in harmony with the existing law and as a part of an overall and uniform system of jurisprudence; the statute's meaning and effect have been determined in connection, not only with the common law and the constitution, but also with reference to court rule and court decisions. *Adoption of Voss,* 550 P.2d at 486 (citing *Civic Association of Wyoming v. Railway Motor Fuels,* 57 Wyo. 213, 238, 116 P.2d 236, 245 (1941)).

Having resolved the separation of powers issue, we next consider whether the legislature constitutionally enacted "new 301."

### V.

### THE STATE'S CONSENT REQUIREMENT OF "NEW 301" WAS CONSTITUTIONALLY ENACTED

*A. Legislative History*

 Earlier we identified and explained what the legislature apparently did in 1987 to change "old 203" into "new 301" and "old 301" into "new 302." Now we will review the legislative history of House Bill 92 (H.B. 92) which became Chapter 157 of the 1987 Session Laws of Wyoming.

Sponsored by the Joint Judiciary Interim Committee, H.B. 92 was a revision of Title 7 of the Wyoming statutes. Digest of House Journal, Forty–Ninth State Legisla-

---

Justice Cardozo put it this way: "We do not pause to consider whether a statute differently conceived and framed would yield results more consonant with fairness and reason. We take this statute as we find it." *Anderson v. Wilson,* 289 U.S. 20, 27, 53 S.Ct. 417, 420, 77 L.Ed. 1004, 1010 (1933).

**19.** Constitution of the United States of America—Analysis and Interpretation, pp. 491–94 (U.S. Gov't. Printing Office 1987), where reference is made to *Ex parte Garland,* 71 U.S. (4 Wall.) 333, 380, 18 L.Ed. 366 (1867), for the point that a pardon may precede the indictment or other beginning of the criminal proceeding.

ture, 183–84 (hereinafter H.J.). The title of the bill states in relevant part:

### Title 7 Revision.

AN ACT * * * to amend, amend and renumber or renumber W.S. * * * 7–13–101 through 7–15–107 * * *; revising Chapters 1 through 5, 13 through 15 and 17 of Title 7 of the Wyoming Statutes; * * * providing procedures for placing certain defendants on probation prior to entry of a judgment of conviction and for their discharge without adjudication of guilt upon successful completion of probation and conforming related statutes * * *.

H.J. 183–84.

H.B. 92 renumbered "old 203" to "new 301" and provided changes in the category of persons qualified for probation before sentence and the procedures to be used before and after placing a qualified person on probation. H.B. 92, Forty–Ninth State Legislature, 87LSO–0102.01, pp. 155–58 (1987). The original version of H.B. 92 contained the requirement of the defendant's consent to probation which was not contained in "old 203." *Id.* at 156. Before leaving the House, "new 301" was the subject of a few relatively minor amendments. H.J. 184–85. On January 21, 1987, H.B. 92 was read for the third time in the House and was passed. H.J. at 186.

H.B. 92 then was sent to the Senate. There, several more amendments were made to "new 301." The most significant amendment made by the Senate was the addition of the requirement of the state's consent to probation. H.J. 189. These amendments were adopted and passed in the Senate. *H.J.* 191–92. H.B. 92 then went back to the House on February 19, 1987, and the House voted not to concur in the Senate amendments. *H.J.* at 192. The matter was referred to a joint conference committee composed of several members from the House and Senate. H.J. at 192.

The joint conference committee reported back a recommendation to adopt, among other amendments, the Senate amendment (H.B. 92SS1/AE) requiring the state's consent to probation. H.J. at 192. The com-

mittee also recommended several other minor changes to "new 301." H.J. at 193. On February 28, 1987, the House and Senate voted to adopt the report of the joint conference committee. H.J. at 194. The act was signed by the Speaker of the House and President of the Senate that same day and by the Governor on March 5, 1987. H.J. at 194. H.B. 92 now appears as Chapter 157, 1987 Session Laws of Wyoming.

### B. "Alteration of Original Purpose" Issue

Wyo. Const. art. 3, § 20, provides, "No law shall be passed except by bill, and no bill shall be so altered or amended on its passage through either house as to change its original purpose". The purpose of this kind of constitutional provision is "to preclude last-minute, hasty legislation and to provide notice to the public of legislation under consideration irrespective of legislative merit." *Anderson v. Oakland County Clerk,* 419 Mich. 313, 353 N.W.2d 448, 455 (1984). *See also Annotation, Construction and Application of Constitutional Provision Against Changing Purpose of Bill During Passage,* 158 A.L.R. 421, 423 (1945). (Our research reveals no later supplementary annotation). In *Scudder v. Smith,* 331 Pa. 165, 200 A. 601, 604 (1938), the court said that kind of provision "put the members of the Assembly and others interested on notice, by the title of the measure submitted, so that they might vote on it with circumspection."

These criminal defendants claim that the original purpose of H.B. 92, as originally introduced, namely, providing procedures—including the requirement of the defendant's consent—for placing a defendant on pre-guilt adjudication probation and discharging the defendant upon successful completion of that probation, was impermissibly changed by the legislature's amendment that added the requirement of the state's consent. We disagree.

In our resolution of this issue, we are guided by *Smith v. Hansen,* 386 P.2d 98 (Wyo.1963), and *Arbuckle v. Pflaeging,* 20 Wyo. 351, 123 P. 918 (1912), 158 A.L.R. 421

(1945). In these cases this court looked to the title and the body of the original bill to determine its purpose and make a comparison of its purpose after amendment.

In *Arbuckle*, certain livestock owners sued the state veterinarian to recover possession of their cattle which the state veterinarian had seized and was going to sell in order to recoup the cost he had incurred in seizing and medically treating the owner's cattle for scabies or mange after the owners had failed to treat them as he had earlier requested. The state veterinarian counterclaimed for the costs incurred in seizing and treating the cattle. The trial court certified to this court ten constitutional questions, one of which was whether the legislature violated the "alteration of original purpose" provision in the passage of 1909 Wyo.Sess.Laws ch. 164. As originally introduced, H.B. 137 stated in its title that it was "an act to amend and reenact sections 148 and 150 * * * of the Revised Statutes of Wyoming of 1899, relating to the duties of the State Veterinarian." Section 150 of the bill stated that the duty of the state veterinarian was to superintend the slaughter and burning of condemned animals and to pay the expense of that activity from any contingent fund appropriated for his office.

The House amended the bill by the Jefferis amendment, which, in pertinent part, added to the bill a section 2 which provided that section 148 of the revised statutes of Wyoming 1899 was amended and reenacted so that the state veterinarian had authority to take steps to prevent the spread of contagious disease among animals, including ordering livestock owners to dip and treat their animals, seizing animals when their owners failed to treat their animals, treating the seized animals and selling them to recoup the cost of those activities.

The plaintiff owners claimed that the Jefferis amendment was for a different purpose from that contemplated in the bill as originally introduced. This court disagreed. It found that the original bill's purpose concerned the state veterinarian's duty, as did the amendment. Both the original bill and its amendment related to

that state official's duties concerning the prevention of the spread of infectious disease among cattle. This court found that the original bill and its amendment were not incongruous but related to that state official's duties to prevent disease, and that they were in furtherance of that purpose and within the scope of the subject of the bill. It held that the amendment adding further duties did not alter or amend the original bill's purpose. On this point, the court held the bill to have been constitutionally enacted.

Using *Arbuckle's* analytical approach, we achieve the same result. As originally introduced, H.B. 92 stated in its title that it was an act to amend and renumber, among other statutory provisions, §§ 7-13-101 through 7-13-107, providing procedures for placing certain defendants on probation before entry of a judgment of conviction and for their discharge without adjudication of guilt upon successful completion of probation. As originally introduced, the body of the bill provided that the defendant's consent was required as part of these procedures. The senate amendment of the original bill added the state's consent requirement to the procedures for placing the defendant on this type of probation.

The criminal defendants here assert that the senate amendment changed the purpose of the original bill. They correctly identify that purpose as being revision of procedures for placing certain defendants on probation. We agree that the purpose of the bill as originally introduced concerns procedures for deferring further prosecution and placing a defendant on probation without entry of adjudication of guilt and discharging the defendant if he successfully completes that probation. One of those procedures is obtaining the defendant's consent. The senate amendment refers to these procedures and simply adds one more procedure to accomplish the purpose of placing the defendant on probation. Both the bill and its amendment relate to those procedures and that purpose. They are not incongruous. They are in furtherance of that purpose, germane to and within the scope of the bill.

The *Smith* case helps us make our point. Several beer wholesalers sued members and the director of the Wyoming Liquor Commission to enjoin the collection of an additional four cents per gallon in excise taxes on malt liquors. The wholesalers contended that the provisions of 1963 Wyo. Sess.Laws ch. 194, § 3(a), purporting to increase the tax from two cents per gallon to six cents per gallon, were unconstitutionally enacted in violation of both the "alteration of original purpose" provision of Wyo. Const. art. 3, § 20, and the "one subject" provision, of Wyo. Const. art. 3, § 24.

Focusing first on the "alteration of original purpose" issue, this court noted that the bill's title, as originally introduced, stated that the act amended and reenacted a statute relating to the excise tax on liquors so as to prohibit a person's importation or transportation of untaxed liquor into or within the state. Thus, the bill's original purpose was to amend and reenact the statute "so as to prohibit" importation or transportation of untaxed liquors. The bill was amended, and the excise tax on malt liquors was increased from two cents to six cents per gallon. The legislature also established an identification card for persons twenty-one years or older to be presented when purchasing liquor. With these amendments, the bill contained three purposes: 1) prohibition of importation or transportation of untaxed liquor, 2) four cent tax increase on malt liquor, and 3) liquor purchase identification card. Because of these amendments, the legislature then amended the bill's original title to include mention of the identification card along with the prohibition of importation or transportation of untaxed liquors. The legislature, however, failed to amend the original title to include the mention of the tax increase. This court held that the new purpose or objective of the tax increase impermissibly changed the bill's original purpose of prohibition of importation or transportation of untaxed liquors. *Smith*, 386 P.2d at 100.

By contrast, in our present case, the senate amendment adding the requirement of state's consent to the procedures provided in the original bill, unlike the new purpose

or objective of a tax increase in *Smith*, did not change the original purpose of the bill. That purpose was, and remained after the amendment, the establishment of procedures for the deferring and placing of a defendant on probation without the entry of an adjudication of guilt and the discharging of that defendant upon successful completion of that probation.

In light of the objective of the "alteration of original purpose" provision and our decisions in *Smith* and *Arbuckle*, we hold that Chapter 157 of the Session Laws of Wyoming 1987 was constitutionally enacted in compliance with Wyo. Const. art. 3, § 20.

### C. The "One Subject" Issue

Wyo. Const. art. 3, § 24, provides: No bill, *except* general appropriation bills and *bills for the* codification and *general revision of the laws*, shall be passed containing more than one subject, which shall be clearly expressed in its title; but if any subject is embraced in any act which is not expressed in the title, such act shall be void only as to so much thereof as shall not be so expressed. (emphasis added).

In past challenges to legislation on this constitutional ground, we have stated that the purpose of this constitutional provision is

to prevent surprise or fraud in legislation. It is not intended that the title shall be an abstract of all provisions contained in a bill; or that the title must encompass all of the aspects of the statute; or that everything therein affected need be delineated. *Brinegar v. Clark*, Wyo., 371 P.2d 62, 66 [1962]; *Morrow v. Diefenderfer*, Wyo., 384 P.2d 601, 603 [1963]; *Board of Com'rs of Laramie County v. Stone*, 7 Wyo. 280, 51 P. 605, 607 [1897].

*State v. City of Laramie*, 437 P.2d 295, 302 (Wyo.1968).

Sixty-five years ago we said that this particular constitutional provision must be liberally and reasonably construed:

This court has long recognized the principle that this section of the constitution,

though mandatory, must be liberally and reasonably construed. In the case *In re Fourth Judicial District*, 4 Wyo. 133, 142, 32 P. 850 [1893], the court quotes the language of Judge Cooley to the effect that the generality of the title is no objection to it, so long as it is not made a cover to legislation incongruous in itself, and which by no fair intendment can be considered as having a necessary and fair connection. Cooley on Const.Lim. (7th Ed.) p. 206. In the same paragraph of that text (p. 205) it is said that, "To require every end and means necessary or convenient for the accomplishment of a general object to be provided for by a separate act relating to that alone, would not only be unreasonable, but would actually render legislation impossible." And in the case of *In re Boulter*, 5 Wyo. 329, 339, 40 P. 520 [1895], it is said that an act is not invalidated for that reason so long as the subjects of legislation are congruous, cognate or germane, and in furtherance of the general subject of the enactment, even though the act may authorize many things of a diverse nature to be done. There may be subordinate subjects if they be "legitimate offspring of the main subject."

*State ex rel. Wyckoff v. Ross*, 31 Wyo. 500, 510–11, 228 P. 636, 638 (1924).

This constitutional provision contains an important exception. The requirement in this "one subject" provision that a bill contain only one subject which shall be clearly expressed in the bill's title does not apply to a bill for the codification and general revision of the laws. We have recognized the meaning of this exception in *State of Wyoming v. Pitet*, 69 Wyo. 478, 243 P.2d 177 (1952).[20] Regarding revisions and codifications, Sutherland informs us:

A *revision is an act* which restates the law embodied in one or more prior acts in order to clarify and harmonize the provisions of the prior acts and *which may alter, add, or omit provisions*. A *codification is a revision and also a systematic arrangement of all* the *statutes* of the state or all those *concerning a general field of the law*. (emphasis added).

1A *Sutherland Stat. Const.* § 22.27, p. 254 (4th ed. 1985).

Defendants contend that H.B. 92 was not a revision because a revision, by its nature, is not intended to change anything but only to restate what has already been legislated, so that revisions of statutes are not presumed to change the law. *State v. Baker*, 195 Conn. 598, 489 A.2d 1041, 1045 n. 4 (1985). They argue that the state's consent requirement contained in "new 301" changed, rather than restated, what had been the law under "old 203," namely, that the court in its discretion would decide whether to place a defendant on probation.

■ We disagree that a revision is merely a restatement of, not a change in, existing law. As noted earlier, Sutherland's definition of revision makes room for the legislation's altering, adding, or omitting provisions of existing law. We adopt that view. The court in *Baker* recognized that if the legislators use language in the revision that admits of a construction which changes the former law, then there is no presumption that the revision did not change the law. *Baker*, 489 A.2d at 1045 n. 4 (applying *Bassett v. City Bank and Trust Co.*, 115 Conn. 393, 161 A. 852 (1932)). Considering the sweep of 1987 Wyo.Sess.Laws, evident in both its title[21]

---

**20.** Codification is defined as: "CODIFICATION. The process of collecting and arranging the laws of * * * a state into a code, that is, into a complete system of positive law, scientifically ordered, and promulgated by legislative authority." 7 Words and Phrases 540, 14 C.J.S. 1306.

A general revision of the laws, or of statutes, has been defined as follows:

"'Revision of the law'" on any subject is a restatement of the law on that subject in a correlated or improved form, which is intended as a substitute for the law as previously stated, and displaces and repeals the former laws relating to the same subject and within the purview of the revising statute. It implies a reexamination of the law." *People v. Gould*, 345 Ill. 288, 178 N.E. 133, 144, [1931]. *Pitet*, 69 Wyo. at 496, 243 P.2d at 184.

**21.** 1987 Wyo.Sess.Laws, ch. 157:

TITLE 7 REVISION

AN ACT to create W.S. 7–3–611; to amend W.S. 1–40–112(c) introductory paragraph, 6–10–

and in its body, we hold that H.B. 92 was a codification and general revision of Title 7 criminal procedure. We observe that, in addition to identifying the statutory provisions to which the revision act applied, the legislature used clear language to describe what the revision was accomplishing: amending; amending and renumbering; revising; eliminating duplication, redundancies and archaic provisions; moving, combining, deleting and renumbering; providing definitions; repealing provisions; modifying provisions; eliminating certain powers; providing procedures and deleting requirements.

106(a)(iii), 9-1-627(c), 20-3-101(a), 25-3-104(b)(iv) and 25-4-102; to amend, amend and renumber or number W.S. 6-3-702(c), 6-10110, 7-1-101 through 7-5-309, 7-13-101 through 7-15-107 and 7-17-101 through 7-17-103 as 7-1-101 through 7-6-115, 7-9-101 through 7-9-112 and 7-13-101 through 7-17-103; to renumber W.S. 7-1-123 as 7-1-103, 7-6-101 as 7-1-104, 7-7-107 as 7-7-103, 7-7-108 as 7-7-104, 7-8-103 as 7-8-102, 7-8-107 as 7-8-103, 7-8-110, as 7-10-104, 7-8-124 as 7-8-105, 7-9-101 as 7-1-104, 7-9-107 as 7-1-105, 7-10-105 as 7-10-103, 7-10-106 as 7-10-104, 7-10-117 as 7-10-105, 7-10-120 as 7-10-106, 7-11-207 as 7-11-203, 7-11-210 through 7-11-212 as 7-11-204 through 7-11-206, 7-11-406 through 7-11-410 as 7-11-403 through 7-11-407, 7-11-503 as 7-11-502, 7-11-514 through 7-11-516 as 7-11-503 through 7-11-505, 7-11-518 as 7-11-506, 7-12-105 as 7-12-104 and 7-12-205 as 7-12-201 as enacted by Chapter 147, Wyoming Session Laws, 1985; and to amend or amend and renumber W.S. 7-7-102, 7-7-109 as 7-7-105 and 7-10-101(b) as enacted by Chapter 147, Wyoming Session Laws, 1985 relating to criminal procedure; revising Chapters 1 through 5, 13 through 15 and 17 of Title 7 of the Wyoming Statutes; eliminating duplications, redundancies and archaic provisions; moving, combining, deleting and renumbering sections; providing definitions; repealing procedural provision superseded by court rules; specifying when peace officers may issue citations for misdemeanors; modifying the offense of desertion and reducing the penalty; eliminating power of sheriff granted to railroad conductors and engineers; modifying procedures relating to the disposition of property seized or held by peace officers and eliminating the provision authorizing allocation of forfeited property to law enforcement agencies; repealing provisions relating to the governor's reward for fugitives; modifying procedures relating to peace bonds; providing for limited personal items of a deceased to be released to his next of kin following a coroner's investigation; providing procedures for drawing and impaneling grand juries; limiting the term of county grand juries; deleting requirement of publication of

The revision act was not intended to be a mere restatement of former law. Obviously, the legislators used language that admits of a construction which in many instances changed the former law. Specifically with reference to §§ 7-13-101 through 7-13-107, which encompass "old 203" and "old 301," the act was "to amend, amend and renumber or renumber" those provisions "providing procedures for placing certain defendants on probation prior to entry of a judgment of conviction and for their discharge without adjudication of guilt upon successful completion of probation and conforming related statutes

grand jury report; providing for secrecy of grand jury indictment and proceedings; providing that in imposing an indeterminate sentence in a felony case the court shall set the minimum term at no more than 90% of the maximum term imposed; providing procedures for placing certain defendants on probation prior to entry of a judgment of conviction and for their discharge without adjudication of guilt upon successful completion of probation and conforming related statutes; providing that a defendant given a split sentence of incarceration followed by probation is not subject to parole and good time provisions and is under the jurisdiction of the sentencing court while incarcerated; specifying when probation revocation proceedings may be commenced; creating the department of probation and parole and providing powers and duties of the director and probation and parole agents; providing for the arrest by a peace officer of alleged probation or parole violators upon the written statement of a probation and parole agent; providing when restitution shall be made a condition of parole; specifying how earnings of certain defendants and prisoners shall be disbursed; specifying sex crimes for which special examination and sentencing provisions apply, designating who shall perform examinations and designating where such convicted defendants may be committed; placing control of the reentry furlough program under the board of charities and reform; modifying provisions relating to the issuance and execution of death warrants; providing procedures relating to the examination of female prisoners sentenced to death who are believed to be pregnant; providing the public defender shall represent certain prisoners asserting violation of constitutional rights; specifying in which cases the state will indemnify sheriffs or other officers from civil liability in connection with prisoner labor; eliminating the state commission on prison labor and transferring functions to the board of charities and reform; providing for work release programs at each of the state's adult penal institutions; and providing for an effective date.

* * *." 1987 Wyo.Sess.Laws, ch. 157, p. 299. No one who read the title and was thus aware of the passage of the law could reasonably claim to have been surprised or misled into thinking that the revision act was a mere restatement of former law.

We hold that since 1987 Wyo.Sess.Laws, ch. 157, originally introduced as H.B. 92, was a proper codification and general revision of the laws to which it pertained, it was excepted from the requirements of the "one subject" constitutional provision. We also hold that it was constitutionally enacted.

## VI.

WHETHER W.S. 7–6–106(d) (JUNE 1987 REPL.), UNDER WHICH LOWRY, VIGIL AND McIVER WERE ORDERED TO REIMBURSE THE STATE FOR PUBLIC DEFENDER ATTORNEY'S FEES, IS CONSTITUTIONAL.

In *Lowry*, when the county court judge appointed the public defender to represent Ms. Lowry, the judge found that she was presently unable to provide for full payment of attorney's fees and other expenses of representation, but that she could afford to pay a certain amount to defray partial costs of representation. This finding was based upon the judge's consideration of Ms. Lowry's affidavit seeking court-appointed counsel in which she provided detailed information about her financial situation and present employment. Specifically, in her affidavit she stated she could afford to make monthly payments towards her court-appointed counsel in the sum of $50 per month. In the judge's order, and based on his finding that Ms. Lowry could afford to pay some amount to defray partial costs of defense counsel, he ordered her to pay $50 per month. Later, when the judge, over the prosecutor's objection, deferred prosecution and placed Ms. Lowry on probation under "new 301," he ordered Ms. Lowry to reimburse the state and county $200 for the services of her court-appointed counsel.

In *Vigil*, when the county court judge appointed the public defender to represent Mr. Vigil, his appointment was based upon Mr. Vigil's affidavit for court-appointed counsel in which he provided detailed information about his financial situation and employment history. Later, in the presentence investigation report Mr. Vigil provided further detailed information about his financial situation and his employment history. When the district court judge sentenced Mr. Vigil, he ordered him to pay the state public defender for all expenses and services according to the public defender's standard fee schedule. The judge ordered this to be paid within Mr. Vigil's five-year probationary period according to a court-approved payment plan.

In *McIver*, the county court appointed a public defender based upon Mr. McIver's affidavit in which he gave detailed information about his financial situation, employment history, educational background, and family background. A presentence investigation report provided further detailed information about his financial situation, employment history, educational background, and family background. When the district court judge sentenced Mr. McIver, he ordered him to repay the state public defender for all expenses and services pursuant to that office's standard fee schedule. The judge ordered this to be paid within Mr. McIver's three year probationary period according to a court-approved payment plan.

Under W.S. 7–6–106(d) (June 1987 Repl.) the courts have the authority to order a defendant to repay the state for the cost of defense services.[22] Defendants Lowry, Vigil and McIver raise for the first time on appeal the question of the constitutionality of this statute. They do not argue plain error. Since we find no jurisdictional claim and no fundamental right claim, we decline

---

22. W.S. 7–6–106(d) (June 1987 Repl.):
 If the court orders probation before sentence, suspended sentence or probation, the court shall order the needy person as a condition of sentence or probation to repay the state for expenses and services provided by appointed attorneys pursuant to the state public defender's standard fee schedule.

to consider this issue. *Hopkinson*, 664 P.2d at 50.

## VII.

### WHETHER PROSECUTOR'S REFUSAL TO CONSENT TO FIRST OFFENDER TREATMENT FOR MR. VIGIL VIOLATED HIS RIGHTS TO DUE PROCESS

■ Since a judge's sentence must be based upon only accurate information found in the presentence investigation report, Mr. Vigil argues that the prosecutor's "sentence-like" consent decision must also be based upon only accurate information. *See Christy v. State*, 731 P.2d 1204, 1207–08 (Wyo.1987). Mr. Vigil claims that the prosecutor refused to give the state's consent to "new 301" probation because Mr. Vigil was a drug dealer, but that he steadfastly denied he dealt drugs. We view the record differently from Mr. Vigil. In the presentence investigation report, Mr. Vigil states that he had previously sold drugs but felt it did not amount to much. At the sentencing proceeding, the district court judge called the presentence investigation report to Mr. Vigil's attention and asked him if it contained any inaccuracies. Mr. Vigil said it did not.

When the prosecutor told the district court judge why the state refused to give its consent to "new 301" probation, he referred to Mr. Vigil's presentence investigation report admission of having previously sold drugs and explained that the state felt the pending criminal matter was not an isolated incident in view of that admission and that the state felt Mr. Vigil should not be absolved and have a clean record under "new 301." The district court judge found the state's position was rational. So do we. We also note that Mr. Vigil did not raise this issue below, but rather presents it here for the first time, and he has not claimed that the prosecutor's refusal to consent was based on any suspect factor. *Jahnke*

692 P.2d at 927–28. Therefore, we find no merit to Mr. Vigil's argument on this point.

## VIII.

### WHETHER PROSECUTOR'S REFUSAL TO CONSENT TO SENTENCING UNDER § 7–13–301 WAS ARBITRARY AND AN ABUSE OF DISCRETION AND, THEREFORE, VIOLATED WYO. CONST., ART. 1, §§ 2 and 7

In each of their respective cases, Vigil, Moon, Magarahan, and Billis claim that the prosecutor's refusal to consent to "new 301" treatment was arbitrary and abuse of discretion, thus violating Wyo. Const., art. 1, §§ 2 and 7.[23]

■ Both Ms. Moon and Ms. Magarahan claim that since the prosecutor in each of their cases gave no reason for the state's refusal to consent to "new 301" treatment, those refusals were arbitrary and characterized by an abuse of discretion. The records in these cases are silent as to why the prosecutors refused to consent. As explained earlier, the prosecutor, not the judge, controls the prosecution up to adjudication. This court will not presume that suspect factors or arbitrary classifications exist. Ms. Moon and Ms. Magarahan cannot point to any suspect factors or other arbitrary classification in the record. We find no merit in their argument.

Under this assignment of error, Mr. Vigil claims, as he did with reference to his due process claim, that the prosecutor's refusal to consent based upon Mr. Vigil's admitted previous drug dealing was arbitrary. We find no merit to this argument for the same reasons we found no merit to his due process argument.

Mr. Billis argues that his prosecutor's refusal to consent to "new 301" treatment was arbitrary. He contends that the prosecutor's refusal to consent is tantamount to sentencing, which we rejected earlier. This is a prosecutor's decision, and the court

---

**23.** Wyo. Const., art. 1:
§ 2. **Equality of all.**—In their inherent right to life, liberty and the pursuit of happiness, all members of the human race are equal.

§ 7. **No absolute, arbitrary power.**—Absolute, arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority.

may not interfere with that, absent the presence of suspect factors. Mr. Billis' contention that the prosecutor's refusal to consent served none of the objectives of sentencing is without merit.

■■■ Last, Mr. Billis asserts that his prosecutor based the refusal to consent upon the arbitrary factor of his age. The record does not bear him out. The prosecutor refused to consent not only because of age but also because the state had already shown leniency by dismissing one count of delivery of cocaine under the plea bargain and because of the rather professional manner in which Mr. Billis had committed the drug crime. We find no merit in any of Mr. Billis' assertions and hold that the prosecutor's exercise of discretion in refusing to consent to "new 301" treatment for Mr. Billis was not abused and was not based on any suspect factor or other arbitrary classification.

## CONCLUSION

We hold that "new 301" does not violate the separation of powers doctrine and was constitutionally enacted. The due process rights of Mr. Vigil were not violated by the prosecutor's refusal to consent. As to the claim made by Ms. Moon, Ms. Magaharan and Mr. Billis, we hold that the prosecutor's refusal to consent was not an abuse of discretion and was not arbitrary.

Because they were not raised below, we decline to address the constitutional claims of Ms. Lowry, Mr. Vigil and Mr. McIver that relate to reimbursement of defense counsel attorney fees.

URBIGKIT, C.J., filed a dissenting opinion in which MACY, J., joins.

MACY, J., filed a dissenting opinion in which URBIGKIT, C.J., joins.

URBIGKIT, Chief Justice, dissenting.

We may as well provide two chairs on the bench during sentencing—one for the judge and one for the prosecutor—and be done with pretense. I dissent for two reasons. First, I would hold that Wyoming's separation of powers provision [1] prohibits the prosecutor from exercising any power over sentencing. Second, I would hold that the 1987 amendments to what is now W.S. 7–13–301 violate Wyo. Const. art. 3, §§ 20 and 24.

## I. WHAT WE HAVE HERE AND WHY I WORRY!

The majority opinion can be breathtaking at times in the display of its scholastic strength. It is, however, an excellent answer to the wrong question. The question is not whether our state's separation of powers doctrine collides with a deferred prosecution scheme, but whether that doctrine prohibits prosecutorial participation during the sentencing process as provided by W.S. 7–13–301. The majority reforms the question to ask if sentencing is an "exclusive judicial function" and answers that question with a "no." I would answer that question with a "yes." Because the majority answers that question with a "no," they make room on the bench for the prosecutor to participate effectively in sentencing.

The judicial processes of Wyoming law have infrequently, if ever, been compelled by majority authorship to grasp so extensively in an effort to justify a societally unproductive and judicially untenable legal position. Paraphrasing from a current admonition against achieving a result without actual precedential justification, the majority "reach[es] out peripherally in [ ] many directions in an attempt to authoritatively support an [unjustified decision]. The reader is inundated with a multitude of citations and a bulk of material running the gambit of quotations from historically well-known United States Supreme Court Justices and legal scholars" to justify a result which is only "useful" to multiply numbers

1. Wyo. Const. art. 2, § 1 states:
 The powers of the government of this state are divided into three distinct departments: The legislative, executive and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any powers properly belonging to either of the others, except as in this constitution expressly directed or permitted.

of Wyoming felony convictions. *City of Rocky River v. State Employment Relations Bd.*, 43 Ohio St.3d 1, 539 N.E.2d 103, 120 (1989), Justice Holmes dissenting.

If these consolidated appeals challenge prosecutorial discretion under W.S. 7–13–301[2] to defer criminal prosecutions, then there is no separation of powers problem and the statute in question may be considered constitutionally valid. But if these consolidated appeals challenge a legislative scheme to allow the prosecutor control over the sentencing process, then a collision with our state's separation of powers doctrine appears unavoidable. I understand W.S. 7–13–301 to collide with our separation of powers doctrine since it allows the prosecutor, against the wishes of the trial judge and the defendant, to control the disposition of a case *after* the accused has been *"found guilty"*. I would hold that once a defendant pleads guilty or is convicted by the jury, the role of the prosecutor has come to an end.

The majority disagrees and claims the role of the prosecutor remains active until the sentencing judgment is entered, but argues as if binding precedent drives their holding. Actually, existent legal rules have nothing to do with the achieved outcome. The cluster of federal cases advanced by the majority is no logical justification for re-authoring Wyoming law. Where the federal supremacy clause does not operate, Wyoming case law is the appropriate precedent and Wyoming precedent is dispositive. " 'When the decision to prosecute has been made, the process which leads to acquittal or to sentencing is fundamentally judicial in nature.' " *Petition of Padget*, 678 P.2d 870, 872 (Wyo. 1984) (quoting *People v. Tenorio*, 3 Cal.3d 89, 94, 89 Cal.Rptr. 249, 252, 473 P.2d 993, 996 (1970)). The majority now hands control over sentencing to the prosecutor when

only two years ago we affirmed that "[t]o require the court to accept the recommendation of the prosecution as a matter of law would transfer the sentencing duty from the court to the prosecution. * * * It is the court's duty to impose the sentence, not the prosecution's." *Mower v. State*, 750 P.2d 679, 681 (Wyo.1988).

Today, the majority turns its back on its duty to guarantee the protection of individual rights and yields to enterprising ambition of a force within or without legislative action to take from the judiciary and give to the executive a power not theirs to give. Not only is the judiciary demeaned, but this holding overall makes no sense unless one examines the unprincipled impact of political theory upon appellate adjudication. Rather than binding precedent, this outcome appears driven by a political theory which tightens the grip of the prosecutor on the throat of the accused at every opportunity.[3]

> As the jurisprudence of Ronald Dworkin has reminded us, several of the constitutional clauses guaranteeing rights to individuals are formulated in such general terms that in many cases judges cannot base their decisions on the text or the intent of the framers. Rather, they must base them, consciously or unconsciously, on a political theory of some kind, a theory that defines in the abstract the proper scope of governmental authority and individual liberty.

Elfenbein, *The Myth of Conservatism as a Constitutional Philosophy*, 71 Iowa L.Rev. 401, 402 (1986). Whatever name is given to the political theory in operation here, it is one which finds primacy in securing legislative supremacy over the rights of citizens unless those rights are enumerated. Such a philosophy does no more than articulate by rote a political theory which selects legislative primacy when the values

---

**2.** W.S. 7–13–301 (emphasis added) provides in pertinent part:

Placing person *found guilty,* but not convicted, on probation.
 (a) If a person who has not previously been convicted of any felony is charged with or is *found guilty of* or *pleads guilty to* any misdemeanor * * *, or any felony except murder, sexual assault in the first or second degree or

arson in the first or second degree, *the court may, with the consent of* the defendant and *the state* and *without entering a judgment of guilt or conviction, defer* further proceedings and place the person on probation * * *.

**3.** *See Cooney v. Park County,* 792 P.2d 1287 (Wyo.1990).

of majority adaptation in representative government and rights of citizens collide.

If " '[t]he general principles governing the construction of statutes apply to the construction of constitutions,' " *County Court Judges Ass'n. v. Sidi,* 752 P.2d 960, 973 (Wyo.1988) (quoting *Zancanelli v. Central Coal & Coke Co.,* 25 Wyo. 511, 173 P. 981, 991 (1918)), and if "[w]e construe *every word, every clause and every sentence* so as to avoid rendering the [constitutional framers' and ratifiers'] actions futile or absurd." *Britton v. Bill Anselmi Pontiac–Buick–GMC, Inc.,* 786 P.2d 855, 864 (Wyo.1990) (emphasis added), how can we examine our separation of powers doctrine without examining simultaneously the potential impact of legislative enactments on the government's ability to protect the rights of citizens against acts of tyranny by state officials?[4] No analysis is given regarding the possible rights of the accused to be free from prosecutorial participation at this level in the judicial process. The dialogue is couched only in terms of historic prosecutorial power.

> "The crucial operative aspect of rights skepticism is its attitude toward the resolution of [the] systemic tension [between majority rule and individual rights]. When a rights-supporting value of the Constitution is understood to be in argua-

ble conflict with majority conduct, the rights skeptic insists that the case for the recognition of the right be made only under circumstances of textual, historical, or structural certainty; otherwise the majoritarian result must prevail. Under this conception, rights are narrowly defined exceptions to an otherwise prevailing general commitment to majority rule."

Elfenbein, *supra,* 71 Iowa L.Rev. at 425 n. 124 (quoting Sager, *Rights, Skepticism and Process–Based Responses,* 56 N.Y.U. L.Rev. 417, 441 (1981)). To maintain this skepticism, the majority leaves us with an unfathomable standard to guide our future judgment of when the legislature has violated the separation of powers doctrine. They say that as long as a legislative enactment does not disturb the "integration of dispersed powers into a balanced, workable government" and can be accommodated by a "pragmatic, flexible view of differentiated governmental power," then there is no violation of the separation of powers. Although that is an unfathomable standard, it is a directed pathway to tyranny—ultimate autocracy of government—absolute statism.

Incredibly, the majority opens their analysis only after first reforming the

---

**4.** It is also harsh, but appropriate, to reflect that the prosecutorial veto would be more acceptable if the appropriateness of punishment was visited upon those responsible authorities in *Gale v. State,* 792 P.2d 570 (Wyo.1990) by challenge to the non-prosecution of the principal wrongdoers or in *Cooney,* 792 P.2d 1287 by a perjury conviction and sentence for the prosecutor. Crime does not first exist when the unwashed are apprehended. It is the ignored, absolved and protected that set the standard for an offensive and criminally infected society.

In context of Madison and Jefferson, ideals of democracy, individual rights, worthiness and the individual within a civilized humane society, these prosecutorial veto cases personify a result-oriented adjudication at its most virulent manifestation. Twenty or twenty-five years from now someone could easily win a Pulitzer or like award by following the future activities of the twelve people whose lives as potentially productive people were damaged or destroyed by the decision to require a conviction of a felony in contravention of the constitutional directive of our penal code of reformation and, usually, for no definable reason.

Status as a felon deals in undescribable and undiscernible present damage to both the individual and, through them, our society. Each miscreant who may seek to rehabilitate but then becomes a hardened criminal by societal failure is the direct responsibility of those who author these failures of fairness. Each future offense and each life lost by the criminalization of a broad group of our younger generation is a loss to all of us for which this court must take the primary responsibility. Inevitably, it will be those unable to protect themselves because of limited wealth or ineffective legal assistance upon whom prosecutorial veto will be most heavily inflicted.

It would be imbecilic or juvenile to ignore the recognition of the sweep of power and effect in the reorganized authority in our society of the prosecutorial veto. The unanchored and uncontrolled power will be implicit, explicit and omnipresent within the totality of the first offense violator and plea bargaining in criminal sentences. This is unanchored increased advocacy power beyond any reasoned fair trial constitutional concepts.

claim made by the several defendants. The majority writes that "these criminal defendants contend it is essential that we preserve each of the powers in separate, *airtight* compartments." (Emphasis added.) I do not find in the record or in the briefs where the appellants argue for "airtight compartments". The only reference to "airtight" I have found occurs in a case relied on by the majority which states "[t]he [federal] Constitution does not require three *airtight* departments of government." *Geraghty v. United States Parole Com'n*, 719 F.2d 1199, 1210 (3rd Cir.1983), *cert. denied* 465 U.S. 1103, 104 S.Ct. 1602, 80 L.Ed.2d 133 (1984) (emphasis added). The majority takes comfort in *Geraghty* standing for the proposition that "[u]nlike interpreting the constitution or adjudicating disputes, sentencing is not inherently or exclusively a judicial function." Such comfort must be cold comfort because *Geraghty*, 719 F.2d at 1210 specifically cautioned that its dicta applied to the federal system because "[t]he federal Constitution, unlike some state constitutions, has no express provision which prohibits the officials of one branch of government from exercising functions of the other branches." The majority mistakenly seizes upon a single phrase in *Geraghty*. From that single phrase, they claim that sentencing in Wyoming is not an exclusive judicial function but, political theories being what they can be, everything leading up to the entry of judgment is, of course, an exclusive prosecutorial function.

The fundamental character of "blending" the constitutional separation of powers out of reality serves only to justify unprincipled result-oriented adjudication to suit a contemporary concept of political or economic morality. *State ex rel. Whitehead v. Gage*, 377 P.2d 299 (Wyo.1963). That course of governmental conduct was not acceptable to the United States Supreme Court in the steel industry seizure case of *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). In that case, it was the executive; but the interest of the constitutional drafters of the United States Constitution was for "hopes for freedom" to exist in responsibility no less in the judiciary. Our system has not chosen to give separately and singularly to the trial advocate—the prosecutor—the keys to the jail nor power uncontrolled to destroy the effective existence of a human being. The direct and collateral consequences of a felony conviction are, in today's society, beyond rational recognition. *Cf. Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). We deal here with productive lives and fruitful existence, not just deficits, money and budgets. *Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986). In exercise of constitutional responsibility and determination of guilt as assessed to the judiciary under the "stringent [ ] standard of disinterest as judges," the zealous advocacy of the prosecutors cannot be given priority if the judiciary chooses not to relegate itself to be in authority only a mere mockery. *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 807, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987). We walked that way once before in impotency. Compare *Gage*, 377 P.2d 299 with *Schaefer v. Thomson*, 240 F.Supp. 247 (D.Wyo.1964).[5]

Operating from the comfortable analytic position of only defending against a claim for *"air-tight* compartments," the majority employs a framer's intent analysis to discover the framers indeed had in mind a "pragmatic, flexible view of differentiated governmental power" that allows a prosecutor control over the outcome *after* the accused has pled or been found guilty.

---

**5.** It is interesting to acknowledge the perspective of Justice William J. Brennan, Jr. that the most important case ever decided in his judicial career, extended as it has been, came to be the reapportionment cases required to correct legislative malfeasance and judicial impotence. *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) as followed by *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506, *reh'g denied* 379 U.S. 870, 85 S.Ct. 12, 13 L.Ed.2d 76 (1964). Unfortunately, *federal judicial response* was called when state political opportunism was more important than the legislator's constitutional oath and directed constitutional reapportionment obligations, and while nothing happened legislatively, the state courts collectively wrung their hands in disdain, despair and inaction. *Gage*, 377 P.2d 299.

Never once, however, does the majority stop to separate intent from purpose. The historic purpose for separating governmental powers is to prevent tyranny.[6] Because the separation of powers doctrine is designed to help prevent governmental tyranny, displays of tyranny by state government employees makes legitimate the question of why our separation of powers model sometimes fails to prevent those displays. By answering the wrong question so well, the majority adds to the potential for tyrannic power which they provided prosecutors in *Cooney v. Park County*, 792 P.2d 1287 (Wyo.1990) by declaring that citizens have no civil recourse against any prosecutor, even when the prosecutor willfully uses the awesome power of the state to settle a personal vendetta. In a real sense, it is even more compelling to ask why prosecutorial power is being strengthened in the face of such structural failure[7].

Do we examine a deferred prosecution scheme against the backdrop of our separation of powers doctrine? Or do we examine a legislative scheme to imbed the prosecutor's role into the sentencing process against the backdrop of our separation of powers doctrine? Initially, these consolidated cases present events occurring *after the guilty plea or jury verdict was entered*. The legislative scheme permits a prosecutor to require the appending of a felony designation to the plea and sentence. *This is what these cases involve. The issue addresses whether the separation of powers doctrine is violated by this legislative scheme to strengthen the leverage of prosecutors by allowing prosecutors the discretion to require felony status as a constituent of any sentence*. Punishment, confinement, or probationary responsibility is not altered by the prosecutorial veto under the Wyoming adjudicatory structure since the trial court can provide the same sentencing responsibility with or without the application of W.S. 7–13–301 in distinction to W.S. 7–13–302, except that the conviction of a felony is or is not appended.

The majority essentially redefines deferred prosecution to include post-plea action of the trial court and hands the reins of the sentencing process to the prosecutor.

In addition to nolle prosequi and acquittal, criminal charges may be disposed by three processes. Process one is the diversion programs[8], process two is a plea or verdict without entry of a felony judgment, and process three is a plea or verdict with entry of a felony judgment. The majority misunderstands or does not recognize the difference between diversion, process one, and plea or verdict without final felony conviction, process two. The plea or verdict which has been entered by probation without felony conviction is no more revocable than is probation with the felony conviction. *Zanetti v. State*, 783 P.2d 134 (Wyo.1989); *Peper v. State*, 768 P.2d 26 (Wyo.1989); *Angerhofer v. State*, 758 P.2d 1041 (Wyo.1988); *Chorniak v. State*, 715 P.2d 1162 (Wyo.1986).[9]

6. Consider A. Hamilton, J. Madison and J. Jay, *The Federalist* (1961).

7. I would also consider *Gale*, 792 P.2d 570 important in this context due to the fact that prosecutors gave criminal immunity to a father after nearly a decade of sexually abusing his daughters.

8. *See State v. Leonardis*, 71 N.J. 85, 363 A.2d 321 (1976), *reh'g* 73 N.J. 360, 375 A.2d 607 (1977).

9. A thorough exploration of the probationary sentence without felony conviction occurs in *People v. Banks*, 53 Cal.2d 370, 1 Cal.Rptr. 669, 348 P.2d 102 (1959), which involved criminal statutes similar in result to the pre–1987 Wyoming law.

In distinguishing the intermediate probationary sentence from the felony conviction, that court described:

> By contrast, the defendant whose guilt has been established (by plea, finding or verdict) but who has not been sentenced to prison, i.e., where probation has been granted and the proceedings have been suspended without entry of judgment, is subject to no disabilities whatsoever except those specifically declared by some other provision of law or affirmatively prescribed by the court as terms or conditions of probation. The probationer in the latter case still retains his ordinary civil rights, unless the court has restricted them, among them being as a matter of law the right to a hearing and arraignment, with counsel, before judgment in the event that he is charged with a violation of the terms of his probation order. * * * He does, however, for some specific purposes—for administration of the probation law and other laws expressly made applicable to persons so situated—stand

## II. HISTORY OF THE STRUCTURE OF WYOMING LAW

From before the time of statehood, Wyoming sentencing processes provided broad discretion to the trial court.[10] S.F. 100, 10th Leg. (1909), enacted as Wyo.Sess. Laws ch. 87 (1909), successfully introduced "[a]n act relating to the parole of prisoners found guilty by a jury on their plea of guilty of crimes charged against them." As first offense sentencing process, the enacted statute was a juvenile sentencing act with comprehensive characteristics for purposes of clarity and to differentiate a succeeding statute. This enactment will be called the Modified Juvenile Sentencing Act.[11]

### PAROLE.

**Section 1.** Whenever any person, not over twenty-one years of age, shall have been found guilty by the verdict of a jury empaneled to try his case, or by his plea of guilty, duly entered in the cause, of any felony except murder, rape of a woman or female child forcibly and against her will, or arson of a dwelling house or other human habitation in the actual occupancy of a human being, the court in which such verdict was found or plea of guilty entered, shall ascertain, if possible, whether the offense of which the accused is found guilty is his first offense, as well as the extent of moral turpitude involved in the act committed, and such other facts and circumstances relating to the accused as he may desire to know; and if satisfied that such person was a person of good reputation before the commission of the offense charged and had never before been convicted of any felony, and that if permitted to go at large would not again violate the law, may in its discretion, by an order entered of record, *delay the passing sentence upon such verdict, or plea, and parole such person and permit him to go at large upon his own recognizance * * * and the Court, if satisfied * * *,* that such person has demeaned himself in a law-abiding manner and lived a worthy, respectable life, may by an order of record, continue such parole from time to time for the period of five years, at the expiration of which period the Court shall enter an order finally discharging such person, and no further proceedings shall be had upon such verdict or plea; *Provided, however, That at any time after the expiration of one year from the date of said original parole the Court shall have the power in its discretion to terminate said parole and finally discharge such person and annul such verdict or plea of guilty.*

### ABSOLUTE DISCRETION.

**Sec. 2.** The Court, in the exercise of its power to determine the previous good character of any such person, to determine the advisability of paroling such person, to determine the propriety of finally discharging such person at any time after the end of one year, and to determine the fact of violation of the terms of the parole and recognizance and propriety of imposing sentence upon such person, shall have absolute discretion, and no appeal or proceeding in error shall lie from the determination of the Court upon any of said questions.

convicted of a felony. For example, under the statute probation may be revoked at any time * * * and the probationer may be arrested without warrant. * * * Such conviction, in itself and without pronouncement of judgment, establishes a status which is attended by certain disabilities. *Id.,* 1 Cal.Rptr. at 680, 348 P.2d at 113. *See Berman v. United States,* 302 U.S. 211, 58 S.Ct. 164, 82 L.Ed. 204 (1937).

10. The present provisions of W.S. 7–13–301 are essentially the same as Wyo.Sess.Laws ch. 84 (1909), except for the *Duffy v. State,* 789 P.2d 821 (Wyo.1990) amendment found in the last sentence. It is also effectively the same within its indeterminate sentence structure since enactment of a general criminal code for Wyoming. *See* The Compiled Laws of Wyoming, ch. 35 (1876).

11. The act initially provided an upper age limit of twenty-five years. The reduction to twenty-one years occurred by amendment during debate. Senate Journal, p. 299. To correlate the Modified Juvenile Sentencing Act to the majority opinion, this statutory proceeding is found in W.S. 7–13–203, 7–13–204 and 7–13–205 (1977) and is the ancestor of W.S. 7–13–301 into which the prosecutorial veto was inserted. *See King v. State,* 720 P.2d 465 (Wyo.1986).

## NO DELAY.

**Sec. 3.** No delay in the passing of sentence or parole of a person as provided in this act shall be ordered against the consent or will of such person.

Wyo.Sess.Laws ch. 87 (1909) (emphasis added).

Exercise of the parole or probationary status provided by the act was initially subject to consent of the charged individual because of exposure to a probation term of five years. That statute, initially limited to persons under twenty-one years of age, was followed in initial success with a 1931 change by which the age limitation was removed. Wyo.Sess.Laws ch. 73, § 9 (1931).[12]

The sentencing statute was triggered by a conviction or a plea of guilty followed by imposed parole obligations and gave authority to the trial court to annul the verdict or plea in order that a conviction of a felony did not result. After the age limitation had been removed from the 1909 enactment, the statute remained essentially unchanged until Wyo.Sess.Laws ch. 157 (1987). It was in the recodification of this Modified Juvenile Sentencing Act where the prosecutorial veto provision became appended by legislative passage as the provision from which this appeal is presented. What had started as a juvenile sentencing statute has now expanded to a first offender, non-conviction statute by W.S. 7-13-301 with transposition of provisions from another statute.

With the 1909 Modified Juvenile Sentencing Act in place, the legislature, by Wyo. Sess.Laws ch. 91 (1939), enacted a separate procedure as a new sentencing code which provided for suspension of trial as well as suspension of sentence by probation. Wyo. Sess.Laws ch. 91 (1939) in part provided:

### Power of Court to Suspend Sentence or Trial in Some Cases—Probation.

**Section 1.** After conviction or plea of guilty for any offense, except crimes punishable by death or life imprisonment, the court may suspend the imposition or the execution of sentence and may also place the defendant on probation or may impose a fine applicable to the offense and also place the defendant on probation. With the consent of a defendant charged with a crime, except a crime punishable by death or life imprisonment, the court may suspend trial and place such defendant on probation.

### County Attorney—Clerk of Court—Duties.

**Section 2.** When directed by the court, the county attorney shall fully investigate and report to the court in writing the circumstances of the offense, and the criminal record, social history and present conditions of the defendant, including, whenever practicable, the findings of a physical and mental examination of the defendant. No defendant charged with a felony, and, unless the court shall direct otherwise in individual cases, no other defendant shall be placed on probation or released under suspension of trial or sentence until the report of such investigation shall have been presented to and considered by the court. If such defendant is committed to any institution, a copy of the report of such investigation shall be sent to the institution at the time of commitment. In all cases the clerk of court shall forward copies of such report to the Board of Charities and Reform, and copies of all orders entered by the court.

### Court May Modify Conditions.

**Section 3.** The court shall determine and may, by order duly entered, impose in its discretion, and may at any time modify any condition or conditions or probation or suspension of trial or sentence.

---

12. The revised statute cited above in introduced bill form raised the age limitation back to the twenty-five originally anticipated by the sponsor in 1909. During the 1931 passage, an amendment was successfully introduced which eliminated any age limitation and provided the structure of the statute which then continued until 1987 to be available without regard for an age limitation. This history justifies the description of Modified Juvenile Sentencing Act, although the law was essentially directed toward young people and particularly so because of the first offense limitation.

**Extension of Suspension or Probation—Discharge—Violation of Conditions by Defendant.**

**Section 4.** The period of probation or suspension of trial or sentence and the conditions thereof shall be determined by the court and may be continued or extended. Upon the satisfactory fulfillment of the conditions of suspension of trial or sentence or probation the court shall by order duly entered discharge the defendant. At any time during the period of suspension of trial or sentence or probation, the court may issue a warrant and cause the defendant to be arrested for violating any of the conditions of probation or suspension of trial or sentence. As soon as practicable after the arrest the court shall cause the defendant to be brought before it and may proceed to deal with the case as if no suspension of trial or sentence or probation had been ordered.

**Fines.**

**Section 5.** When imposing a fine and also placing the defendant on probation, the judge of the district court may permit such fine to be paid in such installments and over such periods of time as he deems possible and reasonable.

**Power of the Governor.**[13]

**Section 6.** Nothing herein contained shall be construed to impair the power of the Governor to grant a pardon or commutation in any case.

The difference between the 1909 Modified Juvenile Sentencing Act and the 1939 adult suspension of trial or sentence act was essentially operational. The Modified Juvenile Sentencing Act required plea or conviction and afforded an opportunity to avoid the felony conviction. Alternatively, the adult suspension of trial or sentence act, if applied following plea, permitted no remission of the felony status but could result, if applied for suspension of trial, with the same result as the Modified Juvenile Sentencing Act. The practical difference between the Modified Juvenile Sentencing Act and the adult suspended trial or sentence act is the provision in the latter where no plea was required for utilization if trial was suspended. Another obvious difference is the flexibility afforded in the Modified Juvenile Sentencing Act permitting a conclusion after one year, which provision might not necessarily be equally available under the later statute.

The finality of the adult sentencing statute was established not only by the probationary terms but by provisions for entry of a judgment for the payment of a fine. Then, Wyo.Sess.Laws ch. 68, § 1 (1984) provided a potential for prison labor when the statute then numbered W.S. 7–13–301, 7–13–302, and 7–13–303 was amended to add:

**7–13–303. Imposition or modification of conditions; work as a condition of probation.**

\* \* \* \* \* \*

(b) As a condition of any probation, the court, subject to W.S. 7–13–701 through 7–13–704, may order the defendant to perform work for a period not exceeding the maximum probation period.

**7–13–701. Work for persons confined in county jail or probationers; generally.**

(a) The sentencing court may require the following persons to perform work pursuant to W.S. 7–13–701 through 7–13–704:

\* \* \* \* \* \*

---

**13.** Wyo.Sess.Laws ch. 91, § 6 (1939), W.S. 7–13–306, entitled "Governor's Power of Pardon Unaffected," also achieved an interesting metamorphosis in the recodification process which was originally found in the session laws as W.S. 7–13–307, captioned "Governor's Power of Pardon Unaffected." The new text with the same caption stated that "[n]othing in W.S. 7–13–301 through 7–13–306 shall be construed to authorize the court to expunge the record of a person charged with or convicted of a criminal offense." Somehow, the caption got re-edited in the current supplements to the statutes and now states as a title, "Expungement of criminal record." The new language added by recodification and the disappearance of the prior statute is not explained. A title change for this text substitution was not included in the enacted legislation.

(iii) Persons for whom work is imposed as a condition or probation pursuant to W.S. 7-13-303(b).

Wyo.Sess.Laws ch. 68 (1984).

These two statutes were essentially re-stated in the 1987 Title 7 recodification with the Modified Juvenile Sentencing Act restated as W.S. 7-13-301 and the adult suspended trial or sentence act restated as W.S. 7-13-302 through 7-13-307.[14]

14. Because of the importance to understand what occurred in recodification, the terminology provided in recodification was restated:

**7-13-301. Probation before sentence; generally; terms and conditions; discharge; revocation of probation and imposition of sentence.**

(a) If a person who has not previously been convicted of any felony is charged with or is found guilty of or pleads guilty to any misdemeanor except any second or subsequent violation of W.S. 31-5-233 or any similar provision of law, or any felony except murder, sexual assault in the first or second degree or arson in the first or second degree, the court may, with the consent of the defendant and the state and without entering a judgment of guilt or conviction, defer further proceedings and place the person on probation for a term not to exceed five (5) years upon terms and conditions set by the court. The terms of probation shall include that he:

(i) Report to the court not less than twice in each year at times and places fixed in the order;

(ii) Conduct himself in a law-abiding manner;

(iii) Not leave the state without the consent of the court; and

(iv) Conform his conduct to any other terms of probation the court finds proper.

(b) If the court finds the person has fulfilled the terms of probation and that his rehabilitation has been attained to the satisfaction of the court, the court may at the end of five (5) years, or at any time after the expiration of one (1) year from the date of the original probation, discharge the person and dismiss the proceedings against him.

(c) If the defendant violates a term or condition of probation at any time before final discharge, the court may:

(i) Enter an adjudication of guilt and conviction and proceed to impose sentence upon the defendant if he previously pled guilty to or was found guilty of the original charge for which probation was granted under this section; or

(ii) Order that the trial of the original charge proceed if the defendant has not previously pled or been found guilty.

(d) Discharge and dismissal under this section shall be without adjudication of guilt and is not a conviction for any purpose.

(e) There shall be only one (1) discharge and dismissal under this section or under any similar section of the probationary statutes of any other jurisdiction.

**7-13-302. Suspension of imposition or execution of sentence; placing defendant on probation; fine and probation.**

(a) After conviction or plea of guilty for any offense, except crimes punishable by death or life imprisonment, and following entry of the judgment of conviction, the court may:

(i) Suspend the imposition or execution of sentence and place the defendant on probation; or

(ii) Impose a fine applicable to the offense and place the defendant on probation.

**7-13-303. Investigation of defendant by district attorney or state probation officer; report of investigation prerequisite to probation or suspension of sentence; copies of report to institution and board of charities and reform.**

(a) When directed by the court, the district attorney or the state probation and parole officer shall fully investigate and report to the court in writing:

(i) The circumstances of the offense;

(ii) The criminal record, social history and present conditions of the defendant; and

(iii) If practicable, the findings of a physical and mental examination of the defendant.

(b) No defendant charged with a felony, and, unless the court directs otherwise, no defendant charged with a misdemeanor, shall be placed on probation or released under suspension of sentence until the report of the investigation under this section is presented to and considered by the court. If the defendant is committed to a state penal institution, a copy of the report of the investigation shall be sent to the institution at the time of commitment. In all felony cases the clerk of court shall forward copies of the report to the board of charities and reform together with copies of all orders entered by the court.

**7-13-304. Imposition or modification of conditions; work as a condition of probation.**

(a) The court may impose, and at any time modify, any condition of probation or suspension of sentence.

(b) As a condition of any probation, the court, subject to W.S. 7-13-701 through 7-13-704 [7-16-101 through 7-16-104], may order the defendant to perform work for a period not exceeding the maximum probation period.

**7-13-305. Determination, continuance or extension of suspension or probation; discharge; violation of conditions.**

(a) The period of probation or suspension of sentence under W.S. 7-13-302 shall be de-

The Modified Juvenile Sentencing Act was turned upside down by a Senate judiciary committee amendment (without change in the title of the bill) to provide prosecutorial veto for use of the sentencing statute by the addition of the words "with the consent of the defendants *and the state.*" The adult suspended trial or sentence act lost its principle reason for existence by deletion of the provision which permitted suspension of trial and entry of a probationary sentence. The provision for suspension of trial disappeared in the same way that the prosecutorial veto provision was inserted.

Without question, the adult suspended trial or sentence act was turned into a pure sentencing statute by deletion of the provisions. The majority now contends that the Modified Juvenile Sentencing Act, circa 1909, was also turned into a diversion statute. The majority uses this contention to justify the legislature's insertion of the prosecutorial veto as a limitation on sentencing authority of the judiciary.

The majority is totally wrong in context and the citation of authority fails to sustain the basic arguments presented. The only diversion feature of either statute had been found in the adult suspended trial or sentence act. *These cases presented never considered the question of diversion.*

First justification for finding the Modified Juvenile Sentencing Act to be a diversionary process and not a sentencing statute is presented by the majority in discussion of prosecutorial powers of nolle prosequi. The presentation is well structured, but contains a pervasive fault. Nolle prosequi has nothing to do with these cases and this prosecutorial veto power in the sentencing statutes. Pure nolle prosequi cases addressing executive and judicial discretion can be immediately excluded as totally inapplicable for any precedent in this case.[15]

Of more arguable relation, we can find the cited cases involving prosecutorial participation in pretrial diversion programs. A clearer look is required to perceive why even this line of authority really does not justify application since W.S. 7–13–301, as the successor to the 1909 juvenile sentencing statute, is still a sentencing statute and not a diversion program as it relates to the cases actually presented. What might have happened if diversion—probation

termined by the court and may be continued or extended.

(b) Upon the satisfactory fulfillment of the conditions of suspension of sentence or probation under W.S. 7–13–302 the court shall enter an order discharging the defendant.

(c) For a violation of a condition of probation occurring during the probationary period, revocation proceedings may be commenced at any time during the period of suspension of sentence or probation under W.S. 7–13–302, or within thirty (30) days thereafter, in which case the court may issue a warrant and cause the defendant to be arrested. If after hearing the court determines that the defendant violated any of the terms of probation or suspension of sentence, the court may proceed to deal with the case as if no suspension of sentence or probation had been ordered.

(d) The time for commencing revocation proceedings shall be automatically extended for any period of time in which the probationer is incarcerated outside this state during the probationary period for the conviction of an offense which is a violation of the conditions of probation, unless the probationer has made a valid request for final disposition under the interstate agreement on detainers, W.S. 7–15–101 through 7–15–106.

**7–13–306. Payment of fine in installments.** When imposing a fine and also placing the defendant on probation, the district judge may permit the fine to be paid in installments over a reasonable period of time.

**7–13–307. Governor's power of pardon unaffected.** Nothing in W.S. 7–13–301 through 7–13–306 shall be construed to authorize the court to expunge the record of a person charged with or convicted of a criminal offense.

Wyo.Sess.Laws ch. 157 (1987).

**15.** *Petition of Padget,* 678 P.2d 870; *State v. Faltynowicz,* 660 P.2d 368 (Wyo.1983); *United States v. Thompson,* 251 U.S. 407, 40 S.Ct. 289, 64 L.Ed. 333 (1920); *In re Confiscation Cases,* 74 U.S. (7 Wall) 454, 19 L.Ed. 196 (1868); *United States v. Schumann,* 2 Abb. 523, 7 Sawy. 439, 27 F.Cas. 984 (C.C.Cal.1866); *United States v. Ammidown,* 497 F.2d 615 (D.C.Cir.1973); *United States v. Woody,* 2 F.2d 262 (D.C.Mont.1924); *United States v. Greater Blouse, Skirt & Neckwear Contractors Ass'n.,* 228 F.Supp. 483 (S.D.N.Y.1964); *United States v. Brokaw,* 60 F.Supp. 100 (S.D.Ill.1945); Comment, *The Nolle Prosequi Under Rule 48(a) of the Federal Rules of Criminal Procedure,* 1978 Det.C.L.Rev. 491 (1978). This subject is more generously pursued in Section IV of this dissent.

without plea—had been attempted is hypothetical and not presented by any of the cases addressed. The reason is that judicial action is invoked only following trial conviction or guilty plea and the sentencing mechanism is restricted to a confined class of individuals and specific offenses. The statute provides a probationary sentence which is wholly unremarkable in sentencing technique with the only individualized feature different from many laws being the opportunity to avoid the burden of a conviction of a felony by good behavior. Over a lifetime, that burden will no doubt exceed any immediate detriment and responsibility impressed by compliance with terms of probation.

The structure of Wyoming criminal statutes for juvenile offenses vests exclusive authority in the juvenile courts for persons under the age of thirteen, court discretionary transfer authority under seventeen, and exclusive discretion in the prosecutor for youths age seventeen or older. W.S. 14–2–203; *Menapace v. State*, 768 P.2d 8 (Wyo.1989). Now, the prosecutor has discretion to require adult proceedings for young people seventeen or older and the power to insist on the entry of a felony judgment.

### III. MAJORITY CASE LAW—DIVERSION CASE

The majority inaccurately cites a number of cases involving modern diversion procedures where discretion of the prosecutor has been favored for authority to justify prosecutorial veto of a sentencing statute. *The cases do not fit!* [16] The pretrial diversion programs of New Jersey, Pennsylvania, Florida, Tennessee, Colorado, Oregon and Kansas do not provide authority for application to the similar Wyoming sentencing statute existent here since 1909 which is triggered only by a guilty plea or a jury verdict.

The idea of pretrial diversion is appealing. It represents an attempt to structure and make visible the informal prosecutorial practices of noncriminal disposition. It also makes possible the early delivery of rehabilitation services on a formal rather than impromptu basis. And it offers the prosecution an alternative to its standard options of full criminal processing or informal screening-out without follow-up supervision.

\* \* \* \* \* \*

Pretrial diversion, which began six years ago with two pilot programs, has become today a reform movement "well on its way to institutionalization." It is predicted that by 1987 there will be 150 programs diverting annually 150,000 persons before trial. But continued proliferation of pretrial diversion programs at this time is hard to justify. Existing programs must first meet the burden of showing that their promises have been or could be delivered. Otherwise, the practice of pretrial diversion, like "almost everything we do in the criminal field, is on the basis of faith."

Note, *Pretrial Diversion from the Criminal Process*, 83 Yale L.J. 827, 852–54 (1974) (quoting Zaloom, in 4 Crim.Justice Newsletter, October 15, 1973, at 4 and Vorenberg & Vorenberg, *Early Diversion From the Criminal Justice System*, 1972 (unpublished paper, Harvard Law School).

Principles of the diversion process case law originated very recently and principally from New Jersey and Pennsylvania. The New Jersey Supreme Court established the diversion program and then provided the character of its exercise involving both prosecutorial and sentencing court responsibilities. After the program was in place, the state legislature adopted the structure by enacted statute. In *State v. Leonardis*, 71 N.J. 85, 363 A.2d 321 (1976), *reh'g* 73 N.J. 360, 375 A.2d 607 (1977) (*Leonardis I*), the pretrial intervention program (PTI) was established by the New Jersey Supreme Court to represent a procedural alternative to the traditional system of prose-

---

**16.** Not one of those cases stands as authority for an unqualified right of the prosecutor to make the decision that the offense, without necessarily affording a difference in probationary term, will result in a felony status. That is all this appeal and these cases are about—the uncontrolled power of the prosecutor to require in sentencing that a felony conviction will result.

cuting and incarcerating criminal suspects. The court noted that PTI was developed within the last decade. Various studies recognize "the desirability of alternative means for the disposition of criminal cases." *Id.* 363 A.2d at 325. The system was to provide "prosecutorial options." *Id.* at 325. As such, the prosecutor's participation and discretion was confirmed. *State v. Leonardis*, 73 N.J. 360, 375 A.2d 607 (1977) (*Leonardis II*) addressed the exercise of that discretion in the PTI program. Considering that the pretrial diversion program was functionally a quasi judicial decision tailored to provide options to the prosecutor, the court in *Leonardis II* discerned the character of supervised discretion of the prosecutor by judicial oversight. The *Leonardis* cases were followed by *State v. Dalglish*, 86 N.J. 503, 432 A.2d 74 (1981) which addressed the development of a legislatively enacted statewide program of pretrial intervention as part of the New Jersey criminal code. The court recognized that

> judicial review of a prosecutor's decision whether or not to suspend criminal charges infringes on both the Legislature's power to define crimes and the Executive's responsibility to enforce the laws and therefore must be performed with sensitivity. Since the Legislature has established a PTI program with judicial review, the trial court correctly concluded that the problem of judicial interference with legislative authority has been eliminated.

*Id.* 432 A.2d at 79. *The New Jersey program did not involve a predicate of an adverse verdict or a guilty plea before participation was considered.* The program was an alternative predating plea or trial. The succeeding case, *State v. Collins*, 180 N.J.Super. 190, 434 A.2d 628 (1981), *aff'd* 90 N.J. 449, 448 A.2d 977 (1982), addressed various procedural and differentiating features within New Jersey law and determined the prosecutor's exercise of discretion to deny pretrial diversion was not abused and that the accused's case would be then pursued to trial. The difference between pretrial diversion and post-conviction sentencing is clear.

The Pennsylvania Supreme Court likewise established an accelerated rehabilitation disposition program (ARD) which

> "provides a means of suspension of formal criminal proceedings before conviction on the condition that the accused will do something in return, such as make restitution, participate in a rehabilitation program, under psychiatric treatment, hold certain employment, or otherwise modify his behavior. The ARD rules provide that after a defendant is held for court by an issuing authority or after an information or indictment, the district attorney sua sponte or at the request of defendant's attorney, may move that the case be considered for ARD. The district attorney has the discretion to refuse to ask for ARD and to insist on prosecuting the defendant for the offense.

*Com. v. Kindness*, 247 Pa.Super. 99, 371 A.2d 1346, 1347 (1977) (quoting *Shade v. Com. of Pennsylvania, Dept. of Transp.*, 394 F.Supp. 1237, 1240 (M.D.Pa.1975)). The Pennsylvania intermediate appellate court addressed constitutional activity of the supreme court as a supervisory power in the establishment of the ARD program. Unquestionably, the ARD program is a diversion without conviction process and provides no informative authority for a separation of powers inquiry as is presented here. *See likewise Com. v. Lutz*, 508 Pa. 297, 495 A.2d 928 (1985). The similar inquiry into the proper exercise of discretion by the prosecutor for the ARD program was presented as the subject of *Com. v. Ebert*, 369 Pa.Super. 318, 535 A.2d 178 (1987). The program was described as "a pretrial disposition of certain cases through which the defendant can earn dismissal of the charges against him if he successfully completes a rehabilitation program." *Id.* 535 A.2d at 179.

Florida has a statutory pretrial intervention program and the issue presented in *State v. Cleveland*, 390 So.2d 364 (Fla.App. 1980) was control or supervision of exercised discretion of the prosecutor before trial. The court noted:

> The system is one of balancing. If the prosecutor takes the case to trial and the

defendant is found guilty, the trial judge has the discretion under the law to sentence the defendant in whatever fashion the trial court sees fit.

*Id.* at 367. Obviously, the discretion of the prosecutor was to permit diversion or to proceed with prosecution. The Florida Supreme Court, in considering the same case, reiterated:

> The pretrial diversion is essentially a conditional decision not to prosecute similar to the nolle prosequi situation postulated by *[State v.] Jogan*, [388 So.2d 322 (Fla.3d DCA 1980)]. It is a pretrial decision and does not divest the state attorney of the right to institute proceedings if the conditions are not met. The pretrial intervention program is merely an alternative to prosecution and should remain in the prosecutor's discretion.

*Cleveland v. State*, 417 So.2d 653, 654 (Fla. 1982). The court noted that the Florida system was different than the California program, citing *People v. Superior Court of San Mateo County*, 11 Cal.3d 59, 113 Cal.Rptr. 21, 520 P.2d 405 (1974).

A special intervention program in the Cleveland municipal court was instituted to provide a form of rehabilitation in lieu of conviction and sentence. *City of Cleveland v. Mosquito*, 10 Ohio App.3d 239, 461 N.E.2d 924 (1983). The program was based on a statutory authorization for prosecuting attorneys to establish the program with cooperation between the court and the executive agency. The program retained the prosecutorial discretion of whether to continue with prosecution or utilize the diversion program. The activity and status demonstrated in the case essentially conforms to New Jersey, Pennsylvania and Florida pre-conviction diversion arrangements. The specific issue in *Mosquito*, 461 N.E.2d at 927 was the prosecutor's place to deny the opportunity of Mosquito to "enter the program and escape trial."

The constitutionality of the Tennessee pretrial diversion program was similarly considered in *Pace v. State*, 566 S.W.2d 861 (Tenn.1978). The Tennessee system involved a memorandum of understanding between the prosecuting attorney and the defendant without effect until trial court approval. The case confirmed the authority of the court to supervise the exercise of discretion and found the statute constitutional. The special concurrence is of particular interest in recognizing the three-stage process involving nolle prosequi or pretrial diversion, and, if neither, then verdict. The essential characteristic of the Tennessee system was premised on the agreement of the defendant and the prosecutor to be incorporated pretrial in the memorandum of understanding. The Colorado court in *People, By and Through Vanmeveren v. District Court In and For Larimer County*, 186 Colo. 335, 527 P.2d 50 (1974) applied the same principle to the same kind of a deferred prosecution statute as a recognition of the prosecutor's charging discretion.

Oregon statutes established a prosecutorial based pretrial diversion authority. The Oregon courts considered the exercise of discretion in *State ex rel. Anderson v. Haas*, 43 Or.App. 169, 602 P.2d 346 (1979) and the character of a hearing, if any, to terminate upon decision of the prosecutor in *State ex rel. Harmon v. Blanding*, 292 Or. 752, 644 P.2d 1082 (1982) and found that the charged defendant had no right to choose treatment as an alternative to prosecution in *State v. Graves*, 58 Or.App. 286, 648 P.2d 866 (1982). The thesis of the statute and the case law resulting is the well-established principle of prosecutorial discretion to prosecute. The program is structured in Oregon on an agreement between the prosecution and the defendant and little supervision is provided the court to require that the prosecutor enter into the agreement.

Kansas patterned its statute after the law enacted in Oregon. The Kansas court in *State v. Greenlee*, 228 Kan. 712, 620 P.2d 1132 (1980) recognized the same picture of a function in exercising discretion to enter into an agreement by the prosecutor while perceiving that the statute itself was largely a recognition of a prior practice of diverted or delayed prosecution. The court noted:

> The control [of the prosecutor] is minimal and the overall effect is merely to make

the process of diversion more formal by establishing a few procedural standards and establishing some degree of uniformity in procedure. The ultimate decision remains with the prosecutor.

*Id.* 620 P.2d at 1137–38. The court did note that the prosecutor, although possessing wide discretion, is not immune from judicial review of the exercise of that discretion for arbitrariness. *Id.* at 1139.

## IV. NOLLE PROSEQUI—NO RELEVANCE

Nolle prosequi does not apply to judicial responsibility for sentencing after either a guilty plea or a guilty verdict. Since the plea of guilty has been made in each of these twelve cases and accepted by the court, nolle prosequi has absolutely nothing to do with the constitutionality of a prosecutorial veto in the sentence entered which determines whether or not a probationary condition will be denied which might permit avoidance of the felony conviction status. There is a difference between dismissing a pending proceeding before guilt has been ascertained and control over sentencing.[17] *Gooden v. State,* 711 P.2d 405 (Wyo.1985); *Jahnke v. State,* 682 P.2d 991 (Wyo.1984); *State v. Faltynowicz,* 660 P.2d 368 (Wyo. 1983), Thomas, J., specially concurring; *United States v. Cox,* 342 F.2d 167 (5th Cir.), *cert. denied* 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700 (1965); *United States v. Brokaw,* 60 F.Supp. 100 (S.D.Ill.1945); *State v. Bailey,* 319 Md. 392, 572 A.2d 544 (1990); Comment, *The Nolle Prosequi Under Rule 48(a) of the Federal Rules of Criminal Procedure,* 1978 Det.C.L.Rev. 491 (1978); Note, *Is Prosecution a Core Executive Function? Morrison v. Olson and the Framers' Intent,* 99 Yale L.J. 1069 (1990); Note, *Criminal Law—Nolle Prosequi—Trial Court Has Power To Dismiss for Want of Prosecution,* 41 N.Y.U.L.Rev. 996 (1966).

The majority opinion loses touch of the issue presented by the appellants. That issue is whether the legislature may delegate to prosecutors any form of control over sentencing. This issue concerns the core function of the judiciary over sentencing. *See MJP v. State,* 706 P.2d 1108 (Wyo.1985). The improper delegation of core functions to coordinate branches of government was reviewed in *Petition of Padget,* 678 P.2d 870. Sentencing is a judicial function. *MJP,* 706 P.2d 1108; *Wright v. State,* 670 P.2d 1090, 1095 (1983), *reh'g denied* 707 P.2d 153 (Wyo.1985).

## V. SENTENCING WITH PROSECUTORIAL INVOLVEMENT

There is a distinguished line of prosecutorial veto cases which address the sentencing feature implicit in the Wyoming Modified Juvenile Sentencing Act of 1909. The principles first enunciated in California case law which addressed sentencing and separation of powers have taken hold in other jurisdictions whose courts addressed issues similar to the issue here.

The conflict first arose in *Tenorio,* 473 P.2d 993 where, in sentencing, the court could dismiss a charged prior offense without approval of the prosecutor. That court indicated:

Thus, even if the Legislature could constitutionally remove the power to strike priors from the courts, it has not done so, but rather has proposed to vest in the prosecutor the power to foreclose the exercise of an admittedly judicial power by an appropriate judicial officer. It is no answer to suggest that this is but a lesser included portion of the prosecutor's discretion to forego prosecution, as the decision to forego prosecution does not itself deprive persons of liberty.

When the decision to prosecute has been made, the process which leads to acquittal or to sentencing is fundamentally judicial in nature. Just as the fact of prosecutorial discretion prior to charging a criminal offense does not imply prosecutorial discretion to convict with-

---

**17.** Responsible authority exists to implement *judicial authority* over the prosecutorial discretion to nolle prosequi even before the plea is entered and without regard for a plea bargain status in special situations. *See Hook v. State,* 315 Md. 25, 553 A.2d 233 (1989). *Cf. Jackson v. State,* 82 Md.App. 438, 572 A.2d 567 (1990), in stating a plausible exception.

out a judicial determination of guilt, discretion to forego prosecution does not imply discretion to sentence without a judicial determination of those factors which the Legislature has never denied are within the judicial power to determine and which relate to punishment. The judicial power is compromised when a judge, who believes that a charge should be dismissed in the interests of justice, wishes to exercise the power to dismiss but finds that before he may do so he must bargain with the prosecutor. The judicial power must be independent, and a judge should never be required to pay for its exercise.

*Id.* at 996. The court held that the tested statute was "violative of the California constitutional separation of powers, as that concept demands that the branches of government be coequal and that a prosecutor not be vested with power to foreclose the exercise of a judicial power recognized in [statute]." *Id.* at 997. *Tenorio* was followed by *Esteybar v. Municipal Court for Long Beach Judicial Dist. of Los Angeles County*, 5 Cal.3d 119, 95 Cal.Rptr. 524, 485 P.2d 1140 (1971) where the prosecutorial veto in determining that a charged defendant may not be tried as a misdemeanor was rejected as a violation of separate judicial responsibility and separation of powers. *People v. Navarro*, 7 Cal.3d 248, 102 Cal.Rptr. 137, 497 P.2d 481 (1972) held that the legislature can control eligibility for probation, parole and term of imprisonment but cannot infringe upon a core judicial function by subjecting a judge to the control of the prosecuting attorney. "The imposition of sentence and the exercise of sentencing discretion are fundamentally and inherently judicial functions." *Id.* 102 Cal.Rptr. at 143, 497 P.2d at 487 (quoting *People v. Burke*, 47 Cal.2d 45, 52, 301 P.2d 241 (1956)).

When an individual judge exercises sentencing discretion he exercises a judical power which must be based upon an examination of the circumstances of the particular case before him, and which is subject to review for abuse. (*People v. Tenorio, supra*, 3 Cal.3d 89, 95, 89 Cal. Rptr. 249, 473 P.2d 993.) Here, as in *Tenorio* and *Esteybar* the Legislature sought to vest the district attorney with unreviewable powers. * * *

We reiterate the statement made by Justice Schuaer in his dissent in *People v. Sidener* (1962) 58 Cal.2d 645, 654, 25 Cal.Rptr. 697, 702, 375 P.2d 641, 646, in his analysis of the separation of powers doctrine, that "It bears reiteration that the Legislature, of course, *by general laws* can control eligibility for probation, parole and the term of imprisonment, but it cannot abort the *judicial process* by subjecting a judge to the control of the district attorney." [18]

*Navarro*, 102 Cal.Rptr. at 144, 497 P.2d at 488 (emphasis in original).

The California principles of excluding the prosecutor from control over sentencing was accepted in Arizona under *State v. Jones*, 142 Ariz. 302, 304, 689 P.2d 561, 563 (1984) (citations omitted):

The concept of separation of powers is fundamental to constitutional government as we know it. * * * It is essential that sharp separation of powers be carefully preserved by courts so that one

---

**18.** The California court in *Superior Court of San Mateo County*, 113 Cal.Rptr. 21, 520 P.2d 405 extended *Tenorio, Esteybar* and *Navarro* further than is required for application to the Wyoming statutes where pretrial diversion veto was also rejected. *Superior Court of San Mateo County* is like the cases cited by the majority, not really relevant to the Wyoming statute. See, however, *Sledge v. Superior Court of San Diego County*, 11 Cal.3d 70, 113 Cal.Rptr. 28, 520 P.2d 412 (1974) where the preliminary determination of the eligibility for division exercised by the district attorney did not constitute an invasion of the separation of powers prohibition.

In a most recent consideration in *People v. Ames*, 213 Cal.App.3d 1214, 261 Cal.Rptr. 911 (1989), the sentencing separation of power concept was revisited to determine whether judicial authority to change a plea bargain existed or the options were either acceptance or rejection. The court noted that "[t]he imposition of sentence and exercise of discretion are fundamentally and inherently judicial functions. * * * While no bargain or agreement can divest the court of the sentencing discretion it inherently possesses * * *, a judge who has accepted a plea bargain is bound to impose a sentence within the limits of that bargain." *Id.*, 261 Cal. Rptr. at 913.

branch of government not be permitted unconstitutionally to encroach upon the functions properly belonging to another. * * * The legislature may not enact a statute which is in conflict with a provision of the state Constitution.

In *State v. Prentiss*, 163 Ariz. 81, 786 P.2d 932 (1989), that principle was reaffirmed when the court considered whether the prosecutor could control sentencing discretion by his charging decision. The court found that the statute violated constitutional concepts of separation of powers, equal protection, and/or substantive due process. "[O]nce the legislature provides the court with the power to use sentencing discretion, the legislature cannot then limit the court's exercise of discretion by empowering the executive branch to review that discretion." *Id.* 163 Ariz. at 85, 786 P.2d at 936. The Arizona court severed the prosecutorial control feature in a fashion comparable to action taken by the Minnesota courts. *Id.* 163 Ariz. at 87, 786 P.2d at 938, appendix.[19]

In Illinois, courts have identified the difference between a sentence and the alternative treatment diversion:

> "The Act provides an alternative to the usual criminal justice procedures; it allows a criminal defendant with a drug abuse problem to *avoid* the criminal justice machinery * * *." The treatment under the Act, unlike a sentence, is not a consequence of defendant's guilt. It is instead an alternative to a criminal conviction and the regular sentencing alternatives available under [Illinois law].

*People v. Teschner*, 81 Ill.2d 187, 40 Ill. Dec. 818, 407 N.E.2d 49, 52 (1980) (emphasis in original and quoting *People v. Phillips*, 66 Ill.2d 412, 416, 6 Ill.Dec. 215, 217, 362 N.E.2d 1037, 1039 (1977)). The difference was also recognized between disposition and imposition of a criminal sanction. *Accord People v. Caldwell*, 118 Ill.App.3d 1027, 74 Ill.Dec. 464, 455 N.E.2d 893 (1983).[20]

In *State v. Olson*, 325 N.W.2d 13 (Minn. 1982), the Supreme Court of Minnesota considered a statute which conditioned the power of a court to sentence without regard to the mandatory minimum provisions upon the discretion of a prosecutor. The Minnesota court observed

**19.** Unbending to the reasoning of the Colorado Supreme Court in *People ex rel. Carroll v. District Court of Second Judicial Dist.*, 106 Colo. 89, 101 P.2d 26 (1940) that a prosecutor had the right to prevent the judge from suspending sentence by withholding his approval as decidedly unpersuasive, the Arizona court severed the unconstitutional veto provision and upheld the balance of the statute. The court noted the differentiating status of *Greenlee*, 620 P.2d 1132 as a diversion agreement process and not involving a sentencing statute.

**20.** In generic terms, *State ex rel. Light v. Sheffield*, 768 S.W.2d 590, 592 (Mo.App.1989) stated:

> At the time Light entered her pleas of guilty to the drug charges, several sentencing alternatives were available to the trial court. It could have sentenced Light to a term of imprisonment as authorized by Chapter 558, RSMo, or pronounced sentence and suspended its execution, placing Light on probation, or, as the trial court did, suspend imposition of the sentence, with or without placing Light on probation. * * * The trial court, evidently in hopes that Light would mend her ways, suspended imposition of sentence and placed her on supervised probation for a term of three years, in which case, if Light successful-

> ly completed her probation, she would not have a criminal conviction on her record. * * * Suspension of imposition of sentence is an entirely different matter from imposing sentence and then suspending execution of it. In the first instance, the person has no criminal conviction, in the second, he does.

*State v. Anderson*, 645 S.W.2d 251 (Tenn.Cr. App.1982) considered an apparent requirement of the prosecutor for guilty pleas before a pre-indictment approval of a memorandum of understanding for pretrial diversion. The court said that if the requirement existed, it was a nullity and "is in irreconcilable conflict with the provisions of the statute. A plea of guilty is a confession. It is an admission, or proof of guilt." *Id.* at 253.

The court noted that the statute provided that no confession or admission against interest during the pendency and relevant to the charges contained in the memorandum of understanding was admissible and stated "[t]here is no rule in this State which requires a defendant to admit his guilt in order to seek probation. To deny probation on that basis is an abuse of discretion." *Id.* at 253. The Louisiana Supreme Court achieved a similar result denying prosecutorial veto to accord constitutionality to the statute in *State v. LeCompte*, 406 So.2d 1300 (La.1981).

that the prosecutor is not only a member of the executive branch, but an advocate as well. His or her attention throughout the criminal trial is focused on achieving conviction, and appropriately so. But we expect too much when we look to the prosecutor alone for an evenhanded assessment of whether mitigating factors may exist in cases that have been successfully prosecuted. The present appeals amply illustrate the inadequacy of such a limited mechanism; it is neither constitutional, nor practical in our adversary system of criminal justice.

\*　　\*　　\*　　\*　　\*　　\*

\* \* \* If the legislature gives such power to the prosecutors, it must also give it to the courts. It cannot constitutionally do otherwise.

*Id.* at 19.

In summary, not only does a rigorous analysis of the diversion cases cited in the majority opinion fail to authenticate the prosecutorial participation in judicial function, but the appropriately related authority uniformly denies that executive branch preclusion in essentially a sentencing decision which is not justified in Wyoming.

## VI. SEPARATION OF POWERS

As the majority points out, the doctrine of separation of powers embodied in the United States Constitution is not mandatory on the states. *Dreyer v. People of State of Illinois,* 187 U.S. 71, 84, 23 S.Ct. 28, 32, 47 L.Ed. 79 (1902). The doctrine is not mandated in the United States Constitution, but is understood to flow naturally from the division of government. *Springer v. Government of the Philippine Islands,* 277 U.S. 189, 201, 48 S.Ct. 480, 482, 72 L.Ed. 845 (1928).

On the other hand, Wyoming's Constitution includes that specific separation of powers clause:

The powers of the government of this state are divided into three distinct departments: The legislative, executive and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any powers properly belonging to either of the others, except as in this constitution expressly directed or permitted.

Wyo. Const. art. 2, § 1. I also make note of our Constitution's placement of the state's judicial power:

The judicial power of the state shall be vested in the senate, sitting as a court of impeachment, in a supreme court, district courts, and such subordinate courts as the legislature may, by general law, establish and ordain from time to time.

Wyo. Const. art. 5, § 1.

Given our declaration that our constitution "is not a grant but a limitation on legislative power," *Witzenburger v. State ex rel. Wyoming Community Development Authority,* 575 P.2d 1100, 1124, *reh'g denied* 577 P.2d 1386 (Wyo.1978), this court should strictly construe our separation of powers clause. In the same regard that the legislature cannot divvy up its basic legislative power to a staff agency, *Legislative Research Com'n By and Through Prather,* 664 S.W.2d 907 (Ky.1984), it also cannot properly reassign a judicial function for sentencing to an advocate of the executive branch of government. See, likewise, the consideration of delegation of the executive charging function to the judiciary in *Petition of Padget,* 678 P.2d 870. See, however, *State ex rel. Unnamed Petitioners v. Connors,* 136 Wis.2d 118, 401 N.W.2d 782 (1987), *overruled* 150 Wis.2d 352, 441 N.W.2d 696 (1989), which in second opinion provided a converse result.

The majority limits judicial power to the power to "adjudicate," by which it means to make the *final* determinations in a case and to administer its own affairs. I refuse to relegate judicial power to such a narrow sphere.

We have visited the concept of judicial power before. In *Bi–Rite Package, Inc. v. District Court of Ninth Judicial Dist. of Fremont County,* 735 P.2d 709, 713–14 (Wyo.1987), we characterized judicial power as follows:

It is unquestioned that courts have inherent powers beyond those specified in rules and statutes that are absolutely

necessary to the courts' ability to perform the functions for which they were created. * * *

* * * * * *

First it is said that courts possess an inherent power described as

"an extremely narrow range of authority involving activity so fundamental to the essence of a court as a constitutional tribunal that to divest the court of absolute command within this sphere is really to render practically meaningless the terms 'court' and 'judicial power.'" *Eash v. Riggins Trucking, Inc.*, 757 F.2d 557, 562, 77 A.L.R.Fed. 751 (3rd Cir.1985).

This power is essential to the separation of powers concept and allows a court to act notwithstanding contrary [constitutional] legislative direction. There is also an inherent power that is described as necessary to the efficient functioning and prompt and just disposition of litigation and business of the court. Thus, courts have an inherent power to summon witnesses and compel their attendance, to administer oaths, prevent abusive process, provide counsel for the indigent, correct records, relieve parties in default, discipline attorneys at law, and take other similar appropriate action. 20 Am.Jur.2d Courts § 79. Finally, there is an inherent power to take such action as is useful to the efficient functioning of the court. What is necessary and what is useful may be difficult to ascertain and subject to considerable disagreement. It has been said that "the notion of inherent power has been described as nebulous, and its bounds as 'shadowy,'" "not possible to locate with exactitude," and, therefore, should be exercised with great restraint and caution. *Eash v. Riggins Trucking, Inc., supra*, 757 F.2d at 561–562.

As nebulous as this concept is, this quotation indicates that judicial power extends beyond the limit which the majority assigns.

The majority speculates that our separation of powers clause was borrowed from the constitutions of Idaho and Montana.

R. Prien, *The Background of the Wyoming Constitution* 56, 70 (1956) notes that Wyo. Const. art. 5, § 1, which contains the grant of judicial power, similarly has its roots in Montana. Thus, the meaning the Montana court assigns to this term could be persuasive authority and serve as an appropriate starting point. *Cf. Matter of Johnson*, 568 P.2d 855, 864 (Wyo.1977).

In *State ex rel. Bennett v. Bonner*, 123 Mont. 414, 214 P.2d 747, 753 (1950) (emphasis in original and added), the Montana Supreme Court viewed judicial power this way:

Judicial power is not only the authority to decide, but to make binding orders and judgments. The kind of authority that is judicial in its nature relates to and acts upon the rights of person and property not created by this authority but existing *under the law*. This judicial authority in specific controversies between parties determines these rights as they exist and does so at the instance of a party to such controversy. *These qualities distinguish judicial power from that which is simply legislative or executive.*

Judicial power as contra-distinguished from the power of the law has no existence. Judicial power is exercised by means of courts which are the mere creations and instruments of *the law*, and independent of *the law* the courts have no existence. *The law* precedes the courts. *The law* governs the courts. Thus it is the function of the courts to expound and administer *law* in those causes properly before them in course of legal procedure.

Montana's concept of judicial power embraces more than the majority's "adjudication" and administration of court business view. Looking to other jurisdictions is also helpful to explain the concept.

Judicial power extends beyond the power to adjudicate a particular controversy and *encompasses the power to regulate matters related to adjudication.* * * *

* * * * * *

* * * Such power, properly used, is essential to the maintenance of a strong

and independent judiciary, a necessary component of our system of government. *State v. Holmes,* 106 Wis.2d 31, 315 N.W.2d 703, 709–10 (1982) (emphasis added). A court has all powers reasonably required to enable a court to perform efficiently its judicial functions, to protect its dignity, independence and integrity, and to make its lawful actions effective. *People v. Little,* 89 Misc.2d 742, 392 N.Y.S.2d 831, 835 (1977). Judicial power comprehends all authority necessary to preserve and improve the fundamental judicial function of deciding cases. *Clerk of Court's Comp. for Lyon County v. Lyon County Com'rs.,* 308 Minn. 172, 241 N.W.2d 781, 786 (1976). Judicial power is the legal right, ability, and authority to hear and decide a justiciable issue or controversy; such power is ordinarily vested in a court of justice. *Illinois Cent. R. Co. v. Mississippi Public Service Commission,* 135 F.Supp. 304, 308 (S.D.Miss.1955). Judicial power consists of three elements: examination of the truth, determination of the law arising upon that fact, and ascertainment and application of the remedy. *Cedar Rapids Human Rights Com'n v. Cedar Rapids Community School Dist., in Linn County,* 222 N.W.2d 391, 395 (Iowa 1974). The legislature is vested with the power to enact the laws, but it cannot constitutionally enact laws that unduly infringe upon the powers of the court. *People v. Felella,* 131 Ill.2d 525, 137 Ill.Dec. 547, 546 N.E.2d 492, 497 (1989).

The prosecutorial veto authority granted by W.S. 7–13–301 interferes with this core power. It denies the trial court the power to determine facts, for the prosecutor need not cite any facts to exercise the veto. It denies the trial court the power to determine an appropriate remedy in any individual situation. In short, the trial court's essential function of delivering justice becomes short circuited due to the veto. No debate is necessary over the power of the prosecutor to decide whether to bring charges and what charges to bring, or to decide to drop the charges when he feels he has no case against a defendant. However, the prosecutor should not have the power to sit on the bench or make the decisions that lead to the final disposition of a case. Adjudication includes the process in arriving at the final outcome as well as deciding the outcome itself. *Waugh v. American Cas. Co.,* 190 Kan. 725, 378 P.2d 170, 175 (1963). In *Petition of Padget,* 678 P.2d at 872 (quoting *Esteybar,* 485 P.2d at 1143), we adopted the following language from the California Supreme Court:

> "When the decision to prosecute has been made, the process which leads to acquittal or sentencing is fundamentally judicial in nature." (*[People v.] Tenorio, supra* [3 Cal.3d 89] at p. 94, 89 Cal.Rptr. [249] at p. 252, 473 P.2d [993] at p. 996.)

> \* \* \* \* \* \*

> "[T]his court [has] struck down under the separation of powers doctrine legislative attempts to subject an exercise of judicial power to prosecutorial concurrence." \* \* \* *Hoines v. Barney's Club, Inc.,* 28 Cal.3d 603, 170 Cal.Rptr. 42, 620 P.2d 628, 633 (1980).

The majority would like for us to forget that we made the second part of that statement.

The grant of power to the trial court to consider W.S. 7–13–301 disposition of a criminal matter is, no doubt, a legitimate legislative exercise of power. *Hopkinson v. State,* 664 P.2d 43, 50 (Wyo.), *cert. denied* 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983). The legislature may authorize the trial court to use broad discretion or no discretion at all in making its determination of how to dispose of such matters. *People v. Bainter,* 126 Ill.2d 292, 127 Ill.Dec. 938, 533 N.E.2d 1066 (1989); *Olson,* 325 N.W.2d at 18. But once the legislature acts, it cannot constitutionally condition the trial court's decision upon prior approval of the prosecutor. *Prentiss,* 163 Ariz. 81, 786 P.2d 932. The present deviation from a historical standard of Wyoming law is demonstrated by *State ex rel. Motor Vehicle Div. v. Holtz,* 674 P.2d 732 (Wyo.1983), where this court refused to accept a *Petition of Padget* kind of delegation from administrative responsibility by legislative action. *See likewise State v. Saltzer,* 20 Ohio App.3d 277, 485 N.E.2d 831 (1985). "Whereas the judicial branch must be and

is largely independent of intrusion by the legislative branch, the executive branch exists principally to do its bidding." *Brown v. Barkley*, 628 S.W.2d 616, 623 (Ky.1982).

W.S. 7–13–301 is an unconstitutional grant of power from the legislature to the executive branch. The prosecutorial veto provision of this statute violates the separation of powers provision of Wyo. Const. art. 2, § 1 and usurps the judicial power granted the judicial branch of government in Wyo. Const. art. 5, § 1.[21]

I would reverse all of these consolidated cases except for Lowry. In Lowry's case, where the trial court found the veto provision unconstitutional and applied W.S. 7–13–301 without the prosecutor's consent, I would vote to affirm. *Mower*, 750 P.2d 679

**21.** The ideological battle that is reflected in the philosophic differences between the majority and this dissent in application of separation of powers identifies the broad jurisprudential dispute. Minimizing separation of powers maximizes statism and dilutes and diminishes individual liberties and personal rights. *Cf.* Alfange, *The Supreme Court and the Separation of Powers: A Welcome Return to Normalcy?*, 58 Geo. Wash.L.Rev. 668 (1990). "The doctrine is not an end in itself, but a means of avoiding threats to individual liberty and of insuring that no branch of the government is disabled from effectively carrying out its constitutional responsibilities." *Id.* at 669–70.

Comparable contemporary literature when closely read details the testiness between institutional power and individual rights implicit in blending separation of powers out of the constitution either nationally or within the state's adjudicatory responsibility when inquiry is made about the intrinsic operation of functional government. Anderson, *The Separation Doctrine—Prescription for Conflict or Cause for Creative Constitutionalism?*, 14 Nova L.Rev. 227 (1989); Gibbons, *The Interdependence of Legitimacy: An Introduction to the Meaning of Separation of Powers*, 5 Seton Hall L.Rev. 435 (1974); Gressman, *Separation of Powers: The Third Circuit Dimension*, 19 Seton Hall L.Rev. 491 (1989); Gusman, *Rethinking Boyle v. United Technologies Corp. Government Contractor Defense: Judicial Preemption of the Doctrine of Separation of Powers?*, 39 Am.U.L.Rev. 391 (1990); Marshall, *"No Political Truth:" The Federalist and Justice Scalia on the Separation of Powers*, 12 U.Ark. Little Rock L.J. 245 (1989–90); Redish, *Separation of Powers, Judicial Authority, and the Scope of Article III: The Troubling Cases of Morrison and Mistretta*, 39 De Paul L.Rev. 299 (1990); Wald, *The Sizzling Sleeper: The Use of Legisla-*

was good law and should not be abandoned.[22]

## VII. PENDING WYOMING CASES

The dozen cases presently pending in this court to test the uncontrolled discretion granted the prosecutor to deny usage of either segment of the non-felony conviction statute, W.S. 7–13–301, are a composite of our modern society. At issue is not the power of persuasion of the prosecutor; it is an undisciplined use of a veto to foreclose judicial probation sentencing alternatives. Not one of the cases involved a properly defined diversion status since in every case an *actual plea was made, justified and accepted* except the one county court case where the statute was declared unconstitutional by the county court judge.

*tive History in Construing Statutes in the 1988–89 Term of the United States Supreme Court*, 39 Am.U.L.Rev. 277 (1990); Comment, *Separation of Powers and the Independent Governmental Entity After Mistretta v. United States*, 50 La.L. Rev. 117 (1989); Note, *Separation of Powers: A New Look at the Functionalist Approach*, 40 Case W.Res. 331 (1989–90). For result without recognition, consider Peters, *Schall v. Martin and the Transformation of Judicial Precedent*, XXXI B.C.L.Rev. 641 (1990).

The issue within a democratic society is how is power created, defined and applied. For a discussion of the results without a delineation of the reasons, compare the three statutory interpretation discussions in Eskridge, *Spinning Legislative Supremacy*, 76 Geo.L.J. 319 (1989); Farber, *Statutory Interpretation and Legislative Supremacy*, 76 Geo.L.J. 281 (1989); and Zeppos, *Judicial Candor and Statutory Interpretation*, 76 Geo.L.J. 353 (1989).

**22.** Doubling the number of persons incarcerated in the states' penitentiaries, *see* Wyoming State Tribune, June 5, 1990, in one decade while the adult population declines by perhaps twenty-five percent should suffice. We do not need a prosecutorial veto of judicial decisions and sentencing to add to the despair of societal illness involved in and resulting from the prevalence of crime in our society. Included in that category is that which may be committed by the prosecutors themselves. *See Cooney*, 792 P.2d 1287, Urbigkit, J., dissenting. See also current newspaper reports that the planned new Wyoming prison must be now doubled in size since a year or so ago when the selection committee started its site studies. The planned facility is over crowded before a site is selected or funding for architectural planning provided. Casper Star–Tribune, Sept. 22, 1990, at B1.

What the trial court might have done in the individual case in the absence of the veto is not necessarily disclosed in these records. Probably at least in one case, a non-felony conviction structure would have been followed and, probably, in the face of the specific plea bargaining statute and with good reasoning and honest argument by the prosecutor, the felony conviction status would have been adopted by the trial court in at least several of the cases. This would have permitted the exercised discretion of the judiciary to leave further amelioration to the Governor under the consti-

tutional powers of pardon and commutation.

Here, the clearly defined issue in every case now pending is the authority of the prosecutor to veto a favorable sentencing alternative without any necessary discretional responsibility or justification and to do this only to insist that a felony conviction results. In not one of these cases was there any semblance of another issue about terms, conditions or probationary aspects of the actual sentence granted which, in all cases, was probation.[23] There is absolutely

23. Victoria Lowry, Supreme Court No. 88–312, bill of exceptions from Campbell County Court, DUI case, April 14, 1988, disposition by plea bargain, guilty plea entered July 13, 1988 and sentenced August 16, 1988 pursuant to the plea bargain and upon objection by the State to application of the provisions of W.S. 7-13-301. The sentence entered was one year supervised probation and reimbursement of $200 in attorney's fees. The original arrest came for speeding forty-four miles per hour in a thirty mile per hour zone in Gillette, Wyoming. Lowry was twenty, single, regularly employed, and had no prior record of any kind. The stated reason for the State's objection to the use of W.S. 7-13-301 was the alcohol test result of .185.

Elmer Cambio, Supreme Court No. 89–169, Natrona County, April 30, 1988, child abuse. On February 21, 1989, Cambio entered a guilty plea to the misdemeanor of battery. On May 31, 1989, he was sentenced to six month's supervised probation. At age fifty-seven, Cambio had minor traffic offenses and was regularly employed. The stated basis for the prosecutorial veto was the fact that the plea bargain arrangement had reduced the charges to a misdemeanor. The prosecutor stated:

Your Honor, I guess one of the first things [defense counsel] brought up, the State would oppose any 7-13-301 treatment. That was discussed time and time again in the negotiations involving this case. If [defense counsel] wants to apply for 7-13-301 treatment, and the Court deems that would be appropriate in this case, I would ask the court to dissolve the plea and proceed on the two felonies. [This is an absolute misstatement of fact. There was only one felony originally charged.] If a negotiated disposition, stay with it and don't come back into court later and ask for more lenient treatment than negotiated with the district attorney.

(There is nothing in the record reflecting a negotiated agreement that Cambio would not try to achieve disposition under the purview of W.S. 7-13-301, although the functionality of the difference is de minimis considering that the conviction itself was a misdemeanor only.)

Jeffrey D. Billis, Supreme Court No. 88–250, Laramie County, December 1 & 10, 1987, two counts, delivery of controlled substance. Undercover agent solicitation at place of employment. On May 24, 1987, a plea bargain negotiated to one count and the second count was dismissed. Billis was sentenced on July 22, 1988 to three to five years, which was suspended. He was placed on supervised probation for three years. Billis, age thirty-three, had a wife and three children. His occupation was a mechanic. He had an epileptic honorable discharge from the Navy and had no prior record of any kind. The justification for the prosecutorial veto given was his age and the method of operation for the offense charged looked professional. Drug offense factor.

Vicki Moon, Supreme Court No. 88–304, Natrona County. On September 24, 1987, Moon was charged with delivery and conspiracy of a controlled substance. Undercover agent purchase, actual delivery by third party. Charges were amended to conspiracy only. A plea bargain was obtained on December 23, 1987 and Moon pled guilty to conspiracy on May 12, 1988. She was sentenced on October 11, 1988 for a two year supervised probation period. At age twenty-nine, Moon was a single parent with three children, no prior felonies, two minor traffic offenses, was self-supporting, and had regular employment. Sentencing under W.S. 7-13-301 was rejected by the prosecutor without a reason stated. The basis argued by Moon was a somewhat innocent victim status and her desire to pursue a higher education at a Montana university.

Scott P. McIver, Supreme Court No. 88–311, Laramie County, conspiracy to commit a burglary of a bottling truck in Cheyenne, two offenses. The crime was committed by another party. The plea was entered July 22, 1988 on the conspiracy charge. McIver was sentenced on October 21, 1988 for eighteen to thirty-six months in the penitentiary, which was suspended, three years probation was given. At age twenty-two, McIver was unmarried, a hard worker, and had a steady record of employment. The prosecutor objected to W.S. 7-3-301 treatment on the basis of the prior planning

involved in the trip to Cheyenne by the three participants.

Willard Vigil, Supreme Court No. 88–310, Laramie County, January 22, 1988, delivery of a controlled substance to an undercover agent. The plea bargain was entered August 19, 1988 and he was sentenced on October 21, 1988 to two to five years in the penitentiary, which was suspended, and five years probation was given. At age twenty-six, Vigil had no prior record of criminal activity. The activity was the basis of prosecutorial rejection of W.S. 7–13–301 consideration by the trial court.

Nellie Magarahan, Supreme Court No. 89–4, Natrona County, March 31, 1988, improper endorsement of a federal income tax return check. The plea bargain was entered on August 11, 1988 and she was sentenced on November 15, 1988. Magarahan was sentenced to eighteen months of supervised probation. At age twenty, she had no prior felony convictions. 1981 Girls' School custody, 1985 dismissed burglary charge. She was self-supporting and had prior restaurant employment. No justification for the prosecutorial veto was given.

Kirk Hudson, Supreme Court No. 89–83, Natrona County, July 5, 1988, delivery of a controlled substance. Hudson pled guilty and the plea bargain was entered on November 15, 1988. He was sentenced on February 14, 1989 to supervised probation for two years. At age twenty-nine, he was a petroleum engineer, married, had no children, regularly employed and had no prior record except traffic offenses. This is a case of a user who became available as a source. The prosecutor opposed W.S. 7–13–301 usage without reason stated by veto.

Thomas Heggen, Supreme Court No. 89–84, Natrona County, March 29, 1987, false unemployment compensation claims, intent to defraud, nine counts totalling $1,584. On October 6, 1988, a plea bargain was arranged bring the charge down to only one count. Heggen was sentenced on February 14, 1989 to two years supervised probation. At age thirty-one, he was married with a family. These events occurred from a period of unemployment; child adoption problem with attendant difficulties and expenses. No prior criminal record. No reason was stated for the exercise of the prosecutorial veto.

Matthew Mollman, Supreme Court No. 89–21, Natrona County, May 4, 1988, larceny in taking a television set from an adjacent apartment. A plea bargain was arranged on August 26, 1988 and was sentenced to one year supervised probation. Guilty plea entered to a burglary offense. This case is unusual as one of the two among the dozen where the subject of sentencing under W.S. 7–13–301 was specifically included in the plea bargain decision. The prosecutor agreed that he would not object to a sentence W.S. 7-3–301 application if the presentence investigation report showed nothing more serious than "minor traffic offenses." On November 18, 1988, Mollman was sentenced pursuant to the guilty plea and plea bargain when the prosecutor then objected to a W.S. 7–13–301 sentence.

In addition to very minor traffic offense charges, the presentence investigation report included reference to one conviction of driving while under the influence and "12/29/85, Vandalism, Glenrock, Wyoming, Fine suspended, damages repaired." Testimony reflected that conviction had not occurred since restitution was arranged for the damage caused in a juvenile "horsing around" occurrence. At age twenty-two, Mollman had no prior felony convictions, no significant misdemeanor charges except one, driving while under the influence, and the dismissed vandalism complaint. Justification for the prosecutorial veto was that the dismissed vandalism did not fit into the plea bargain.

Sandra Gezzi, Supreme Court No. 89–275, Laramie County. Gezzi's husband, a Cheyenne, Wyoming businessman, was sentenced to the Wyoming penitentiary for delivery offenses and she was charged with writing eleven bad checks in an amount of $510.41 on a discontinued bank account. On June 23, 1989, a plea bargain was obtained and she pled guilty to two charges, nine were dismissed. This is the second case where it is indicated that the W.S. 7–13–301 status was specifically the subject of the plea bargain and, in this case, no W.S. 7–13–301 consideration would be given by the trial court as a condition for the dismissed charges and the prospective probationary sentence. On September 15, 1989, Gezzi was sentenced to two to three years incarceration, which was suspended, and three years supervised probation was given. The file does not include the presentence investigation report so her age is indeterminate, although there are three minor children at home. The offenses were committed by economic necessity by virtue of her husband's incarceration in order to have food for her children. The basis of the W.S. 7–13–301 rejection was continued sequence of crimes over a period of time and that the subject of W.S. 7–13–301 consideration was a specific decision in the plea bargain.

Carl Kruzich, Supreme Court No. 90–15, Natrona County, October 12, 1988, two counts of delivery and conspiracy to deliver a controlled substance. A change of plea from an earlier guilty plea was entered on June 29, 1989. The plea bargain encompassed two years of supervised probation. On November 17, 1989, Kruzich was sentenced to two years supervised probation. At age thirty-five, he was a homeowner, had no prior record except misdemeanor driving charges, and was regularly employed. The reason given for the prosecutorial veto was that drug cases were not appropriate for W.S. 7–13–301 type treatment in the opinion of the prosecutor.

These are only the presently appealed cases and do not include cases where the prosecutorial veto is used for bargaining "leverage" or, as in one city, the *city council directed the city prosecutor* to veto all requests as a city council determination for client direction to attorney. The W.S. 7–13–301 prosecutorial veto has appar-

no case cited by the State or included in the majority opinion that justifies the unsupervised prosecutorial discretion after considering that the diversion cases are not precedentially applicable to the post-guilty plea sentencing cases involved here.

### VIII(A). VETO WAS NOT PROPERLY ENACTED—CONSTITUTIONAL PROVISION—CHANGE OF PURPOSE

The history of legislative misconduct and mistake, Wyo.Sess.Laws ch. 91 (1939) (as amended), emphasizes the need for the constitutional protection included in the Wyoming Constitution for limitations on the bill passage process. Those found in the Wyoming Constitution are similar to many states:

**Laws to be passed by bill; alteration or amendment of bills.**

No law shall be passed except by bill, and no bill shall be so altered or amended on its passage through either house as to change its original purpose.

Wyo. Const. art. 3, § 20.

**Bill must go to committee.**

No bill shall be considered or become a law unless referred to a committee, returned therefrom and printed for the use of the members.

Wyo. Const. art. 3, § 23.

**Bill to contain only one subject, which shall be expressed in title.**

No bill, except general appropriation bills and bills for the codification and general revision of the laws, shall be passed containing more than one subject, which shall be clearly expressed in its title; but if any subject is embraced in any act which is not expressed in the title, such act shall be void only as to so much thereof as shall not be so expressed.

Wyo. Const. art. 3, § 24.

**Vote required to pass bill.**

No bill shall become a law except by a vote of a majority of all the members elected to each house, nor unless on its final passage the vote taken by ayes and noes, and the names of those voting be entered on the journal.

Wyo. Const. art. 3, § 25.

In addition, the very detailed Wyo. Const. art. 3, § 27 itemizes prohibitions against special legislation in the large number of individualized perspectives.

Wyo. Const. art. 3, § 20 provides that "no bill shall be so altered or amended on its passage through either house as to change its original purpose," and Wyo. Const. art. 3, § 24 relates to the single purpose and the purpose expressed in the title that challenges the constitutional validity of the committee insertion of prosecutorial veto without changing the title in the bill.

H.B. 92, 49th Leg. (1987), which, with amendments, subsequently became Wyo. Sess.Laws ch. 157 (1987), was a product of the Joint Judiciary Interim Committee's criminal code review of Wyoming's criminal statutes which continued over a number of years. Earlier revision of the criminal code in Title 6 of the statutes occurred by enactment of Wyo.Sess.Laws ch. 75 (1982) and Wyo.Sess.Laws ch. 171 (1983) which were products of the same continuing program. With the exception of some specific substantive amendments, the revisionary purpose of H.B. 92 was stated for "eliminating duplications, redundancies and archaic provisions; moving, combining, deleting and renumbering sections; providing definitions; repealing procedural provision superseded by court rules; * * *." In addition, substantive provisions were recognized in the title specifically to identify substantive changes by exclusion or inclusion. The included provision relating to this subject was providing procedures for placing certain defendants on probation prior to the entry of a judgment of conviction and for their discharge without adjudication of guilt upon successful completion of probation and conforming related statutes.

Following House passage of H.B. 92, the Senate Judiciary Committee inserted prosecutorial veto of the sentencing discretion of the trial court as a committee amendment. No change to the title was made to reflect

ently become involved in many sentencing deci-

sions since enactment.

the addition of the state's consent. "The purpose of the constitutional requirements relating to the enactment of *laws* was to put the members of the Assembly and *others interested, on notice,* by the title of the measure submitted, so that they might vote on it with circumspection." *Scudder v. Smith,* 331 Pa. 165, 200 A. 601, 604 (1938) (emphasis in original).

If the separation of powers issue identified by the prosecutorial veto amendment was not significant, the extended consideration in majority opinion was wasted. The mother and father of Jeffrey D. Billis surely were not warned by information available in a process where no one outside of a few insiders would have been aware of the change in Wyoming law to give a power to the prosecutor to require felony conviction status for their son. Not only does the title fail to disclose creation of the prosecutorial veto of judicial sentencing discretion, but conversely, it clearly conveys the impression that no actual change in the existent law is intended.

> The title is therefore misleading and gives rise to surprise. It follows then that those provisions which are beyond the subject, as expressed in the title, must be held to be inoperative, since the general public would not be put upon notice of the contents of the act from a reading of the title.

*Smith v. Hansen,* 386 P.2d 98, 102 (Wyo. 1963).

The general nature of the title does not strengthen the choice made by the majority in this case where specific subjects are given a title reference, but prosecutorial veto remains untitled.

*Edwards v. Business Men's Assur. Co. of America,* 350 Mo. 666, 168 S.W.2d 82, 93 (1942) recognized that the title "must be a fair index of the matters in the bill" when it stated:

> The purpose of the constitutional provision, supra, has been stated as follows: "First, to prevent hodge podge or 'log rolling' legislation; second, to prevent surprise or fraud upon the Legislature by means of provisions in bills of which the titles gave no intimation and which might therefore be overlooked and carelessly and unintentionally adopted; and, third, to fairly apprise the people, through such publication of legislative proceedings as is usually made, of the subjects of legislation that are being considered in order that they have opportunity of being heard thereon, by petition or otherwise, if they shall so desire."

*Id.* 168 S.W.2d at 92 (quoting *State ex rel. United Railways Co. v. Wiethaupt,* 231 Mo. 449, 459, 133 S.W. 329, 331).

Furthermore, where the title is restrictive, the bill must be restrictive. *Hunt v. Armour & Co.,* 345 Mo. 677, 136 S.W.2d 312 (1939).

The error made by the majority's argument is the disregard of the compound constitutional questions presented. The one subject and title recitation of purpose requirement of Wyo. Const. art. 3, § 24 addresses a general informational function. Additionally, Wyo. Const. art. 3, § 20, amendment or alteration—the log rolling proviso—addresses surreptitious or unnoticed change after bill consideration starts. Here we have both a separate subject inserted and an amendment to achieve a different purpose during passage without changed title.[24] The cogent analysis in *Alabama Ed. Ass'n v. Board of Trustees of University of Alabama,* 374 So.2d 258, 262 (Ala.1979) (emphasis in original) should be applied to the Wyoming Constitution:

---

**24.** A poll of each of the ninety-four members of the 1987 Wyoming Legislature would be interesting to determine whether they were aware of any change and whether they knowingly voted to redelegate prior judicial sentencing discretion after entry of the jury verdict or guilty plea to a prosecutorial right of veto over the historical structure of Wyoming law for avoidance of felony conviction status if the probationary term was successfully served. Unquestionably, there is nothing in the title to give notice to the legislator or to the public generally. *Cf. Ex parte Hilsabeck,* 477 So.2d 472 (Ala.1985), Adams, J., dissenting, and *Knight v. West Alabama Environmental Imp. Authority,* 287 Ala. 15, 246 So.2d 903 (1971), Coleman, J., dissenting.

There is *no warning or notice* to the members of the legislature nor to the public * * *.

If this Act is not violative of [the Alabama Constitution], then there is little, if any, room for operation of those sections and extensive "log-rolling" would result *to the detriment of the citizens of this state.*

If this Act does not violate [constitutional provisions], then any appropriation bill could carry in its body a *hidden proviso* that no judge, no legislator, nor the executive could receive the appropriations of his respective office until that official performs some act as a prerequisite.

If this were permitted *no legislator, no public official, nor the public* would know of the existence of the *hidden proviso* without *reading the entire bill.* To require reading the entire bill so as to discover its pertinent provisions would clearly fly in the teeth of the [constitutional] requirements. * * *

There are well-stated and very significant reasons for the constitutional provisions restricting bill passage. Spoken in terms of both legislator awareness and public information, the anathema to democratic processes is secret government conducted by insulated and isolated processes where special interests can reign supreme. For a majority which values the supremacy of majority rule over the potential rights of minorities so greatly, I am surprised they do so little to ensure that the legislative product is indeed the product of a majority.

If the substantive bill change reflected here by introducing the prosecutorial veto does not fall within the constitutional criteria, then it is hard to find anything that will do so considering the fundamentals of separation of power. Examination of Wyoming case law does not convince me that our predecessors on this court undertook to abandon the historical purposes of the text of constitutional limitations on bill passage processes. The cattle-dipping case of *Arbuckle v. Pflaeging,* 20 Wyo. 351, 123 P. 918 (1912) does not provide that authority for non-compliance in the prosecutorial veto

statute. At issue in the case, as a purpose of the legislation, were details of the duties of the state veterinarian. The case addressed a rather ordinary addition relating to epidemic control of diseased animals. The germaneness of the change can hardly be questioned. *Arbuckle,* in discussing veterinarian duties, provides no light on this present subject. The majority ignores fact by comparing the prosecutorial veto of judicial sentencing authority to a veterinarian's control over diseased animals.

It is strange that the majority finds support from *Smith,* 386 P.2d 98. In *Smith,* a bill directed to control out-of-state liquor importation suffered a barnacle during passage providing for an increase of the excise tax on malt liquors. The invalidity of the tax increase under the constitutional constraints of Wyo. Const. art. 3, § 20 is clearly comparable to the prosecutorial veto of judicial sentencing power found here.

Generally speaking, if the matter contained in an amendatory or supplementary act is germane to the original act, a reference in the title to the section of the statute to be amended or supplemented accurately indicates the general subject of the legislation and is not in violation of the constitutional provision requiring a clear expression of such subject. * * *

Also, it has been held that such a reference, although not specifying the nature of the amendment, is adequate, where the subject matter of the actual amendment is "germane" to that of the provision amended—the theory being that the reader of the bill will get enough information by looking at the earlier law and the caption of the amendatory bill. * * *

This general rule has no application, however, when the nature of the amendment actually is specified and the title of the bill indicates that a particular change in the original act is proposed. As for example, in both the original title and amended title of S.F. No. 103, the title specifies that § 12–5 is to be amended "so as to prohibit" certain acts. It does not indicate § 12–5 is to be amended in any other respect.

The attorney general's office shows us no reason to believe and no authority for the proposition that this limited purpose of amending, "so as to prohibit" the forbidden acts, could be construed to include all subject matters germane to the original act. It does, however, place reliance upon what was said in the *Board of Com'rs v. Stone* case, supra, at 51 P. 607. In that case an attempt was made in the title to state the effect, or part of the effect, of the amendatory act, but the court found the statement to be entirely meaningless and therefore pronounced it harmless and of no effect. We fail to find any support in the Stone case for defendants' position, and we know of no other reliable authority therefor.

On the other hand, we consider the following cases authority for holding that when a title particularizes the changes which are to be made in an amendatory act, the legislation is limited to matters specified, and anything beyond this limitation would be void regardless of how germane it might be to the subject of the original act[.]

*Smith*, 386 P.2d at 100–01.

The relevance of *Smith* is identified by our discussion of the Nebraska cases, including *Thompson v. Commercial Credit Equipment Corp.*, 169 Neb. 377, 99 N.W.2d 761, 769 (1959) and language found in 1 T. Cooley, *Constitutional Limitations* 310 (8th ed. 1927):

The conclusion in Nebraska has been that an act is unconstitutional and void if the title is not broad enough to include the subject matter of legislation. In other words, as stated in 1 Sutherland, Statutory Construction, § 1908, p. 349 (3d Ed.), while a title need not set out the nature of the changes made, if it does, the body of the amendatory act may not contain any other matter, however germane it may be to the subject of the original act as a whole.

Sutherland, on the same page, further points out that if a narrow title is selected, the amendment should not go beyond its scope. Otherwise, the function of the title is defeated.

*Smith*, 386 P.2d at 101.

In *Smith*, 386 P.2d at 101, we further recognized prior precedent of this court:

In the recent case of *Morrow v. Diefenderfer*, supra, at 384 P.2d 603, Chief Justice Parker re-emphasized an earlier pronouncement to the effect that the object of Art. 3, § 24, is to prevent surprise or fraud in legislation, caused by provisions in a bill of which the title gives no intimation. Also, an opinion written by former Chief Justice Blume for *In re West Highway Sanitary and Improvement District*, 77 Wyo. 384, 317 P.2d 495, 500, makes it clear that the title to a bill should not be misleading or give rise to surprise or deception, and if a title is specific, it is not entitled to the liberal interpretation which would prevail otherwise.

A new subject was introduced by the bill amendment within the definition of *Morrow v. Diefenderfer*, 384 P.2d 601, 604 (Wyo.1963) and a reasonable ground by which any legislator or other person could in fact claim surprise or fraud was provided. The *Morrow* circumstance cannot serve to provide validity to the first-time, new-subject amendment insertion.

Although the court in *Matter of West Highway Sanitary & Imp. Dist.*, 77 Wyo. 384, 317 P.2d 495 (1957) declined to decide Wyo. Const. art. 3, § 24 or the bill subject to be clearly expressed in the title, Chief Justice Blume provided thoughtful expression to the general rules by stating "[t]he title should not be misleading or give rise to surprise or deception. * * * If it is specific it is not entitled to the liberal interpretation which would prevail otherwise." *Id.* 317 P.2d at 500.

In *Matter of West Highway Sanitary & Imp. Dist.*, Chief Justice Blume noted the title was both general and specific by reason of providing for the issuance of general obligation bonds, and he then reflected "[i]f the title had given authority only to issue revenue bonds, and the body of the act had made a provision for general obligation bonds, then, we think we would be required

to hold that the title would be deceiving and hence in violation of Article 3, § 24, Constitution of Wyoming[.]" *Id.* at 500.

In the context of these principles, we could also follow another rule of construction stated in the opinion:

> [With enumeration] we must apply the rule of expressio unius est exclusio alterius. Accordingly, "where a statute enumerates the subjects or things on which it is to operate, or the persons affected, or forbids certain things, it is to be construed as excluding from its effect all those not expressly mentioned." * * * The rule is applicable in construing constitutional provisions.

*Id.* at 504 (quoting 82 C.J.S. Statutes § 333, p. 666).

In an opinion anchored in practical experience, I have no disagreement with majority citation and quotation that the Wyoming Constitution in this regard, as all others, should be liberally and reasonably construed (including guarantees of Wyo. Const. art. 1). *Morrow*, 384 P.2d at 603; *Brinegar v. Clark*, 371 P.2d 62, 66 (Wyo. 1962); *Board of Com'rs of Laramie County v. Stone*, 7 Wyo. 280, 51 P. 605 (1898). The difference we have embraces justification of a separation of powers issue by in-passage amendment of a legislative bill to provide for a prosecutorial veto of judicial sentencing authority for the first time. This creates a power in the prosecutor to decide that the accused must be branded a felon. In *Morrow*, the issue of difference between general obligation bonds and revenue bonds as a change was not decided in decision. In *Brinegar*, the controversy developed from a bill title relating to general powers of the fire marshal with text directed to the development of rules to control coin operated gasoline pump service stations. In *State ex rel. Wyckoff v. Ross*, 31 Wyo. 500, 228 P. 636 (1924), the bill title broadly addressed Wyoming's adventure into prohibition prohibiting the possession and manufacture of intoxicating beverages "and carrying into effect so far as the state of Wyoming is concerned the Eighteenth Amendment to the Constitution of the United States[.]" *Id.* 228 P. at 637. Bill provi-

sions provided for gubernatorial removal of ineffective or inefficient law enforcement officers and came to be applied to the prosecuting attorney of Hot Springs County, Wyoming. Under the law, the amended and supplementary complaint filed with the governor charges that the prosecuting attorney of Hot Springs County "has been guilty of intoxication and drunkenness on some 14 stated dates * * * [and] he has at times willfully failed and refused to perform the duties imposed upon him by the said act, and has at frequent intervals by intoxication incapacitated himself from carrying on the work of county and prosecuting attorney." *Id.* at 637.

In sustaining the relationship of the removal process to the title of the bill, the court stated:

> The attention of the legislature was directed to the subject of suppressing the unlawful manufacture, sale, etc. of intoxicating liquors. The effectiveness of the law would have to depend largely on the faithfulness and diligence of the officers charged with its enforcement, and it was deemed proper to provide for removal by the Governor of those officers who refused or neglected to perform the duties imposed upon them by the act. This provision, of course, would apply to only those officers who have duties to perform under the act, and we believe that the further provision in the same sentence, for the removal of officers guilty of intoxication or drunkenness must be restricted in its meaning to the same class of officers, and as permitting their removal, if by intoxication and drunkenness they render themselves unfit or unable to perform those duties. This we believe to be the real meaning of the language in question, when considered with a proper regard for the subject-matter and the object sought to be accomplished. As thus interpreted, we believe the inclusion in the act of the provision for removal of such officers is not contrary to the constitutional requirement that every act shall contain but one sub-

ject, which shall be clearly expressed in the title.

*Id.* at 638.

I find support in that case by the statement that "[t]his court has long recognized the principle that this section of the Constitution, though mandatory, must be liberally and reasonably construed," to recognize that the prosecutorial veto amendment fails compliance here. *Id.* at 638. The only purpose of the prosecutorial veto insertion was to provide power to the prosecutor to make a first-time offender a felon with loss of citizenship and other disabilities. That power is directly related to the plea bargaining leverage by creating the advocate's right to destroy lives as a function of non-agreement in plea or, as a constituent of plea, may bargain for probation. This is not a matter of form, it is a question of power within a three-department government in a democratic society.

I am no more enamored by the majority's justification based on the nature of H.B. 92 as a partial revision of Title 7 of the Wyoming Statutes where the bill attends to "eliminating duplications, redundancies and archaic provisions; moving, combining, deleting and renumbering sections; providing definitions; repealing procedural provision superseded by court rules," and then addresses a specifically detailed subject described in the title. I would apply the *Matter of West Highway Sanitary & Imp. Dist.*, 317 P.2d at 504 (quoting 82 C.J.S. Statutes § 333, p. 666) rule on construction " 'where a statute enumerates the subjects or things on which it is to operate, or the persons affected, or forbids certain things, it is to be construed as excluding from its effect all those not expressly mentioned.' "

Revisers of statutes are presumed not to change the law if the language which they use fairly admits of a construction which makes it consistent with the former statute. *Duffield v. Pike*, 71 Conn.

521, 529, 42 A. 641; [ (1899) ] *Westfield Cemetery Ass'n v. Danielson*, 62 Conn. 319, 26 A. 345; [ (1892) ] *State v. Neuner*, 49 Conn. 232, 235; 36 Cyc. p. 1067.

*Bassett v. City Bank & Trust Co.*, 115 Conn. 393, 161 A. 852, 854 (1932).

The prosecutorial veto amendatory addition is not an alteration or omission; it is an entirely new subject which should have been inserted in Title 5, Courts, since it relates to Wyo. Const. art. 2, § 1, separation of powers, and Wyo. Const. art. 5, judiciary to limit discretion and authority of the courts in criminal sentencing by a delegation of powers to the executive officer. Prosecutorial veto, with the prior body of Wyoming, was clearly so incongruous that it could not, by any fair intendment, be considered germane to a revision or recodification of the earlier Wyoming sentencing statute of probation for first-time offenders derived from a juvenile sentencing statute. *Cf. State v. Pitet*, 69 Wyo. 478, 243 P.2d 177 (1952) which related to the criminal offense of practicing medicine without a medical license.

Although I believe the majority ranges far too broadly in approval of a revision which becomes a piggy-back medium for separate statutory changes, my challenge is to the new legislation in this case which was neither recognized in the title nor germane to the issues addressed within the Title 6 designation.[25]

All of the justifications for mandatory compliance with the constitutional criteria for enactment process are violated by the implicit phraseology and far reaching consequences of the words "and the state" as an unnoted and probably unnoticed bill amendment.

## VIII(B). CONSTITUTIONAL COMPLIANCE ALSO MANDATORY FOR THE LEGISLATURE

---

**25.** The Connecticut court addressed statutory amendment compared to revision in recognition that an amendment contemplated change while "a revision is by its nature not intended to change anything, but only to restate what has already been legislated." * * * It is for that reason that "[r]evisors of statutes are presumed not to change the law if the language which they use fairly admits of a construction which makes it consistent with the former statute." *State v. Baker*, 195 Conn. 598, 489 A.2d 1041, 1045 n. 4 (1985) (quoting *Bassett*, 115 Conn. at 400–01, 161 A. 852).

There is one specific purpose in the state constitutional provisions addressing procedural requirements for legislative enactment. Service in the legislature is eminently persuasive of the wisdom of the constitutional provisions *and requirements for compliance.*[26] There are few people, if any, who know what is going on when complex issues are presented during extended recodification.

Consequently, the theory of the procedural requirement of the Wyoming Constitution is to provide as much assistance and information to the individual member of the legislature as possible. The greatest danger develops from ingenious expertise when applied to recodification and revision. Without a legislative history foundation, such as is provided in the United States Congress or in many state legislatures by recorded debates and records of committee proceedings, the danger of accidental misadventure or surreptitious redirection is unfortunately enhanced without required disclosure. Sometimes only a few innocuous words are required.[27]

Not particularly different is the small amendatory addition to one of Wyoming's basic sentencing statutes, but one which effectively turned the eighty-year Wyoming law upside down. It is fair to assess that, excluding a few lobbyists who knew what they were doing, almost no member of the 1987 session had any perception of either the existence or the importance of the insertion of the prosecutorial veto into the sentencing statute. I would find the significant change in the sentencing statute, H.B. 92, when enacted into Wyo.Sess.

Laws ch. 157 (1987), to fail because: (1) the change was not described in the bill title as required by Wyo. Const. art. 3, § 24; (2) addition of the subject in H.B. 92 changed the original purpose in defiance of Wyo. Const. art. 3, § 20; (3) the change did not comply with the ·germaneness criteria of rules adopted by both the Wyoming House of Representatives and the Senate; and (4) the change substantially invaded the separation of powers of Wyo. Const. art. 2, § 1 by denigration of the judicial sentencing power.

Admittedly, this court has been less than vigilant in observation of legislative carelessness and disinclined to follow constitutional enactment requirements. Eternal vigilance, which is the essential constituent of the oath of office to support, obey and defend the constitution, cannot be magically eliminated by dissertations of shared burdens and spread responsibility. No other official in our democratic society can be the recipient of a shared delegation of the judiciary's responsibility for the maintenance of the state's Constitution and the United States Constitution. If the judiciary cannot, or chooses not to, then the system will inevitably fail.

### VIII(C). BILL TITLE—SPECIFICITY AND ACCURACY

The general principle was specifically recognized by this court in *Smith*, 386 P.2d 98, discussed in detail hereafter, and re-recognized with the broader, non-specific title in *State ex rel. Fire Fighters Local No. 946, I.A.F.F. v. City of Laramie*, 437 P.2d 295, 303 (Wyo.1968), which stated:

---

**26.** Even speed readers could not be informed as to the content in the mass of proposed legislation unless the title adequately describes and the specific language provides clues. At best, eternal vigilance against both accident and undisclosed intent is required.

**27.** Any experienced legislator can cite samples and examples, but the most significant example occurred in the Wyoming legislature in the 1965 session when an Albany County legislator achieved a minor change in the state's eminent domain statute which effectively gave the Union Pacific Railroad a stranglehold and veto on future underground trona development in southern Wyoming. In the following session, per-

haps the most heavily lobbied and most changes in the state's history occurred in reversal of the minor 1965 provision of Wyo.Sess.Laws ch. 35 (1965). H.B. 208, 39th Leg. (1967), co-sponsored by the late Governor of the State of Wyoming, Ed Herschler, present United States Senator Alan K. Simpson, and Republican leader Harold Hellbaum, produced monumental expenditures in support and opposition, but when passed as Wyo.Sess.Laws ch. 244 (1967), became the inducement for a billion dollar trona mining industry in Sweetwater County. In 1965, the statutory change was "housekeeping." In 1967, it was a million dollar investment in legislative effort correction.

In *Smith v. Hansen*, Wyo., 386 P.2d 98, 101, we pointed out, since the legislature may make the title to an act as restrictive as it pleases, it is obvious that it may sometimes so frame a title as to preclude matters which might with entire propriety have been embraced, but which must now be excluded because the title is unnecessarily restrictive and the courts cannot enlarge the scope of the title. We found that to have happened in the *Smith* case. If the title for the act now being dealt with had been restricted in the manner which the city contends for, it is entirely possible the act would be suffering the same fate as the act in the *Smith* case did.

The criteria of the Wyoming constitutional provision that the subject be *clearly expressed* in the title was recognized in early Colorado cases:

"Moreover, we are bound to assume that the word 'clearly' was not incorporated into the constitutional provision under consideration by mistake. It appears in but few of the corresponding provisions of other state Constitutions—a fact that could hardly have been unobserved by the convention. That this word was advisedly used, and was intended to affect the manner of expressing the subject, we cannot doubt. The matter covered by legislation is to be 'clearly,' not dubiously or obscurely indicated by the title."

*People v. Friederich*, 67 Colo. 69, 185 P. 657, 658 (1919) (quoting *In re Breene*, 14 Colo. 401, 24 P. 3 (1890)).

That court followed the same thesis in *Friederich*, 185 P. at 658:

In determining the first question: whether the title of the Act fails to clearly express the subject of the statute, we are aware that no legislative act should be nullified upon constitutional grounds unless such legislation is plainly in violation of the Constitution. It is equally true, however, that the authority of the fundamental law of the state must be recognized, approved and enforced.

Section 21 of Article 5 is practically identical with provisions found in most of the state Constitutions, providing that the subject of any act shall be expressed in its title. Our Constitution, however, declares that not only must the subject be expressed in the title, but that such subject must be "clearly" so expressed. The rule, as announced in Cooley's Constitutional Limitations (6th Ed.) page 178, is as follows:

"As the legislature may make the title to an act as restrictive as they please, it is obvious that they may sometimes so frame it as to preclude many matters being included in an act which might with entire propriety have been embraced in one enactment with the matters indicated by the title, but which must now be excluded because the title has been made unnecessarily restrictive. The courts cannot enlarge the scope of the title; they are vested with no dispensing power; the Constitution has made the title the conclusive index to the legislative intent as to what shall be operative; it is no answer to say that the title might have been more comprehensive—in fact the legislature have not seen fit to make it so."

By all authority and precedent it is firmly settled that the purpose of a statute must be ascertained and determined by its title, and that the title is presumed to be the controlling and conclusive index of the legislative intent.

*See also Gronert v. People*, 95 Colo. 508, 37 P.2d 396 (1934).

The clearly expressed subject is a mandatory requirement:

The fact is this: that whatever constitutional provision can be looked upon as directory merely is very likely to be treated by the legislature as if it was devoid even of moral obligation, and to be therefore habitually disregarded. To say that a provision is directory, seems, with many persons, to be equivalent to saying that it is not law at all. That this ought not to be so must be conceded; that it is so we have abundant reason and good authority for saying. If, therefore, a constitutional provision is to be

enforced at all, it must be treated as mandatory. And if the legislature habitually disregard it, it seems to us that there is all the more urgent necessity that the courts should enforce it. And it also seems to us that there are few evils which can be inflicted by a strict adherence to the law, so great as that which is done by the habitual disregard, by any department of the government, of a plain requirement of that instrument from which it derives its authority, and which ought, therefore, to be scrupulously observed and obeyed.

1 T. Cooley, *supra* at 312–13.

The Nebraska court, in considering a comparable constitutional provision in *State ex rel. School Dist. No. 6 of Pierce County v. Board of County Com'rs of Pierce County*, 10 Neb. 476, 6 N.W. 763 (1880), found an amendment of a bill without a change in the title unconstitutional in purpose extension. In a succeeding lien controversy, that court restated the principled purpose of constitutional provisions in *Miller v. Hurford*, 11 Neb. 377, 9 N.W. 477, 479 (1881):

Our constitutional provision, that "no bill shall contain more than one subject, which shall be clearly expressed in the title," is but making inviolable the rule governing legislative bodies that "no proposition or subject different from that under consideration shall be admitted under color of amendment." Experience has shown that in the absence of constitutional restrictions the rule at times is liable to be overthrown, and objectionable and pernicious legislation is the result. To guard against this evil our constitution prohibits more than one subject being embraced in a bill. And while this provision has sometimes been attended with inconvenience, as in case of a revision of the laws, it is a safeguard against corrupt or improvident legislation, and its effect has been to simplify legislation

and place every bill upon its true merits. But if, under the pretext of amending a section, a subject entirely foreign to the subject-matter of the section to be amended can be introduced, this barrier will be entirely broken down, and the constitutional guaranty in effect destroyed.

*See likewise Trumble v. Trumble*, 37 Neb. 340, 55 N.W. 869, 871 (1893), which stated:

We are fully conscious of the importance of the principle which forbids the courts to declare a statute unconstitutional where any substantial doubt exists, but we have no doubts in this case. The act is, upon its face, clearly violative of several constitutional provisions. To sustain it would be to invite their disregard in the future, if not to countenance the practice suggestively designated as "logrolling." In such a case the duty of the court to set aside an act is as clear as its duty generally to presume the validity of statutes, and no considerations based upon the importance of interests affected can discharge the courts from performing such duty.

## IX. CONCLUSION

In terms of legislative enactment process, this prosecutorial veto was not constitutionally inserted; in terms of notice for citizen participation, nothing was provided. The majority fails in constitutional responsibility on this test also.[28]

The ability of many nonviolent persons to function as productive members of society will be destroyed by the ability of prosecutors to insist unilaterally that they be branded as felons despite the judgment to the contrary by the trial judge. I dissent against the grant of power to an advocate to act as a judge then empowered needlessly to add numbers to our members of society who are stigmatized as felons and more likely to be unproductive burdens on those of us who must work. Who is pushing and

---

**28.** It is interesting to speculate if the amending Senate committee had known what they were being asked to do and had consequently inserted that subject, "providing a veto of the judicial discretion for sentencing to grant status to the prosecution to demand commission of a felony status first offender," in the title of the bill to provide a properly completed amendment whether consideration and approval of the ultimate legislation would have differed, either in the Senate committee or later during the enactment process with floor debate.

who is leading all of us to the cliff of economic non-competitiveness is painfully obvious. I also dissent with profound concern for what has been done to the precious division of governmental power which helps keep tyranny at bay.

MACY, Justice, dissenting, with whom URBIGKIT, Chief Justice, joins.

I dissent. I commend the author for his struggle to compose the prestigious opinion for the majority. I simply disagree and dissent with the hope that somehow it will help to discourage further erosion of our constitution.

I am firmly dedicated to the proposition that the power and duty to adjudicate should remain exclusively in the judiciary. It is axiomatic that it is a violation of the separation of powers doctrine for the legislature to require a presiding judge to obtain the consent of a member of the executive branch of government before he can enter an order imposing a legislatively determined alternative for the disposition of a criminal charge.

I cannot submit to the majority's view that the framers of our constitution had in mind "a pragmatic, flexible view of differentiated governmental power." To believe this is to ignore Article 2, Section 1 of the Wyoming Constitution, which plainly states:

> The powers of the government of this state are divided into three distinct departments: The legislative, executive and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any powers properly belonging to either of the others, except as in this constitution expressly directed or permitted.

I am convinced that each of the three distinct departments of government, or, if you prefer, the "three air-tight compartment(s)," has exclusive power of its own not to be compromised in the interest of another branch of government. It was intended that there be a balance of power. If we continue to merge the powers, who is going to balance them?

We cannot carve out exceptions to our constitution without threatening the existence of the rights guaranteed by it. Once exceptions are made, the guarantees become shallow and meaningless, and further erosion becomes inevitable. Former Supreme Court Justice William O. Douglas once commented:

> But that guarantee is not self-executing. As nightfall does not come all at once, neither does oppression. In both instances, there is a twilight when everything remains seemingly unchanged. And it is in such twilight that we all must be most aware of change in the air—however slight—lest we become unwitting victims of the darkness.

*The Douglas Letters: Selections from the Private Papers of Justice William O. Douglas* at 162 (M. Urofsky ed. 1987).

I am informed that at least one city council has instructed its prosecutor not to give his consent to allowing the first offender status, now permitted by Wyo.Stat. § 7-13-301 (1977), for an accused if he is charged with driving while under the influence of alcohol. It does not take a mental giant to foresee how the exception to the separation of powers doctrine carved out by the majority will expand and fall into common abuse, depending upon the whims of the prosecutor or his boss. Hopefully, we will not become victims of the darkness.